TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
Dina Roumiantseva SBN 300576
dina.roumiantseva@tuckerellis.com
515 South Flower Street,
Forty-Second Floor
Los Angeles, CA 90071
Telephone:    213.430.3400
Facsimile:    213.430.3409

Attorneys for Plaintiffs,
META PLATFORMS, INC. (fka FACEBOOK, INC.), INSTAGRAM, LLC, and WHATSAPP LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| META PLATFORMS, INC., INSTAGRAM, LLC, and WHATSAPP LLC, <br><br> Plaintiffs, <br><br> v. <br><br> OPENTLD B.V., B.V. DOT TK, CENTRAFRIQUE TLD B.V., EQUATORIAL GUINEA DOMAINS B.V., MALI DILI B.V., GABON TLD B.V., STICHTING FREENOM WHOIS PROXY, BITSAFE PAYMENTS B.V., VTL MERCHANT SUPPORT, INC., and JOHN DOES 1-20, INCLUSIVE, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR CYBERSQUATTING; TRADEMARK INFRINGEMENT; FALSE DESIGNATION OF ORIGIN; DILUTION; AND VIOLATION OF THE ANTI-PHISHING ACT UNDER CAL. BUS. & PROF. CODE § 22948** <br><br> **DEMAND FOR JURY TRIAL** <br><br> <span style="color:red">**CASE FILED UNDER SEAL**</span> |

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

Filed
DEC 0 8 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

Plaintiffs Meta Platforms, Inc. ("Meta"), Instagram, LLC ("Instagram"), and WhatsApp LLC ("WhatsApp") (collectively "Plaintiffs") by and through their attorneys, Tucker Ellis LLP, file their complaint against Defendants OpenTLD B.V. dba Freenom ("Freenom"), B.V. Dot TK ("Dot TK"), Centrafrique TLD B.V. ("Dot CF"), Equatorial Guinea Domains B.V. ("Dominio GQ"), Mali Dili B.V. ("Mali Dili"), Gabon TLD B.V. ("My GA"), Stichting OpenTLD WHOIS Proxy ("ID Shield"), Bitsafe Payments B.V. ("Bitsafe"), VTL Merchant Support, Inc. ("VTL") (collectively, "Defendants"), and John Does 1-20, inclusive ("Doe Defendants"), for injunctive relief and damages.

## I.    INTRODUCTION

1.    Cybercrime is highly dependent on registered domain names, which are used to host phishing websites[1] and engage in other types of online abuse.

2.    Defendants' business model involves registering and licensing domain names, and providing related services and content, to the Doe Defendants, who are high-risk clients engaged in illicit activity such as in phishing and adult content.

3.    Defendants individually, collectively and/or together as alter egos, as direct participants, and/or as agents of each other, registered, trafficked in, and used over 5,000 domain names that are identical or confusingly similar to Plaintiffs' trademarks with a bad faith intent to profit in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA") (collectively, the "Infringing Domain Names").

4.    Plaintiffs' brands are among the most attacked on the internet[2] and the domain names registered by Freenom and/or its alter egos account for one of the largest sources of phishing targeting

---

[1] "Phishing" refers to the practice of deceiving internet users into divulging personal information, such as login IDs and passwords, using fraudulent websites or emails that impersonate businesses. The Anti-Phishing Working Group ("APWG"), a nonprofit that works to combat cybercrime, reported 1,097,811 total phishing attacks in the second quarter of 2022, "a new record and the worst quarter for phishing that APWG has ever observed." Anti-Phishing Working Group, *Phishing Activity Trends Report, 2nd Quarter 2022* (Sept. 20, 2022), available at docs.apwg.org/reports/apwg_trends_report_q2_2022.pdf.

[2] In 2022, FACEBOOK, WHATSAPP, INSTAGRAM were each listed in the top five brands targeted by phishing attacks. *See* Directorate-General for Communications Networks, Content and Technology (European Commission), *Study on Domain Name System (DNS) abuse* (Jan. 1, 2022), available at https://op.europa.eu/en/publication-detail/-/publication/d9804355-7f22-11ec-8c4001aa75ed71al/language-en. FACEBOOK was ranked number 1, INSTAGRAM was ranked number 2, and WHATSAPP was ranked number 5. *Id.*

TUCKER ELLIS LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

1    Plaintiffs and their customers.

2        5.      The Infringing Domain Names—including, for example, faceb00k.ga, fb-lnstagram.cf,

3    facebook-applogin.ga, instagrams-help.cf, instaqram.ml, chat-whatsaap.gq, chat-whatsaap-com.tk, and

4    supportservice-lnstagram.cf—not only are identical or confusingly similar to Plaintiffs' trademarks but

5    many have been used to launch phishing attacks, display adult content, and for other types of abusive,

6    nefarious, fraudulent, and infringing activities that harm both Plaintiffs' users and Plaintiffs. A list of the

7    Infringing Domain Names is attached to this Complaint as Exhibit 1.

8        6.      Freenom is, among other things, the exclusive domain name *registry*[3] services provider

9    for five country code top level domains ("ccTLDs"). A country code top level domain is a two-letter

10   domain that corresponds to a country, territory, or other geographic location (e.g., .us for the United

11   States ). Freenom is the registry service provider for the operator of: .tk for Tokelau, .gq for Equatorial

12   Guinea, .cf for the Central African Republic, .ml for Mali, and .ga for Gabon.[4]  On information and belief,

13   Freenom sets and administers the policies and performs all registry operations for these ccTLDs.

14   Freenom is also the exclusive *registrar*[5] and provides free domain name registrations for domain names

15   in these five ccTLDs.

16       7.      Freenom is also an ICANN-accredited domain name registrar for generic top level

17   domains ("gTLDs"). Generic top level domains include .com and .net, to list only a few. As an

18   ICANN-accredited domain name registrar, Freenom provides registration services for domain names in

19   the various gTLDs.

20       8.      One of Freenom's alter egos, ID Shield, provides a proxy service whereby ID Shield

21   registers domain names, as the registrant and in its own name, and then licenses these domain names to

22

-------------------------------------------------------------------

23   [3] According to the Internet Corporation for Assigned Names and Numbers ("ICANN"), "[t]he 'Registry'

24   is the authoritative, master database of all domain names registered in each Top Level Domain." ICANN,
     *Glossary of WHOIS Terms*, available at whois.icann.org/en/glossary-whois-terms ("ICANN Glossary").

25   [4] Freenom created subsidiaries for each of the five ccTLDs it provides registry services for: Dot TK for

26   .tk, Dot CF for .cf, Dominio GQ for .gq, Mali Dili for .ml, and My GA for .ga (collectively, the
     "ccTLD Service Providers"). Each of the ccTLD Service Providers and Freenom are alter egos of one

27   another.

28   [5] A "registrar" processes a registrant's desired domain name registration and records that registration with
     the registry. *See* ICANN Glossary.

Freenom and to Freenom's customers for their use.

9.    Freenom, directly and through a complex and geographically diverse web of alter egos, DBAs, and shell entities abuses its position of trust and authority to operate a coordinated scheme to cybersquat on, infringe, and dilute Plaintiffs' trademarks.

10.    The five ccTLDs to which Freenom provides its services are the TLDs of choice for cybercriminals because Freenom provides free domain name registration services and shields its customers' identity, even after being presented with evidence that the domain names are being used for illegal purposes. On information and belief, even after receiving notices of infringement or phishing by its customers, Freenom continues to license new infringing domain names to those same customers.

11.    According to the 2022 *Study on Domain Name System abuse* conducted for the European Commission, "five out of ten most abused TLDs (.ml, .tk, .ga, .cf, and .gq) are operated by Freenom."[6] The study further concluded that "[t]he lack of registration fees is the most likely reason Freenom's TLDs are widely abused by malicious actors."

12.    Further, according to the Interisle Consulting Group's *Phishing Landscape 2021* report, Freenom's five ccTLDs were reported for abuse in over 124,000 instances in that year alone.[7]

13.    Despite the well-documented proliferation of cybercrime through the use of its services, Freenom has repeatedly failed to take appropriate steps to investigate and respond appropriately to reports of abuse.

14.    Defendants have demonstrated that they are knowingly disregarding (a) their legal and contractual obligations, (b) the intellectual property rights of those being harmed by cybercriminals who use Defendants' services to register domain names to infringe the marks of others, and (c) the harm caused to third parties who fall victim to cybercrime such as phishing that is facilitated through domain names registered with Defendants on behalf of their cybercriminal customers. These cybercrimes rely on deceptive domain names, like the Infringing Domain Names, registered with Defendants to harvest users' personal and financial information.

---

[6] Directorate-General for Communications Networks, Content and Technology, *supra* note 3, at Appendix 1.

[7] Interisle Consulting Group, *Phishing Landscape 2021* (Sept. 22, 2021), available at www.interisle.net/PhishingLandscape2021.pdf.

Tucker Ellis LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

15.     Defendants profit from their cybersquatting scheme because the Defendants directly (a) register the Infringing Domain Names, (b) resell or offer to sell the Infringing Domain Names, and/or (c) monetize the Infringing Domain Names by operating revenue-generating parking pages[8] and redirect visitors to other commercial websites, websites with pornographic content, and websites used for malicious activity like phishing.

16.     Defendants' and Doe Defendants' use of Plaintiffs' trademarks to divert internet traffic to the Infringing Domain Names, including to websites used to launch phishing attacks, display adult content, and for other malicious activity, deceives the public and erodes the goodwill associated with Plaintiffs' brands. By this lawsuit, Plaintiffs seek to stop Defendants' and Doe Defendants' ongoing unlawful and harmful conduct.

## II.    THE PARTIES

17.     Plaintiff Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

18.     Plaintiff Instagram, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

19.     Plaintiff WhatsApp LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

20.     Defendant Freenom, which is a trade name of OpenTLD B.V., is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, Freenom also does business under the name Freedom Registry, Inc.,[9] which has a business address at 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303.

21.     Defendant Dot TK is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, Dot TK is a subsidiary of Freenom. Dot TK is the domain name registry service provider for the .tk ccTLD of Tokelau. Dot TK represents on its LinkedIn page that it "is a subsidiary of Freenom," which "has offices in Amsterdam

---

[8] A "parking page" is a website used to display commercial advertisements, typically in the form of links to other commercial websites or commercial content.

[9] Freedom Registry, Inc. does not appear to exist as a legal entity in any jurisdiction.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

(Netherlands) and Palo Alto (USA)."

22.    Defendant Dot CF is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, Dot CF is a subsidiary of Freenom. Dot CF is the domain name registry service provider for the .cf ccTLD of the Central African Republic.

23.    Defendant Dominio GQ is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, Dominio GQ is a subsidiary of Freenom. Dominio GQ is the domain name registry service provider for the .gq ccTLD of Equatorial Guinea.

24.    Defendant Mali Dili is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, Mali Dili is a subsidiary of Freenom. Mali Dili the domain name registry service provider for the .ml ccTLD of Mali.

25.    Defendant My GA is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. On information and belief, My GA is a subsidiary of Freenom. My GA is the domain name registry service provider for the .ga ccTLD of Gabon.

26.    Defendant ID Shield is a Dutch limited liability entity with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. ID Shield is Freenom's domain name proxy service, which registered domain names in the name of ID Shield on publicly-available domain name registration records.

27.    Defendant Bitsafe is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Bitsafe is an Internet payment service provider that specializes in high-risk financial transactions, catering specifically to online adult entertainment. Bitsafe also provides domain name registration and related services. Bitsafe represents that it has offices in San Francisco, California.

28.    Defendant VTL is a Delaware corporation with its principal place of business at 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303. According to its filings with the California Secretary of State, VTL is in the business of payment processing and, according to its website, available at vtl.support, VTL sells outsourcing services, including customer service support, to third parties.

29.    On information and belief, Freenom, the ccTLD Service Providers, ID Shield, Bitsafe, and VTL are a single enterprise and/or alter egos of each other. Freenom is also the direct participant in the actions of the ccTLD Service Providers, ID Shield, Bitsafe, and VTL as alleged in this Complaint.

30.    Plaintiffs have not yet identified the Doe Defendants. The Doe Defendants are individuals or entities, including individuals and entities related to Defendants, who have registered, or caused to be registered, domain names that cybersquat and infringe on Plaintiffs' trademarks and have been used to launch phishing attacks, display adult content, and for other types of abusive, nefarious, fraudulent, and infringing activities against Plaintiffs and their users. As explained in more detail below, the Doe Defendants are also licensees of Freenom, the ccTLD Service Providers, and/or ID Shield. Plaintiffs reserve the right to amend this complaint to allege such Doe Defendants' true names and capacities when they are ascertained.

## III.    JURISDICTION AND VENUE

31.    The Court has federal question jurisdiction over the federal causes of action alleged in this complaint pursuant to 28 U.S.C. § 1331.

32.    The Court has personal jurisdiction over the Defendants because each of them regularly conducts business in California and purposefully avails themselves of the privilege of conducting activities in this forum.

33.    The Court has personal jurisdiction over Defendants because, as discussed herein, each is part of a single enterprise and/or an alter ego of the others that have continuous and systematic contacts with California, including VTL, which is located in California.

34.    The Court has personal jurisdiction over the Defendants because each of them knowingly directed and targeted parts of their unlawful scheme at the United States. For example, Defendants have targeted the intellectual property of businesses in the United States; Defendants' services are specifically targeted, advertised, and provided to consumers in the United States; Defendants' services are specifically offered in United States dollars; Defendants' websites are all in English and are accessible to consumers in the United States; and Defendants have contracted with numerous businesses in the United States in conjunction with their unlawful activity as described herein.

35.    The Court has personal jurisdiction over Defendants because Defendants have entered

into one or more contracts with businesses in the United States in conjunction with their unlawful activity which, on information and belief, include as a material term Defendants' agreement to submit to the jurisdiction of courts within the United States.

36.     Venue is proper with respect to each of the Defendants pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged occurred in this district.

37.     Pursuant to Civil L.R. 3-2(c), this case is exempt from the Court's division-specific venue rule because it involves intellectual property rights.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Plaintiffs and their Trademarks

#### 1.     Meta

38.     Meta offers the Facebook social networking website and mobile applications that enable its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

39.     Meta owns the exclusive rights to several trademarks and service marks to provide its online services, including the distinctive FACEBOOK word mark and stylized mark, and has used the marks in connection with its services since 2004.

40.     In addition to its extensive common law rights, Meta owns numerous United States trademark registrations for its FACEBOOK marks, including:

    a.     United States Registration Number 3,122,052; and

    b.     United States Registration Number 3,881,770.

Copies of these registration certificates are attached to this Complaint as Exhibit 2.[10] Meta's common law and registered trademarks are collectively referred to as the "Facebook Trademarks."

41.     Meta also owns and operates the website available at www.facebook.com and other websites that use the Facebook Trademarks to provide and promote its goods and services.

42.     Meta's use of the Facebook Trademarks in interstate commerce has been extensive,

---

[10] Meta Platforms, Inc. owns the Facebook Trademarks. The registration certificates for the Facebook Trademarks reflect Meta's former corporate name, Facebook, Inc.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

continuous, and substantially exclusive. Meta has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Meta and the Facebook Trademarks. As a result of Meta's efforts and use, the Facebook Trademarks are famous (and have been famous since at least as early as 2011) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Meta.

### 2. Instagram

43.     Instagram offers a photo and video sharing and editing service, mobile applications, and social network. Instagram users can choose to share their photos and videos with their followers online.

44.     Instagram owns the exclusive rights to the distinctive INSTAGRAM word mark and stylized mark, having used the marks in connection with its goods and services as early as 2010.

45.     In addition to its extensive common law rights, Instagram owns numerous United States trademark registrations for the INSTAGRAM marks, including:

a.     United States Registration Number 4,795,634;

b.     United States Registration Number 4,146,057;

c.     United States Registration Number 4,756,754;

d.     United States Registration Number 5,566,030;

e.     United States Registration Number 4,170,675;

f.     United States Registration Number 4,856,047;

g.     United States Registration Number 4,822,600;

h.     United States Registration Number 4,827,509;

i.     United States Registration Number 4,863,595;

j.     United States Registration Number 5,019,151; and

k.     United States Registration Number 5,869,731.

Copies of these registration certificates are attached to this Complaint as Exhibit 3. Instagram's common law and registered trademark rights are collectively referred to as the "Instagram Trademarks."[11]

46.     Instagram also owns and operates the website available at www.instagram.com and other

---

[11] Instagram, LLC owns the Instagram Trademarks. A number of the registration certificates for the Instagram Trademarks reflect Instagram Inc. as the owner. Instagram Inc. no longer exists, having been merged with Instagram LLC.

websites that use the Instagram Trademarks to provide and promote its goods and services.

47.     Instagram's use of the Instagram Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Instagram has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Instagram and the Instagram Trademarks. As a result of Instagram's efforts and use, the Instagram Trademarks are famous (and have been famous since at least as early as 2014) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Instagram.

### 3.     WhatsApp

48.     WhatsApp offers WhatsApp, a simple, secure, reliable messaging and calling service, provided for mobile devices and through desktop computers globally.

49.     WhatsApp owns the exclusive rights to several trademarks and service marks, including the distinctive WHATSAPP word mark, having used the mark in connection with its goods and services since at least as early as 2009.

50.     In addition to its extensive common law rights, WhatsApp owns numerous United States trademark registrations for the WHATSAPP marks, including, but not limited to:

a.     United States Registration Number 3,939,463;

b.     United States Registration Number 4,083,272;

c.     United States Registration Number 5,492,738; and

d.     United States Registration Number 5,520,108.

Copies of these registration certificates are attached to this Complaint as Exhibit 4.[12] WhatsApp's common law and registered trademark rights are collectively referred to as the "WhatsApp Trademarks."

51.     WhatsApp owns and operates the website available at www.whatsapp.com and other websites that use the WhatsApp Trademarks to provide and promote its goods and services.

52.     WhatsApp's use of the WhatsApp Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. WhatsApp has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of WhatsApp and the WhatsApp Trademarks.

---

[12] WhatsApp LLC owns the WhatsApp Trademarks. A number of the registration certificates for the WhatsApp Trademarks reflect WhatsApp's former corporate name, WhatsApp Inc.

As a result of WhatsApp's efforts and use, the WhatsApp Trademarks are inextricably linked with the products and services offered by WhatsApp.

53.     The Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks are collectively referred to as the "Plaintiffs' Trademarks."

54.     Plaintiffs spend billions of dollars each year marketing and advertising the services offered under Plaintiffs' Trademarks. Indeed, the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks are regularly listed as among the most recognized and valuable brands in the United States and globally by sources including Forbes, BrandFinance, and Interbrand.

**B.     The Defendants' Abuse of the Corporate Form To Perpetuate Their Cybersquatting Scheme**

55.     The Defendants are part of a web of companies created to facilitate cybersquatting, all for the benefit of Freenom. On information and belief, one or more of the ccTLD Service Providers, ID Shield, Bitsafe, VTL, and Doe Defendants were created to hide assets, ensure unlawful activity including cybersquatting and phishing goes undetected, and to further the goals of Freenom.

**1.     Freenom and the ccTLD Service Providers**

56.     On information and belief, the first Defendant to be established, Freenom, was founded by Joost Zuurbier in 2012.

57.     Freenom has established relationships with the governments of Tokelau, the Central African Republic, Equatorial Guinea, Mali, and Gabon wherein Freenom provides technical and operational support services to the managers of those countries' ccTLDs.

58.     For each of the five ccTLDs it services, Freenom has created a separate subsidiary to offer domain registry and registration services: Dot TK for .tk of Tokelau; Dot CF for .cf of the Central African Republic; Dominio GQ for .gq of Equatorial Guinea; Mali Dili for .ml of Mali; and My GA for .ga of Gabon. Freenom has referred to the ccTLD Service Providers as its "subsidiaries," "sister companies," and "daughter companies."

59.     On information and belief, Freenom exercises control and/or directs the ccTLD Service Providers because the same individuals hold positions within each of these entities as directors, officers, and/or managers. For example, Joost Zuurbier, the CEO of Freenom, is also an officer of all five

ccTLD Service Providers.

60.    On information and belief, these directors, officers, and/or managers do not independently manage and direct the Freenom and the ccTLD Service Providers, but rather operate the ccTLD Service Providers as a single integrated company with a unified management system.

61.    Freenom and the ccTLD Service Providers all share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business.

62.    On information and belief, Freenom and the ccTLD Service Providers have held themselves out as integrated entities to the public. For example, the websites of the five ccTLD Service Providers all contain links to "Login to My Freenom" and/or redirect to freenom.com.

63.    Each time a customer enters into an agreement with any of the ccTLD Service Providers to register a domain name, that customer is entering into an agreement with Freenom. When a visitor attempts to register a domain name through Dot CF, Dominio GQ, Mali Dili, or My GA, that visitor is redirected to Freenom's website. For example, when registering a .ml domain name using Mali Dili's website available at point.ml, visitors are prompted to enter the domain name into a search field as shown in the screenshot below:



However, when visitors click "GO" they are redirected to freenom.com where they may finalize the

domain name registration, as shown screenshot below.



64.    Visitors who click on the "Policies" page on the website of Dot TK are redirected to a policy page located under the freenom.com domain name.

65.    On information and belief, Freenom does not engage in arm's length transactions with the ccTLD Service Providers when Freenom registers or sells domain names through the ccTLD Service Providers.

66.    On information and belief, Freenom and the ccTLD Service Providers comingle assets and resources with each other. For example, payments for the purchase of ccTLD domain names owned by the ccTLD Service Providers were made to Freenom.

### 2.    Freenom and ID Shield

67.    ID Shield provides a proxy service whereby ID Shield registers domain names, as the registrant and in its own name, and then licenses these domain names to Defendants and Doe Defendants for their use.

68.    Freenom and the ID Shield share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business. For example, when a visitor attempts to navigate to ID Shield's website available

at idshield.tk, the visitor is automatically redirected to freenom.com.

69.     On information and belief, ID Shield has no bank accounts or assets and is undercapitalized.

70.     On information and belief, ID Shield has no employees of its own and its operations are performed by Freenom's employees.

71.     On information and belief, Freenom controls the operations of ID Shield.

72.     On information and belief, Freenom controls the policy decisions made by ID Shield.

73.     On information and belief, Freenom controls the agreements into which ID Shield enters.

74.     On information and belief, Freenom pays all of the expenses of ID Shield.

75.     On information and belief, Freenom collects all revenue from ID Shield's domain name registration proxy service. Freenom's customers purchase and pay for the ID Shield services directly from Freenom's website.

76.     On information and belief, Freenom and ID Shield do not engage in arm's length transactions when they conduct transactions with each other. For example, the "Freenom ID Shield WHOIS Privacy Service Agreement" outlines the terms and conditions for a customer's "use of the services offered by Stichting OpenTLD WHOIS Proxy [ID Shield]. . . *and* OpenTLD B.V. [Freenom]. . ." (emphasis added). The Freenom ID Shield WHOIS Privacy Service Agreement is attached to this Complaint as Exhibit 5.

**3.     Freenom and Bitsafe (fka Verotel)**

77.     Freenom and Bitsafe share the same officer, director, and/or majority shareholder: Joost Zuurbier. Joost Zuurbier is the CEO of Freenom and Bitsafe. Similarly, Marcel Trik is the CFO of both Freenom and Bitsafe.

78.     Bitsafe was previously known as Verotel Merchant Services B.V. ("Verotel"). On information and belief, Bitsafe continues to use Verotel as a trade name.

79.     According to its website available at verotel.com, "Verotel is a leading Internet Payment Service Provider (IPSP) that has been enabling more than 50,000 high-risk webmasters with building their online businesses since 1998."

80.     When a customer purchases and pays for domain name registration services or privacy

services from Freenom, credit card processing is provided by Verotel.

81.     Verotel also offers domain name registration services. According to Verotel's website available at veroteldomains.com, "[t]hrough its affiliation with Freenom, an ICANN accredited registrar, Verotel Domains offers a dedicated registrar platform for adult webmasters who are privacy conscious and require extra protection and service for they [*sic*] high risk domain names."

82.     According to its website available at bitsafe.com, Bitsafe is "the new name for Freenom and Verotel, two disruptive brands in the transactional online business space. . . . Bitsafe brings these two brands together into a new service: a Bitsafe Basic Payment Account. Offering a 'discreet account', Bitsafe provides a Bitsafe IBAN, allowing account holders to take part of SEPA transactions and hold domain names and other digital assets. Purchases and ATM withdrawals can be made with the Bitsafe Debit Card."

83.     A June 6, 2018 press release by Verotel contained the following information: "Verotel and Bitsafe allow you to register or transfer your domains while protecting your identity online. Domain names can be registered with Bitsafe at cost price [sic], making this service the cheapest domain solution available. Bitsafe also offers additional privacy protection for a nominal fee that further safeguards your digital assets and ensures your continuity."

84.     Marcel Trik, the CFO of Freenom and Bitsafe, is quoted in the same press release: "Combining the trust in payments and domains makes perfect sense. . . . With Bitsafe we are not only protecting your money but also your digital assets in one single discreet account."

85.     On information and belief, the directors, officers, and/or managers do not independently manage and direct Freenom and Bitsafe/Verotel, but rather operate Freenom and Bitsafe/Verotel as a single integrated company with a unified management system.

86.     Freenom and Bitsafe/Verotel both share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business.

87.     On information and belief, Freenom does not engage in arm's length transactions with Bitsafe/Verotel, for example, when Freenom registers or sells domain names through Bitsafe/Verotel. Each time a customer enters into an agreement with Bitsafe/Verotel to register a domain name, that

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1    customer is entering into an agreement with Freenom.

2        88.    On information and belief, Freenom and Bitsafe/Verotel comingle assets and resources

3    with each other. For example, payments for the purchase of domain name registration services and proxy

4    services offered by Bitsafe/Verotel are made to Freenom.

5            **4.    Freenom and VTL**

6        89.    VTL's filing with the California Secretary of State identifies its type of business as

7    "Payment Processing."

8        90.    In its filings with the California Secretary of State, VTL represents that its principal office

9    in California is 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303. VTL thus shares an

10   address with Freenom dba "Freedom Registry, Inc."

11       91.    VTL's filing with the California Secretary of State identifies "Johannes W.A. Zuurbier"

12   (which, on information and belief, is used as an alias by Joost Zuurbier) as VTL's CEO.

13       92.    Similarly, Marcel Trik, the CFO of Freenom and Bitsafe, serves as VTL's Secretary and

14   CFO.

15       93.    According to its website, VTL is "a leading international Help Desk Outsourcing service

16   for both Enterprise and medium sized businesses."

17       94.    VTL's website is nearly identical to websites of other entities that, on information and

18   belief, are connected to the Defendants. For example, VTL's website is nearly identical to that of yet

19   another entity called VTL Support Services, Inc., a Nevada corporation for which Joost Zuurbier (again

20   using the alias "Johannes Zuurbier") serves as the President, Secretary, Treasurer, and Director. These

21   websites are compared below:

22

23

24

25

26

27

28

COMPLAINT

 

95.    Similarly, both of these websites are nearly identical to that of still another entity called Verotel Merchant Support, Inc., a Delaware corporation. On information and belief, Verotel Merchant Support, Inc. is another shell company or alter ego of Bitsafe/Verotel. Apart from the fact that Verotel is a trade name of Bitsafe, the website for Verotel Merchant Support, Inc., shown in the screenshot below, shares key features with the two websites pictured above:

COMPLAINT



### C.    Defendants' Unlawful Conduct

#### 1.    Defendants Registered the Infringing Domain Names

96.    In connection with the five ccTLDs (.tk, .cf, .gq, .ml, and .ga), Freenom offers free domain name registration services.

97.    Under Freenom's free domain name model, when a customer seeks to register a free domain name in one of these ccTLDs, Freenom registers the domain name, as the registrant, and licenses it to the customer. Freenom's Terms and Conditions Agreement that applies to free domain names ("Free Domain Name Agreement") is attached to this Complaint as Exhibit 6.

98.    According to the Free Domain Name Agreement, "[b]y accepting this agreement . . . you have authorized Freenom to register the domain name that you requested."

99.    Freenom's Free Domain Name Agreement also provides: "All domain names registered through FREE DOMAIN are registered in our name or in the name of one holding [sic] or sister companies."

100.    In documents filed in a 2015 arbitration proceeding between Freenom and ICANN stemming from ICANN's suspension of some of Freenom's registrar services, Freenom admitted that "when a third party registers a country code domain using [Freenom] free registration services, the domain is registered in [Freenom's] name on behalf of the actual registrant, who nonetheless remains the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

licensee and user of the domain name."

101.    For example, when a domain name is registered within the .tk ccTLD using Freenom's domain name registration services, the WHOIS[13] record for that domain name lists Freenom's alter ego Dot TK as the registrant, as shown in the screenshot below for the domain name faceb00k.tk:

FACEB00K.TK

✔ Your selected domain name is a FREE domain name. That means that, according to the Terms and Conditions of FREE domain names, the registrant is:

BV Dot TK
Dot TK administrator
P.O. Box 11774
1001 GT Amsterdam
Netherlands

Due to restrictions in Freenom's Privacy Statement personal information about the user of the domain name cannot be released.

102.    When a free ccTLD domain name expires or is "cancelled, suspended, refused, or reserved" Freenom revokes its licensees' license to use the domain name and transfers the domain name to "Freedom Registry, Inc."

103.    Once the license for the domain name concludes, Freedom Registry, Inc. is listed as the registrant of the domain name in the WHOIS directory.[14] One such example of a domain name that has been "taken back" by Freenom is shown in the screenshot below:

---

[13] The WHOIS directory contains important information about domain names, including the identity and contact information for the registrant or owner of the domain name.

[14] This is a legal distinction without a difference because Freedom Registry, Inc. is merely another alter egos and/or alias for Freenom.

COMPLAINT

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

SECURITYFACEBOOK.TK

✔ Your selected domain name is a domain name that has been cancelled, suspended, refused or reserved at the Registry. It
may be available for re-registration at http://www.freenom.com.

In the interim, the rights for this domain have been automatically transferred to:

Freedom Registry, Inc.
2225 East Bayshore Road #290
Palo Alto CA 94303
United States
Phone: +1 650-681-4172
Fax: +1 650-681-4173
E-mail: abuse: abuse@freenom.com, copyright infringement: copyright@freenom.com

104.     Freedom Registry, Inc. is an entity of unknown form. On information and belief, Freenom
was formerly known as Freedom Registry, Inc. and continues to trade and operate under the name
Freedom Registry, Inc. According to its website, Freenom is in fact owned by "Freedom Registry B.V."

105.     Freenom's alter ego, ID Shield, provides a proxy service that is used to hide Freenom's
customer and/or the licensee of some of the Infringing Domain Names.

106.     Defendants registered at least 1,500 Infringing Domain Names that are identical or
confusingly similar to the Facebook Trademarks. Several examples include: faceb00k.cf, facebo0k.cf,
accounts-facebook.cf,     facbook.ga,     facebooklogiin.ga,     facebooknet.gq,     www-facebook.gq,
fecebooksupport.ml, facebooksecurelogin.ml, facelboook.tk, and wwvv-facebook.tk. Freenom, or one of
its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, is or was
the registrant for each of these Infringing Domain Names. A list of these Infringing Domain Names is
attached to this Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing
Domain Names is attached to this Complaint as Exhibit 7.

107.     Defendants registered at least 3,000 Infringing Domain Names that are identical or
confusingly similar to the Instagram Trademarks. Several examples include: instagramsecurity.cf,
lnstaqram.cf,     password-reset-instagram.ga,     login-instagram.ga,     www-instagram-com.gq,
www-instagram.gq, www-instagramhelp-com.gq, instaqram.ml, lnsta-gram.ml, instagram-com.tk, and
lnstaqram.tk. Freenom, or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy
company, ID Shield, is or was the registrant for each of these Infringing Domain Names. A list of these

Infringing Domain Names is attached to this Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing Domain Names is attached to this Complaint as Exhibit 8.

108.    Defendants registered at least 800 Infringing Domain Names that are identical or confusingly similar to the WhatsApp Trademarks. Several examples include: whatsapp-messenger.cf, whatsap-chat.cf, whatsaap.ga, whaatsapp.ga, chat-whatsap.gq, chats-whatsapp.gq, whatsapchat.ml, chatwhatsaap.ml, whatsaap.tk, and whetsapp.tk. Freenom, or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, is or was the registrant for each of these Infringing Domain Names. A list of these Infringing Domain Names is attached to this Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing Domain Names is attached to this Complaint as Exhibit 9.

109.    Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous when Defendants registered, trafficked in, or used the Infringing Domain Names.

110.    Plaintiffs' WhatsApp Trademarks were distinctive when Defendants registered, trafficked in, or used the Infringing Domain Names.

**2.    Defendants and Doe Defendants Trafficked in The Infringing Domain Names**

111.    For free domain names registered in one of the ccTLDs serviced by Freenom, Freenom or one of the ccTLD Service Providers registers the domain name and licenses it to the customer to use. Freenom's Free Domain Name Agreement states, "we grant you a limited, non-exclusive, personal, non-transferable license to use FREE DOMAIN and the domain name provided to you in connection therewith."

112.    For domain names using ID Shield's proxy service, ID Shield registers the domain name and licenses it to the Doe Defendants to use.

113.    Defendants trafficked in many of the Infringing Domain Names by licensing the Infringing Domain Names to Doe Defendants to use.

**3.    Defendants and Doe Defendants Used the Infringing Domain Names**

114.    Doe Defendants have used many of the Infringing Domain Names to host phishing websites (the "Phishing Websites").

TUCKER ELLIS LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

115.    The Phishing Websites often display content bearing the Facebook, Instagram, and/or WhatsApp Trademarks and imitating the look and feel of Plaintiffs' websites. For example, one of the Doe Defendants used the domain name facebook-accounts.cf to operate a Phishing Website, as shown in the screenshot below:



116.    Screenshots of additional Phishing Websites are attached to this Complaint as Exhibit 10.

117.    The Phishing Websites are intended to mislead Internet users into providing their Facebook, Instagram, or WhatsApp login credentials, including account IDs and passwords, believing that they are visiting Plaintiffs' genuine websites.

118.    The Defendants and Doe Defendants' use of Plaintiffs' Trademarks, including stylized versions of those marks, is without Plaintiffs' authorization or approval.

119.    The Defendants and Doe Defendants' use of Plaintiffs' Trademarks, including stylized versions of those marks, on the Phishing Websites is intentional and designed to trade on the goodwill of Plaintiffs' Trademarks and deceive Plaintiffs' users and the public.

120.    Doe Defendants have also used many of the Infringing Domain Names to either host or redirect to websites that display adult content.

121.    Defendants generate revenue from domain names, including from the Infringing Domain Names, after the domain names have expired or been "cancelled, suspended, refused, or reserved." According to Freenom, "Domains that are no longer used by the registrant [Freenom's licensee] or are expired are taken back by Freenom and the residual traffic is sold to advertisement networks."

122.    Additionally, even when Freenom licenses free domain names to its customers, Freenom uses and profits from the traffic to the domain name. According to the Free Domain Name Agreement,

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1  "all visitors/visits to the domain name provided to [Freenom's licensee] in connection with FREE

2  DOMAIN shall be counted solely as traffic to Freenom for all purposes relating to tracking and reporting

3  audience measurement."

4      123.    Defendants used and continue to use many of the Infringing Domain Names to operate

5  revenue-generating advertising "parking pages" that divert consumers away from Plaintiffs' legitimate

6  websites. Additionally, Defendants have used some of the Infringing Domain Names even after Plaintiffs

7  sent notice of the infringement.

8      124.    One example of Defendants' use of the Infringing Domain Names is instagramchat.gq.

9  When Internet users navigate to instagramchat.gq, they are redirected first to domain.dot.tk[15] and then

10  directed to freenom.link, as shown in the screenshot below:

*Date Traced: 2022-09-27 00:12:49 GMT*

**User Agent:** Wheregoes.com Redirect Checker/1.0

| # | Code | Requested URL |
|---|------|---------------|
| ⌄ | 203 | http://instagramchat.gq |
|   |     | ▪ Redirects: 2 |
| 1 | 203 | ⊛ ⎙ http://instagramchat.gq |
|   |     | **Status Code: 203 - Meta-Refresh Redirect** |
| 2 | 301 | ⎙ http://domain.dot.tk/p/?d=INSTAGRAMCHAT.GQ&i=167.71.162.214&c=1&ro=0&ref=unknown&_=1664237569628 |
|   |     | **301 Redirect** |
| 3 | 200 | ⊛ http://freenom.link/?k=80808080&_=1664237553 |
|   |     | **Trace Complete** |

25      125.    As a result, when Internet users attempt to visit instagramchat.gq, they ultimately land on

26  freenom.link, which displays a revenue-generating parking page, as shown in the screenshot below:

---

28  [15] The domain name dot.tk (under which domain.dot.tk is hosted) is owned and operated by Defendants.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis



126.    On information and belief, Defendants own freenom.link, which was registered using Porkbun, LLC, a registrar based in the United States.

127.    Defendants host the freenom.link website on a server provided by Bodis, LLC. Bodis, LLC is a United States-based company that provides Defendants with the commercial links Defendants display on the freenom.link website.

128.    Defendants use freenom.link to display revenue-generating parking pages whenever Internet users are redirected from one or more of the Infringing Domain Names.

129.    Other examples of Defendants' use of the Infringing Domain Names include: facebook-instagram-busines.ml, facebookhelpcustomer.cf, facebookloginup.cf, whatsap.cf, and whatsap-chat.gq. Screen captures showing Defendants' use of the Infringing Domain Names to host revenue-generating parking pages are attached to this Complaint as Exhibit 11.

**D.    ID Shield's Failure to Disclose Contact Information**

130.    Freenom is an ICANN-accredited registrar subject to ICANN's RAA. A copy of the RAA is attached to this Complaint as Exhibit 12.

131.    When a domain name is registered in a gTLD using Freenom's registrar services, the terms

of the RAA apply. Specifically, the RAA requires that certain terms be incorporated into Freenom's registration agreement for these gTLD domain names. Freenom's Terms and Conditions Agreement that applies to paid domain names (including domain names in a gTLD) ("Paid Domain Name Agreement") is attached to this Complaint as Exhibit 13.

132.    One such ICANN requirement included in Freenom's registration agreement provides that ID Shield (as the registrant of the domain names) "shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [ID Shield] reasonable evidence of actionable harm." *See* Exhibits 12 & 13.

133.    Freenom and ID Shield's service agreements anticipate that they will be sued for misuse of domain names, including for trademark infringement and cybersquatting, and require parties to their respective agreements to indemnify against such claims. *See* Exhibits 13 & 6.

134.    ID Shield has registered one or more of the Infringing Domain Names, as the registrant and in its own name, and then licenses these domain names to Freenom and to Freenom's customers for their use. For example, the Infringing Domain Name fecebookiyat.info was registered by ID Shield, as the registrant and in its own name. A copy of the WHOIS record listing Stichting OpenTLD WHOIS Proxy (ID Shield) as the registrant is attached to this Complaint as Exhibit 14.

135.    Plaintiffs' authorized representatives sent communications to Defendants with evidence the Infringing Domain Names, including fecebookiyat.info, caused actionable harm, including by infringing on the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks, and requesting that Defendants disclose the identities of the registrant(s).

136.    Defendants failed to timely disclose the identity or any contact information of the licensee when presented with reasonable evidence of actionable harm by Plaintiffs or their authorized representatives. In fact, ID Shield did not respond at all to one or more of the Plaintiffs' notices.

**E.    Defendants' and Doe Defendants' Bad Faith Intent to Profit**

137.    Neither Defendants nor Doe Defendants have any trademark or other intellectual property rights in the Infringing Domain Names.

138.    The Infringing Domain Names do not consist of the legal name of Defendants or the Doe

Defendants, nor do they consist of a name that is otherwise commonly used to identify Defendants or Doe Defendants.

139.    Neither Defendants nor Doe Defendants have made any prior use of the Infringing Domain Names in connection with a bona fide offering of any goods or services.

140.    Neither Defendants nor Doe Defendants have made any a bona fide noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

141.    On information and belief, Defendants profit from their provision of domain names for free because the free registration services prompt customers to use Freenom's registrar services and other fee-based related services.

142.    Defendants also profit when free domain names are registered and subsequently expire, or are cancelled, suspended, or refused, because Freenom revokes the license to the licensee and uses those domain names for its own benefit.

143.    Defendants and Doe Defendants monetize their domain names by operating revenue-generating parking pages and redirecting visitors to other commercial websites, websites with pornographic content, and websites used for malicious activity like phishing.

144.    The ID Shield proxy service is part of a deliberate scheme by Defendants to shield the identity of the Defendants and Doe Defendants and thus aid in cybersquatting, including cybersquatting on Plaintiffs' Trademarks.

145.    For many Infringing Domain Names, Defendants intentionally omit any WHOIS record, falsely stating that a domain name has not been registered when in fact the domain name has been registered and is being used by Defendants or Doe Defendants. For example, as discussed above, instagramchat.gq is registered and is actively used by Defendants to operate a revenue-generating parking page. Despite this, when a visitor attempts to query Freenom's website for the WHOIS record of instagramchat.gq, the following webpage results:

COMPLAINT



146.    The Defendants have an economic incentive to resist attempts to expose the identities of the Doe Defendants using their proxy services even when presented with reasonable evidence of actionable harm by Plaintiffs and other trademark owners.

147.    Defendants knowingly and intentionally shield the identities of the Doe Defendants, who are cybercriminals, including those who infringe and cybersquat on Plaintiffs' Trademarks.

148.    Freenom has a history of cybersquatting on famous and distinctive trademarks.

149.    Defendants have received multiple inquiries, non-compliance notices, and contractual breach letters from ICANN regarding their failure to provide registration data and failure to investigate and correct WHOIS inaccuracies, to validate and verify WHOIS data for their customers, and to publish required information about its ultimate parent entity.

150.    On or about June 23, 2015, ICANN suspended Freenom's ability to create new domain

names or initiate inbound transfers of domain names for 90 days. The suspension was premised on ICANN's determination that, "[p]ursuant to Section 5.5.2.4 of the RAA, … [Freenom] has engaged in a pattern and practice of trafficking in or use of domain names identical or confusingly similar to a trademark or service mark of a third party in which the Registered Name Holder has no rights or legitimate interest."

151.    In the 2015 arbitration proceeding between ICANN and Freenom resulting from Freenom's suspension, Freenom admitted that its free registration services "prove appealing to unscrupulous third parties engaged in abusive registration practices."

152.    Freenom has also been named in administrative complaints filed under the Uniform Domain-Name Dispute-Resolution Policy ("UDRP"), resulting in the transfer of the domain name(s) to the trademark owners bringing the complaint.

153.    Defendants are aware that the domain names they register and traffic in are used to infringe the trademark rights of trademark owners because Freenom and/or the ccTLD Service Providers, as the registrant and/or registrar, receive notices of infringement by trademark owners (including Plaintiffs) and their agents, and receive notices of every UDRP complaint and decision against a domain name registered using Defendants' services.

154.    Despite Defendants' awareness of the infringement, they continue to refuse to disclose identifying information for licensees when presented with evidence of actionable harm caused by domain names.

155.    By refusing to identify the licensees when presented with evidence of actionable harm, even after being subject to numerous UDRP complaints and having received multiple Notice of Breach letters from ICANN, Defendants have demonstrated that they are knowingly disregarding their legal and contractual obligations, the rights of those being harmed by cybercriminals who use their services to register domain names to infringe the marks of others, and the harm caused to third parties who fall victim to cybercrime such as phishing attacks that are facilitated through domain names registered with Defendants on behalf of their cybercriminal customers. These cybercrimes rely on deceptive domain names, like the Infringing Domain names, registered with Defendants to harvest users' personal and financial information.

156.    Defendants and the Doe Defendants intended to divert consumers to websites using domain names that were confusingly similar to the Facebook Trademarks, Instagram Trademarks and WhatsApp Trademarks. In some instances, the Infringing Domain Names have been used in connection with phishing attacks, pornographic content, and to operate revenue-generating parking pages and to redirect visitors to other commercial websites.

157.    This history of conduct also demonstrates Defendants' and the Doe Defendants' bad faith intent to profit from Plaintiffs' Trademarks, as well as the marks of others, by earning revenue from cybercriminals who exploit those marks for unlawful purposes.

## FIRST CAUSE OF ACTION

### [Cybersquatting on Plaintiffs' Trademarks Under 15 U.S.C. § 1125(d)]

158.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

159.    Plaintiffs' Trademarks were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time Defendants registered, used, and trafficked in the Infringing Domain Names.

160.    One or more of the Infringing Domain Names are confusingly similar to Plaintiffs' Trademarks.

161.    One or more of the Infringing Domain Names are dilutive of the Facebook Trademarks or Instagram Trademarks.

162.    Defendants registered (as the registrant), used, or trafficked in, one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

163.    Doe Defendants used, or trafficked in, one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

164.    Neither Defendants nor Doe Defendants have any trademark or other intellectual property rights in the Infringing Domain Names.

165.    The Infringing Domain Names do not consist of the legal name of any of the Defendants or Doe Defendants, nor do they consist of a name that is otherwise commonly used to identify them.

166.    Neither Defendants nor Doe Defendants have any prior use of any of the Infringing Domain Names in connection with the bona fide offering of any goods or services.

167.    Neither Defendants nor Doe Defendants have made any bona fide noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

168.    Defendants and Doe Defendants intended to divert consumers from Plaintiffs' legitimate websites to a website accessible under the Infringing Domain Names for their commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

169.    Defendants' registration, use, and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

170.    Doe Defendants' registration, use and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

171.    Defendants and Doe Defendants have registered multiple domain names which they knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

172.    Defendants and Doe Defendants have provided material and misleading false contact information for the Infringing Domain Names.

173.    Plaintiffs' remedy at law is not adequate to compensate it for the injuries Defendants and Doe Defendants inflicted on Plaintiffs. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

174.    Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

175.    Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

176.    Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs' actual damages, and the costs of this action. Instead of actual damages and profits, Plaintiffs may alternatively elect to an award of statutory damages under 15 U.S.C. § 1117(d) in an amount of $100,000 per Infringing Domain Name. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

COMPLAINT

177.    This is an exceptional case, entitling Plaintiffs to an award of reasonable attorneys' fees under 15 U.S.C. § 1117.

### SECOND CAUSE OF ACTION

**[Trademark and Service Mark Infringement of Plaintiffs' Trademarks Under 15 U.S.C. § 1114]**

178.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

179.    Defendants and Doe Defendants have used Plaintiffs' Trademarks in interstate commerce. Defendants' and Doe Defendants' use of Plaintiffs' Trademarks is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs of Defendants' and Doe Defendants' websites.

180.    The above-described acts of Defendants and Doe Defendants constitute trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and entitle Plaintiffs to relief.

181.    Defendants and Doe Defendants have unfairly profited from the alleged trademark and service mark infringement.

182.    By reason of Defendants' and Doe Defendants' acts of trademark and service mark infringement, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

183.    Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

184.    Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

185.    Plaintiffs' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

186.    Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs', actual damages, and the costs of this action. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

187.    This is an exceptional case, making Plaintiffs eligible for an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**THIRD CAUSE OF ACTION**

**[Trademark and Service Mark Infringement of Plaintiffs' Trademarks**

**and False Designation of Origin Under 15 U.S.C. § 1125(a)]**

188.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

189.     Plaintiffs' Trademarks are distinctive marks that are associated with Plaintiffs and exclusively identify their respective businesses, products, and services.

190.     Defendants' and Doe Defendants' use in commerce of Plaintiffs' Trademarks, and variations thereof, is likely to cause confusion, or to cause mistake, or to deceive the relevant public that Defendants' and Doe Defendants' goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs.

191.     Defendants' and Doe Defendants' acts constitute trademark and service mark infringement of Plaintiffs' Trademarks, as well as false designation of origin, in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

192.     Defendants and Doe Defendants have unfairly profited from their conduct.

193.     By reason of the above-described acts of Defendants and Doe Defendants, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

194.     Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiff and Plaintiffs' Trademarks.

195.     Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

196.     Plaintiffs' remedy at law is not adequate to compensate it for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

197.     Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs' actual damages, and the costs of this action. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

198.     This is an exceptional case, making Plaintiffs eligible for an award of reasonable

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

attorneys' fees pursuant to 15 U.S.C. § 1117.

## FOURTH CAUSE OF ACTION

### [Dilution of the Facebook Trademarks and Instagram Trademarks Under 15 U.S.C. § 1125(c)]

199.    Meta and Instagram reallege and incorporate by reference all of the preceding paragraphs.

200.    The Facebook Trademarks and Instagram Trademarks are famous, as that term is used in 15 U.S.C. § 1125(c), and they were famous before Defendants' and Doe Defendants' use of them and variations of the trademarks in commerce. This fame is based on, among other things, the inherent distinctiveness and federal registration of each of the Facebook Trademarks and Instagram Trademarks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them.

201.    Defendants' and Doe Defendants' use of the Facebook Trademarks and Instagram Trademarks, and variations thereof, in commerce is likely to cause dilution by blurring or dilution by tarnishment of these trademarks.

202.    Defendants' and Doe Defendants' acts constitute willful dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Meta and Instagram to relief.

203.    Defendants and Doe Defendants have unfairly profited from their conduct.

204.    Defendants and Doe Defendants damaged the goodwill associated with the Facebook Trademarks and the Instagram Trademarks and they will continue to cause irreparable harm.

205.    Meta's and Instagram's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Meta and Instagram are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

206.    Defendants and Doe Defendants have irreparably harmed Meta and Instagram and, if not enjoined, will continue to irreparably harm them and their federally registered trademarks and service marks.

207.    Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

208.    Because Defendants and Doe Defendants acted willfully, Meta and Instagram are entitled to damages, and those damages should be trebled pursuant to 15 U.S.C. § 1117.

209. This is an exceptional case, making Meta and Instagram eligible for an award of attorneys' fees pursuant to 15 U.S.C. § 1117.

## FIFTH CAUSE OF ACTION

### [Violation of the Anti-Phishing Act Under Cal. Bus. & Prof. Code § 22948]

210. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

211. By using some of the Infringing Domain Names to operate Phishing Websites, Doe Defendants falsely represented themselves to be Facebook, Instagram, or WhatsApp, without Plaintiffs' authorization

212. Doe Defendants' Phishing Websites were intended to, and on information and belief did in fact, solicit, request, and induce users of Facebook, Instagram, and WhatsApp to provide identifying information, including account credentials.

213. Plaintiffs were adversely affected by Doe Defendants' phishing scheme and suffered, without limitation, damage to the goodwill associated with Plaintiffs' Trademarks, harm to their users, and monetary losses in an amount to be determined.

214. Doe Defendants' conduct constitutes a violation of Cal. Bus. & Prof. Code § 22948.3(a)(1).

215. As a result, Plaintiffs are entitled to recover the greater of their actual damages or five hundred thousand dollars ($500,000) per each phishing website pursuant to Cal. Bus. & Prof. Code § 22948.3(a)(1).

216. Further, because Doe Defendants engaged in a pattern and practice of violating the Anti-Phishing Act, Plaintiffs request the trebling of their actual damages pursuant to Cal. Bus. & Prof. Code § 22948.3(c)(1).

217. Plaintiffs further seek an award of their attorneys' fees and costs of suit pursuant to Cal. Bus. & Prof. Code § 22948.3(c)(2).

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request:

218. That the Court find that:

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

a.      Defendants registered, trafficked in, or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d);

b.      Doe Defendants registered, trafficked in or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d);

c.      Defendants infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1);

d.      Doe Defendants infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1);

e.      Defendants infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a);

f.      Doe Defendants infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a);

g.      Defendants have willfully diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c);

h.      Doe Defendants have willfully diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c);

i.      Doe Defendants have solicited, requested, or taken action to induce another person to provide identifying information by representing themselves as Plaintiffs without the authority or approval of Plaintiffs in violation of Cal. Bus. & Prof. Code § 22948.2;

j.      Defendants did not timely and accurately disclose the current contact information provided by the Doe Defendant and the identity of the Doe Defendant in response to one or more of Plaintiffs' notices;

k.      Defendants are liable for the harm to Plaintiffs caused by those Doe Defendants' wrongful use of the Infringing Domain Names.

l.      Defendants are alter egos each individually and collectively liable for others' unlawful acts;

COMPLAINT

m.    Freenom is the direct participant in the unlawful acts of the ccTLD Service Providers, ID Shield, Bitsafe, and VTL, and thus is liable for the harm caused; and

n.    each of the above acts was willful.

219.    That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d).

220.    That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1125(d).

221.    That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1).

222.    That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1114(1).

223.    That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a).

224.    That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a).

225.    That the Court enter a judgment against Defendants that Defendants have infringed the rights of Meta and Instagram in the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

226.    That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Meta and Instagram in the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

227.    That the Court enter a judgment against Doe Defendants that Doe Defendants have solicited, requested, or taken any action to induce another person to provide identifying information in violation of Cal. Bus. & Prof. Code § 22948.2.

228.    That the Court enter a judgment against Defendants that Defendants are liable for the harm caused to Plaintiffs by Doe Defendants cybersquatting, trademark infringement and dilution of Plaintiffs'

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Trademarks for each instance in which Defendants did not timely and accurately disclose the current contact information provided by the Doe Defendant and the identity of the Doe Defendant in response to one or more of Plaintiffs' notices regarding an Infringing Domain Name.

229.    That Plaintiffs be awarded Defendants' profits and Plaintiffs' actual damages, or, in the alternative, $100,000 in statutory damages per infringing domain name by reason of Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117(d).

230.    That Plaintiffs be awarded Doe Defendants' profits and Plaintiffs' actual damages, or, in the alternative, $100,000 in statutory damages per infringing domain name by reason of Doe Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117(d).

231.    That Plaintiffs be awarded Defendants' profits and Plaintiffs' actual damages, and costs of the action, by reason of Defendants' trademark infringement, false designation of origin and willful dilution, and that these damages be trebled in accordance with the provisions of 15 U.S.C. § 1117.

232.    That Plaintiffs be awarded Doe Defendants' profits and Plaintiffs' actual damages, and costs of the action, by reason of Doe Defendants' trademark infringement, false designation of origin and willful dilution, and that these damages be trebled in accordance with the provisions of 15 U.S.C. § 1117.

233.    That Defendants and Doe Defendants be ordered to account for and disgorge to Plaintiffs all amounts by which Defendants and Doe Defendant have been unjustly enriched by reason of the unlawful acts complained of.

234.    That Plaintiffs be awarded an amount sufficient to reimburse Plaintiffs for the costs of corrective advertising.

235.    That Plaintiffs be awarded prejudgment interest on all infringement damages.

236.    That Plaintiffs be awarded Plaintiffs' actual damages, or, in the alternative, $500,000 in statutory damages per violation of California's Anti-Phishing Act of 2005 by Doe Defendants and that these damages be trebled in accordance with the provisions of Cal. Bus. & Prof. Code § 22948.3.

237.    That Plaintiffs be awarded their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, Cal. Bus. & Prof. Code § 22948.3(c)(2), and any other applicable provision of law.

238.    That the Court award Plaintiffs their costs of suit incurred herein.

239.    That the Court order each of the Infringing Domain Names be transferred to Plaintiffs.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

240.    That Defendants, Doe Defendants, and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants or Doe Defendants, be permanently enjoined and restrained from:

a.    Registering, using, or trafficking in any domain name that is identical or confusingly similar to the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks;

b.    Engaging in any use, including advertising, promoting, marketing, franchising, selling, and offering for sale any goods or services, on or in connection with Plaintiffs' Trademarks, or any similar mark or designation, that is likely to cause confusion, or to cause mistake as to the affiliation of that use with Plaintiffs; and

c.    Engaging in any activity which lessens the distinctiveness or tarnishes the Facebook Trademarks and Instagram Trademarks.

241.    That Doe Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, be permanently enjoined and restrained from:

a.    Soliciting, requesting, or taking action to induce another person to provide identifying information by representing themselves as Plaintiffs without the authority or approval of Plaintiffs.

242.    That the Court award such other or further relief as the Court may deem just and proper.

DATED: December 7, 2022                    Tucker Ellis LLP


By: David J. Steele
    David J. Steele
    Howard A. Kroll
    Steven E. Lauridsen
    Dina Roumiantseva

    Attorneys for Plaintiffs,
    META PLATFORMS, INC.,
    INSTAGRAM, LLC, AND
    WHATSAPP LLC

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

COMPLAINT

1

2
**DEMAND FOR TRIAL BY JURY**

3
      Plaintiffs Meta Platforms, Inc., Instagram, LLC, and WhatsApp LLC hereby demand a trial by

4
jury to decide all issues so triable in this case.

5

6
DATED: December 7, 2022             Tucker Ellis LLP

7

8
By: _David J. Steele_

9
David J. Steele
Howard A. Kroll

10
Steven E. Lauridsen
Dina Roumiantseva

11

12
Attorneys for Plaintiffs,
META PLATFORMS, INC.,

13
INSTAGRAM, LLC, AND
WHATSAPP LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT