TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
Dina Roumiantseva SBN 300576
dina.roumiantseva@tuckerellis.com
515 South Flower Street,
Forty-Second Floor
Los Angeles, CA 90071
Telephone:     213.430.3400
Facsimile:     213.430.3409

Attorneys for Plaintiffs,
META PLATFORMS, INC. (fka FACEBOOK, INC.), INSTAGRAM, LLC, and WHATSAPP LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., INSTAGRAM, LLC, and WHATSAPP LLC, <br><br> Plaintiffs, <br><br> v. <br><br> OPENTLD B.V., FREEDOM REGISTRY B.V., FINTAG GROUP B.V., CERVESIA ACIDA BV, B.V. DOT TK, CENTRAFRIQUE TLD B.V., EQUATORIAL GUINEA DOMAINS B.V., MALI DILI B.V., GABON TLD B.V., STICHTING OPENTLD WHOIS PROXY, YOURSAFE B.V., JOOST ZUURBIER MANAGEMENT SERVICES B.V., VTL MERCHANT SUPPORT, INC., and JOHN DOES 1-20, INCLUSIVE, <br><br> Defendants. | Case No. 4:22-cv-07768-HSG <br><br> **SECOND AMENDED COMPLAINT FOR CYBERSQUATTING; TRADEMARK INFRINGEMENT; FALSE DESIGNATION OF ORIGIN; DILUTION; AND VIOLATION OF THE ANTI-PHISHING ACT UNDER CAL. BUS. & PROF. CODE § 22948** <br><br> **DEMAND FOR JURY TRIAL** <br><br><br> Hon. Haywood S. Gilliam, Jr. |

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Plaintiffs Meta Platforms, Inc. ("Meta"), Instagram, LLC ("Instagram"), and WhatsApp LLC ("WhatsApp") (collectively "Plaintiffs") by and through their attorneys, Tucker Ellis LLP, file their Second Amended Complaint against Defendants OpenTLD B.V. dba Freenom dba Bitsafe Domains ("Freenom"), Freedom Registry B.V. ("Freedom Registry"), Fintag Group B.V. aka Bitsafe B.V. ("Fintag"), Cervesia Acida BV ("Cervesia"), B.V. Dot TK ("Dot TK"), Centrafrique TLD B.V. ("Dot CF"), Equatorial Guinea Domains B.V. ("Dominio GQ"), Mali Dili B.V. ("Mali Dili"), Gabon TLD B.V. ("My GA"), Stichting OpenTLD WHOIS Proxy aka OpenTLD WHOIS Proxy Foundation ("ID Shield"), Yoursafe B.V. aka Bitsafe Payments B.V. aka Verotel aka Verotel Merchant Services B.V. ("Yoursafe"), Joost Zuurbier Management Services B.V., VTL Merchant Support, Inc. aka Freedom Registry, Inc. ("VTL") (collectively, "Defendants"), and John Does 1-20, inclusive ("Doe Defendants"), for injunctive relief and damages.

## I.    INTRODUCTION

1.    Cybercrime is highly dependent on registered domain names, which are used to host phishing websites[1] and engage in other types of online abuse.

2.    Defendants' business model involves registering and licensing domain names, and providing related services and content, to Doe Defendants, who are high-risk clients engaged in illicit activity such as in phishing and adult content.

3.    Defendants operate as a complex web of shell companies controlled by individuals named Johannes Wilhelmus Antonius Zuurbier aka Joost Zuurbier ("Joost Zuurbier") and Marcel Trik, and Defendants have, individually, collectively and/or together as alter egos, as direct participants, and/or as agents of each other, registered, trafficked in, and used over 5,000 domain names that are identical or confusingly similar to Plaintiffs' trademarks with a bad faith intent to profit in violation of the Anticybersquatting Consumer Protection Act,    15 U.S.C. § 1125(d)    ("ACPA")    (collectively,    the

---

[1] "Phishing" refers to the practice of deceiving internet users into divulging personal information, such as login IDs and passwords, using fraudulent websites or emails that impersonate businesses. The Anti-Phishing Working Group ("APWG"), a nonprofit that works to combat cybercrime, reported 1,097,811 total phishing attacks in the second quarter of 2022, "a new record and the worst quarter for phishing that APWG has ever observed." Anti-Phishing Working Group, *Phishing Activity Trends Report, 2nd Quarter 2022* (Sept. 20, 2022), available at docs.apwg.org/reports/apwg_trends_report_q2_2022.pdf.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

"Infringing Domain Names").

4.      Plaintiffs' brands are among the most attacked on the internet[2] and the domain names registered by Freenom and/or its alter egos account for one of the largest sources of phishing targeting Plaintiffs and their customers.

5.      The Infringing Domain Names—including, for example, faceb00k.ga, fb-lnstagram.cf, facebook-applogin.ga, instagrams-help.cf, instaqram.ml, chat-whatsaap.gq, chat-whatsaap-com.tk, and supportservice-lnstagram.cf—not only are identical or confusingly similar to Plaintiffs' trademarks but many have been used to launch phishing attacks, to display adult content, and to conduct other types of abusive, nefarious, fraudulent, and infringing activities that harm both Plaintiffs' users and Plaintiffs. A list of the Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 1.

6.      Freenom is, among other things, the exclusive domain name *registry*[3] services provider for five country code top level domains ("ccTLDs"). A country code top level domain is a two-letter domain that corresponds to a country, territory, or other geographic location (e.g., .us for the United States ). Freenom is the registry service provider for the operator of: .tk for Tokelau, .gq for Equatorial Guinea, .cf for the Central African Republic, .ml for Mali, and .ga for Gabon.[4] On information and belief, Freenom sets and administers the policies and performs all registry operations for these ccTLDs. Freenom is also the exclusive *registrar*[5] and provides free domain name registrations for domain names

---

[2] In 2022, FACEBOOK, WHATSAPP, INSTAGRAM were each listed in the top five brands targeted by phishing attacks. *See* Directorate-General for Communications Networks, Content and Technology (European Commission), *Study on Domain Name System (DNS) abuse* (Jan. 1, 2022), available at https://op.europa.eu/en/publication-detail/-/publication/d9804355-7f22-11ec-8c4001aa75ed71a1/language-en. FACEBOOK was ranked number 1, INSTAGRAM was ranked number 2, and WHATSAPP was ranked number 5. *Id.*

[3] According to the Internet Corporation for Assigned Names and Numbers ("ICANN"), "[t]he 'Registry' is the authoritative, master database of all domain names registered in each Top Level Domain." ICANN, *Glossary of WHOIS Terms*, available at whois.icann.org/en/glossary-whois-terms ("ICANN Glossary").

[4] Freenom created subsidiaries for each of the five ccTLDs it provides registry services for: Dot TK for .tk, Dot CF for .cf, Dominio GQ for .gq, Mali Dili for .ml, and My GA for .ga (collectively, the "ccTLD Service Providers"). Each of the ccTLD Service Providers and Freenom are alter egos of one another.

[5] A "registrar" processes a registrant's desired domain name registration and records that registration with the registry. *See* ICANN Glossary.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

in these five ccTLDs.

7.      Freenom is also an ICANN-accredited domain name registrar for generic top level domains ("gTLDs"). Generic top level domains include .com and .net, to list only a few. As an ICANN-accredited domain name registrar, Freenom provides registration services for domain names in the various gTLDs.

8.      One of Freenom's alter egos, ID Shield, provides a proxy service whereby ID Shield registers domain names, as the registrant and in its own name, and then licenses these domain names to Freenom and to Freenom's customers for their use.

9.      Freenom, directly and through a complex and geographically diverse web of alter egos, DBAs, and shell entities abuses its position of trust and authority to operate a coordinated scheme to cybersquat on, infringe, and dilute Plaintiffs' trademarks.

10.     The five ccTLDs to which Freenom provides its services are the TLDs of choice for cybercriminals because Freenom provides free domain name registration services and shields its customers' identity, even after being presented with evidence that the domain names are being used for illegal purposes. On information and belief, even after receiving notices of infringement or phishing by its customers, Freenom continues to license new infringing domain names to those same customers.

11.     According to the 2022 *Study on Domain Name System abuse* conducted for the European Commission, "five out of ten most abused TLDs (.ml, .tk, .ga, .cf, and .gq) are operated by Freenom."[6] The study further concluded that "[t]he lack of registration fees is the most likely reason Freenom's TLDs are widely abused by malicious actors."

12.     Further, according to the Interisle Consulting Group's *Phishing Landscape 2021* report, Freenom's five ccTLDs were reported for abuse in over 124,000 instances in that year alone.[7]

13.     Despite the well-documented proliferation of cybercrime through the use of its services, Freenom has repeatedly failed to take appropriate steps to investigate and respond appropriately to reports

---

[6] Directorate-General for Communications Networks, Content and Technology, *supra* note 3, at Appendix 1.

[7] Interisle Consulting Group, *Phishing Landscape 2021* (Sept. 22, 2021), available at www.interisle.net/PhishingLandscape2021.pdf.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

of abuse.

14.     Defendants have demonstrated that they are knowingly disregarding (a) their legal and contractual obligations, (b) the intellectual property rights of those being harmed by cybercriminals who use Defendants' services to register domain names to infringe the marks of others, and (c) the harm caused to third parties who fall victim to cybercrime such as phishing that is facilitated through domain names registered with Defendants on behalf of their cybercriminal customers. These cybercrimes rely on deceptive domain names, like the Infringing Domain Names, registered with Defendants to harvest users' personal and financial information.

15.     Defendants profit from their cybersquatting scheme because Defendants directly (a) register the Infringing Domain Names, (b) resell or offer to sell the Infringing Domain Names, and/or (c) monetize the Infringing Domain Names by operating revenue-generating parking pages[8] and redirect visitors to other commercial websites, websites with pornographic content, and websites used for malicious activity like phishing.

16.     Defendants' and Doe Defendants' use of Plaintiffs' trademarks to divert internet traffic to the Infringing Domain Names, including to websites used to launch phishing attacks, display adult content, and for other malicious activity, deceives the public and erodes the goodwill associated with Plaintiffs' brands. By this lawsuit, Plaintiffs seek to stop Defendants' and Doe Defendants' ongoing unlawful and harmful conduct.

## II.     THE PARTIES

17.     Plaintiff Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

18.     Plaintiff Instagram, LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

19.     Plaintiff WhatsApp LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.

20.     Defendant Freenom, which is a trade name of OpenTLD B.V., is a Dutch corporation with

---

[8] A "parking page" is a website used to display commercial advertisements, typically in the form of links to other commercial websites or commercial content.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Freenom also does business under the name Freedom Registry, Inc.,[2] which has a business address at 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303.

21.     Defendant Freedom Registry is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Freedom Registry is the sole shareholder of Freenom.

22.     Defendant Fintag is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Fintag is the majority shareholder and sole director of Freedom Registry. Fintag is also a director of Freenom.

23.     Defendant Cervesia is a Dutch corporation with its principal place of business at Spaarndammerdijk 699, Amsterdam 1014AE, Netherlands. Cervesia held or holds 87.5% of the shares of Fintag and was the sole director of Fintag until October 24, 2022.

24.     Defendant Dot TK is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Dot TK is a subsidiary of Freenom. Dot TK is the domain name registry service provider for the .tk ccTLD of Tokelau. Dot TK represents on its LinkedIn page that it "is a subsidiary of Freenom," which "has offices in Amsterdam (Netherlands) and Palo Alto (USA)."

25.     Defendant Dot CF is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Dot CF is a subsidiary of Freenom. Dot CF is the domain name registry service provider for the .cf ccTLD of the Central African Republic.

26.     Defendant Dominio GQ is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Dominio GQ is a subsidiary of Freenom. Dominio GQ is the domain name registry service provider for the .gq ccTLD of Equatorial Guinea.

27.     Defendant Mali Dili is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Mali Dili is a subsidiary of Freenom. Mali Dili

---

[2] Freedom Registry, Inc. changed its name to VTL Merchant Support, Inc. in November 2017. Freenom has done—and continues to do—business as Freedom Registry, Inc. despite the fact that corporate records indicate that Freedom Registry, Inc. was a separate entity from Freenom and despite the fact that corporate records indicate that VTL Merchant Support, Inc. is a separate entity from Freenom.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

the domain name registry service provider for the .ml ccTLD of Mali.

28.     Defendant My GA is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. My GA is a subsidiary of Freenom. My GA is the domain name registry service provider for the .ga ccTLD of Gabon.

29.     Defendant ID Shield is a Dutch limited liability entity with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. ID Shield is Freenom's domain name proxy service, which registered domain names in the name of ID Shield on publicly-available domain name registration records.

30.     Defendant Yoursafe is a Dutch corporation with its principal place of business at Danzigerkade 23D, Amsterdam 1013AP, Netherlands. Yoursafe is an Internet payment service provider that specializes in high-risk financial transactions, catering specifically to online adult entertainment. Yoursafe also provides domain name registration and related services. Yoursafe represents that it has offices in San Francisco, California.

31.     Defendant VTL is a Delaware corporation with its principal place of business at 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303. According to its filings with the California Secretary of State, VTL's former agent for service of process in 2018 was Johannes W.A. Zuurbier (aka Joost Zuurbier) located at 628 O'Farrell Street #7, San Francisco, CA, and its current agent as of August 19, 2021 is Zhaobo Liu, located at 61 Airport Boulevard, Suite H, South San Francisco, CA 94080. According to these corporate filings, VTL is in the business of payment processing and, according to its website, available until recently at vtl.support, VTL sells outsourcing services, including customer service support, to third parties. Until November 2017, VTL operated under the name Freedom Registry, Inc. Joost Zuurbier is VTL's CEO, and Marcel Trik is its CFO and Secretary.

32.     Defendant Joost Zuurbier Management Services B.V. is a Dutch corporation with its principal place of business at Melis Stokehof 100, Amsterdam 1064JE, Netherlands. Joost Zuurbier Management Services B.V. is the director of Fintag.

33.     On information and belief, Freenom, Freedom Registry, Fintag, Cervesia, the ccTLD Service Providers, ID Shield, Yoursafe, VTL, and Joost Zuurbier Management Services B.V. are a single enterprise and/or alter egos of each other. Freenom is also the direct participant in the actions of

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Freedom Registry, Fintag, Cervesia, the ccTLD Service Providers, ID Shield, Yoursafe, VTL, and Joost

Zuurbier Management Services B.V.

34.    Plaintiffs have not yet identified the Doe Defendants. The Doe Defendants are individuals

or entities, including individuals and entities related to Defendants, who have registered, or caused to be

registered, domain names that cybersquat and infringe on Plaintiffs' trademarks and have been used to

launch phishing attacks, display adult content, and for other types of abusive, nefarious, fraudulent, and

infringing activities against Plaintiffs and their users.[10] As explained in more detail below, Doe

Defendants are also licensees of Freenom, the ccTLD Service Providers, and/or ID Shield. Plaintiffs

reserve the right to amend this complaint to allege such Doe Defendants' true names and capacities when

they are ascertained.

## III.    JURISDICTION AND VENUE

35.    The Court has federal question jurisdiction over the federal causes of action alleged in this

complaint pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law

claim set forth herein under 28 U.S.C. § 1367(a) because that claim is so related to the federal claims that

they form part of the same case or controversy.

36.    The Court has personal jurisdiction over Defendants because each of them, either by

themselves or by virtue of being an alter ego of and/or direct participant in the conduct of the others,

regularly conducts business in California and purposefully avails themselves of the privilege of

conducting activities in this forum. Defendants have entered into one or more contracts with businesses

in the United States in conjunction with their unlawful activity which, on information and belief, include

as a material term Defendants' agreement to submit to the jurisdiction of courts within the United States.

For instance, Freenom has entered into a number of contracts with California individuals or entities,

including with ICANN[11], a United States-based company located in California. Freenom has also entered

into at least one contract governed by California law with Meta.

---

[10] For example, Cybersecurity & Infrastructure Security Agency has listed Freedom Registry, Inc. in a Malware Analysis Report as the registrant of certain domains implicated in use of ComRAT malware to exploit victim networks. *See* https://www.cisa.gov/uscert/ncas/analysis-reports/ar20-303a.

[11] Freenom initiated arbitration proceedings in Los Angeles, California against ICANN concerning this contract, which resulted in an order denying Freenom's requested relief on August 24, 2015.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

37.     The Court also has personal jurisdiction over Defendants because each of them, either themselves or through one of their alter egos/direct participants, knowingly directed and targeted parts of their unlawful scheme at the United States. For example, Defendants have targeted the intellectual property of businesses in the United States; Defendants' services are specifically targeted, advertised, and provided to consumers in the United States; Defendants' services are specifically offered in United States dollars; Defendants' websites are all in English and are accessible to consumers in the United States; and Defendants have contracted with numerous businesses in the United States in conjunction with their unlawful activity as described herein.

38.     The Court also has personal jurisdiction over Defendants because Defendants have conducted business related to their unlawful scheme in the United States, as demonstrated by the fact that Freenom filed a trademark application on September 3, 2013 for domain name registration services, as well as various related services. In that application, Freenom's then Managing Director, Joost Zuurbier, declared under penalty of perjury that Freenom had been providing these services in interstate commerce in the United States since at least as early as March 1, 2013. Accordingly, on information and belief, Freenom was offering, and continues to offer, domain name registration services in two or more states, including in California.

39.     As discussed in detail in this Second Amended Complaint, Joost Zuurbier and Marcel Trik have incorporated a web of shell companies and alter egos who are liable for the conduct alleged herein. This web extends to the United States in general and California specifically even apart from the named Defendants and, on information and belief, have been used by Defendants to further their unlawful scheme in the United States and in California. In addition to the web of shell companies and alter egos identified above, Joost Zuurbier, Marcel Trik, and Defendants have also incorporated a number of related entities in the United States, such as Freenom, Inc. and OpenTLD, Inc. Freenom, Inc. was incorporated in Delaware by Joost Zuurbier in October 2012 and dissolved in March 2013. Corporate records indicate that Joost Zuurbier served as President and Director of this company with an address of 584 Castro Street, Suite 290, San Francisco, CA 94144. OpenTLD, Inc. was also incorporated in Delaware by Joost Zuurbier, again while he was located at 584 Castro Street, in November 2012 and was dissolved in January 2015. On information and belief, Freenom, Inc. and OpenTLD, Inc. were either shell companies

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

for, or predecessors of, Defendants.

40.     The Court has personal jurisdiction over Defendants because, as discussed herein, each is part of a single enterprise and/or an alter ego of the others that have continuous and systematic contacts with California, including VTL, which is located in California and is registered in California as a corporation.

41.     Venue is proper with respect to each Defendant pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged occurred in this district.

42.     Pursuant to Civil L.R. 3-2(c), this case is exempt from the Court's division-specific venue rule because it involves intellectual property rights.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Plaintiffs and their Trademarks

#### 1.     Meta

43.     Meta is a Fortune 500 company that offers the Facebook social networking website and mobile applications that enable its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.

44.     Meta owns the exclusive rights to several trademarks and service marks to provide its online services, including the distinctive FACEBOOK word mark and stylized mark, and has used the marks in connection with its services since 2004.

45.     In addition to its extensive common law rights, Meta owns numerous United States trademark registrations for its FACEBOOK marks, including:

          a.     United States Registration Number 3,122,052; and

          b.     United States Registration Number 3,881,770.

Copies of these registration certificates are attached to this Second Amended Complaint as Exhibit 2.[12] Meta's common law and registered trademarks are collectively referred to as the "Facebook Trademarks."

_____

[12] Meta Platforms, Inc. owns the Facebook Trademarks. The registration certificates for the Facebook Trademarks reflect Meta's former corporate name, Facebook, Inc.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

46.     Meta also owns and operates the website available at www.facebook.com and other websites that use the Facebook Trademarks to provide and promote its goods and services.

47.     Meta's use of the Facebook Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Meta has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Meta and the Facebook Trademarks. As a result of Meta's efforts and use, the Facebook Trademarks are famous (and have been famous since at least as early as 2011) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Meta.

### 2.     Instagram

48.     Instagram offers a photo and video sharing and editing service, mobile applications, and social network. Instagram users can choose to share their photos and videos with their followers online.

49.     Instagram owns the exclusive rights to the distinctive INSTAGRAM word mark and stylized mark, having used the marks in connection with its goods and services as early as 2010.

50.     In addition to its extensive common law rights, Instagram owns numerous United States trademark registrations for the INSTAGRAM marks, including:

a.     United States Registration Number 4,795,634;

b.     United States Registration Number 4,146,057;

c.     United States Registration Number 4,756,754;

d.     United States Registration Number 5,566,030;

e.     United States Registration Number 4,170,675;

f.     United States Registration Number 4,856,047;

g.     United States Registration Number 4,822,600;

h.     United States Registration Number 4,827,509;

i.     United States Registration Number 4,863,595;

j.     United States Registration Number 5,019,151; and

k.     United States Registration Number 5,869,731.

Copies of these registration certificates are attached to this Second Amended Complaint as Exhibit 3. Instagram's common law and registered trademark rights are collectively referred to as the "Instagram

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Trademarks."[13]

51.     Instagram also owns and operates the website available at www.instagram.com and other websites that use the Instagram Trademarks to provide and promote its goods and services.

52.     Instagram's use of the Instagram Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. Instagram has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of Instagram and the Instagram Trademarks. As a result of Instagram's efforts and use, the Instagram Trademarks are famous (and have been famous since at least as early as 2014) as they are recognized within the US and around the world as signifying high-quality, authentic goods and services provided by Instagram.

### 3.     WhatsApp

53.     WhatsApp offers WhatsApp, a simple, secure, reliable messaging and calling service, provided for mobile devices and through desktop computers globally.

54.     WhatsApp owns the exclusive rights to several trademarks and service marks, including the distinctive WHATSAPP word mark, having used the mark in connection with its goods and services since at least as early as 2009.

55.     In addition to its extensive common law rights, WhatsApp owns numerous United States trademark registrations for the WHATSAPP marks, including, but not limited to:

        a.     United States Registration Number 3,939,463;

        b.     United States Registration Number 4,083,272;

        c.     United States Registration Number 5,492,738; and

        d.     United States Registration Number 5,520,108.

Copies of these registration certificates are attached to this Second Amended Complaint as Exhibit 4.[14]

WhatsApp's common law and registered trademark rights are collectively referred to as the "WhatsApp Trademarks."

---

[13] Instagram, LLC owns the Instagram Trademarks. A number of the registration certificates for the Instagram Trademarks reflect Instagram Inc. as the owner. Instagram Inc. no longer exists, having been merged with Instagram LLC.

[14] WhatsApp LLC owns the WhatsApp Trademarks. A number of the registration certificates for the WhatsApp Trademarks reflect WhatsApp's former corporate name, WhatsApp Inc.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

56. WhatsApp owns and operates the website available at www.whatsapp.com and other websites that use the WhatsApp Trademarks to provide and promote its goods and services.

57. WhatsApp's use of the WhatsApp Trademarks in interstate commerce has been extensive, continuous, and substantially exclusive. WhatsApp has made, and continues to make, a substantial investment of time, effort, and expense in the promotion of WhatsApp and the WhatsApp Trademarks. As a result of WhatsApp's efforts and use, the WhatsApp Trademarks are inextricably linked with the products and services offered by WhatsApp.

58. The Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks are collectively referred to as the "Plaintiffs' Trademarks."

59. Plaintiffs spend billions of dollars each year marketing and advertising the services offered under Plaintiffs' Trademarks. Indeed, the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks are regularly listed as among the most recognized and valuable brands in the United States and globally by sources including Forbes, BrandFinance, and Interbrand.

**B.     Defendants' Abuse of the Corporate Form to Perpetuate Their Cybersquatting Scheme**

60. On information and belief, Joost Zuurbier founded Defendant Freenom in 2012.

61. Defendants are part of a web of companies created to facilitate cybersquatting, all for the benefit of Freenom. On information and belief, one or more of the ccTLD Service Providers, ID Shield, Yoursafe, Freedom Registry, Fintag, Cervesia, VTL, Joost Zuurbier Management Services B.V., and Doe Defendants were created to hide assets, ensure unlawful activity including cybersquatting and phishing goes undetected, and to further the goals of Freenom.

62. Joost Zuurbier and Marcel Trik are the officers and directors of these various entities, and on information and belief, they formed and operate these entities to further the unlawful goals of Freenom and the other Defendants and to hide assets. On information and belief, Joost Zuurbier and Marcel Trik control all aspects of these various entities for the benefits of Defendants. Accordingly, Defendants are alter egos of one another and direct participants in each other's unlawful activities, all at the ultimate direction of Joost Zuurbier and Marcel Trik.

63. On information and belief based on the facts discussed in detail herein, Defendants

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

comingle assets, fail to keep appropriate corporate records (including of financial transactions), fail to file or timely file financial statements, are subject to the dominion and control by the same entities/individuals, use the same business location, share employees (and do so without any appropriate allocation or payment of costs), treat the stock of certain companies as interchangeable, conceal the ownership and control of the various entities through a series of shells, use the various entities as a conduit for the business of each other and of Joost Zuurbir and Marcel Trik, fail to maintain arms-length relationships (as demonstrated, on information and belief, through at least one court finding conflicts of interest), and manipulate assets so as to concentrate assets in certain entities and liabilities in other companies.

64.     This complex web[15] of companies is illustrated in the following chart assembled based on corporate filings and the allegations described in detail below, with a more detailed chart attached to this Second Amended Complaint as Exhibit 15:

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

---

[15] It is common for cybersquatters and malicious actors on the Internet to develop and maintain complex corporate structures—just as Defendants have done—to mask their identities and to facilitate their unlawful activities.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG



SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1.   **Defendants' General Corporate Structure and Potential Corporate Malfeasance as Described by the Enterprise Chamber of the Amsterdam Court of Appeal**

65.   On information and belief based on a certified translation of a court judgment as well as translations of public records, Defendants Freedom Registry and Bitsafe B.V. (a former name for Fintag until December 13, 2022) were recently engaged in a legal dispute in the Netherlands brought by one of Freedom Registry's investors before the Netherlands Commercial Court in Amsterdam (the "Amsterdam Court"). The investor accused Freedom Registry and Fintag/Bitsafe B.V. of having an ownership structure that resulted in conflicts of interest, comingling assets and personnel, failing to maintain corporate resolutions, failing to file required corporate documents and financial statements, and improperly dissipating assets. The investor requested that the court appoint a director to monitor the companies to ensure proper corporate and financial compliance and to ensure assets that the investor alleged were illegally withdrawn from Freedom Registry by Joost Zuurbier be recovered.[16]

66.   On October 17, 2022, the Amsterdam Court issued its decision (a certified English translation followed by a copy of the decision in Dutch is attached to this Second Amended Complaint as Exhibit 16), which was published on December 22, 2022 and which, on information and belief, made the following specific findings:

67.   Fintag/Bitsafe B.V., Freedom Registry, Cervesia, a number of related companies, and Joost Zuurbier developed a corporate structure[17] that resulted in Joost Zuurbier controlling

---

[16] The court decision redacts the name of the individual involved; however, the decision describes various positions this individual holds in the companies at issue, and, on information and belief, these positions match those held by Joost Zuurbier according to corporate records. Accordingly, Plaintiffs refer to this anonymous individual from the court decision as Joost Zuurbier.

[17] As detailed in the chart above, the court found Bitsafe B.V. (now Fintag) is the sole director of Freedom Registry and holds 64% of its shares. The investor who began the legal proceedings owns 28% of Freedom Registry's shares, and a company referred to as STAK owns the remaining 8% of the shares. Defendant Cervesia was at the time of the decision the sole director of and held 87.5% of the shares of Fintag/Bitsafe B.V., and an entity known as Stichting Administratiekantoor Bitsafe holds the remaining 12.5% of Fintag/Bitsafe B.V.'s shares. Joost Zuurbier is the sole shareholder and sole director of Cervesia and thus controlled Bitsafe B.V. during the time period referenced in the decision. At the same time, corporate filings from January 2023 indicate that Fintag fka Bitsafe B.V. is the director of STAK and that Freedom Registry is the sole shareholder of Freenom.

Fintag/Bitsafe B.V. during the relevant time period. Fintag/Bitsafe B.V. in turn was the director and majority shareholder of Freedom Registry, resulting in Bitsafe B.V. having a conflict of interest because the interests of Freedom Registry, in which Fintag/Bitsafe B.V. is a director and majority shareholder, and the interests of Fintag/Bitsafe B.V. and the affiliated company (understood from the decision to be Cervesia) of which Joost Zuurbeir is a director and sole shareholder, are not always aligned, resulting in reasonable doubt whether Fintag/Bitsafe B.V.'s actions would be guided solely by the business interests of Freedom Registry. The investor who brought the lawsuit also pointed out that Joost Zuurbier is an indirect director and majority shareholder of Freedom Registry's "domain name" business while also being an indirect director and sole shareholder of the "payment business" conducted by Fintag/Bitsafe B.V. and associated companies, causing the investor to assert that Joost Zuurbier did not sufficiently separate his interests in the two companies.

68. The Amsterdam Court's decision also indicates that Freedom Registry, Fintag/Bitsafe B.V., and Freenom comingled assets and employees. Such comingling entailed offers for an investor in Freedom Registry to exchange its shares in the company for shares in Fintag/Bitsafe B.V. Other comingling occurred through Fintag/Bitsafe B.V. hiring Freenom's employees, who had been performing and continued to perform work for Freedom Registry, without Fintag/Bitsafe B.V. passing on the personnel costs for those employees to Freedom Registry because Freedom Registry could not pay those costs, thus indicating on information and belief that Freedom Registry was undercapitalized. Joost Zuurbier stated he had decided to keep personnel costs outside of Freedom Registry as of January 1, 2017 and to have those costs paid by a Fintag/Bitsafe B.V. company to allow Freedom Registry to continue to operate in a manner "at break even," thus further indicating on information and belief that Freedom Registry was undercapitalized.

69. In addition to comingling assets and employees, Fintag/Bitsafe B.V. and Freedom Registry did not keep records of all transactions.

70. The investor that brought the lawsuit argued Freedom Registry "has repeatedly violated its obligations with regard to the financial statement law and in particular the preparation and publication obligation and does not conduct proper administration from which the rights and obligations of Freedom can be known at all times." The investor also alleged "[t]here may be a conscious concealment of the

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

actual financial and operational state of affairs at Freedom [Registry]." The Amsterdam Court considered the evidence and arguments advanced in support of these allegations, among others, to "provide[] valid reasons to doubt the correct policy and the proper conduct of Freedom [Registry] . . . ."

71.     By way of example, Fintag/Bitsafe B.V. acknowledged that Freedom Registry's financial statements for 2013 through 2020 were not prepared and published in a timely manner. A filing overview submitted by Fintag/Bitsafe B.V. showed that financial statements for 2013, 2014, and 2017 through 2020 were not filed on time and that the financial statements for 2015 and 2016 had not been filed. Further, Fintag/Bitsafe B.V. acknowledged a summary and the relevant financial statements incorrectly stated that the financial statements for 2014, 2017, and 2018 had been adopted, yet the adoption resolutions from Freedom Registry's general meetings are missing.[18] Freedom Registry and Fintag/Bitsafe B.V. also admittedly could not answer or could not sufficiently answer a large number of questions posed by the investor concerning Freedom Registry's financial administration. The numerous questions that could not be answered, including those posed at the hearing, led the Amsterdam Court to determine that there were valid reasons to doubt Freedom Registry's correct policy and proper conduct.

72.     According to the decision, Fintag/Bitsafe B.V. acknowledged that Freedom Registry's state of affairs has not been proper with respect to the holding of shareholder meetings and the adoption of financial statements.

73.     For at least these reasons, the Amsterdam Court found the soundness of Freedom Registry's administration to be questionable, and the Amsterdam Court also stated that these facts provide a valid reason for doubting the correct policy and the proper conduct of Freedom Registry. The Amsterdam Court also found that Freedom Registry's "historical and current financial and operational state of affairs . . . cannot be understood at all."

---

[18] On information and belief, records from the Netherlands Chamber of Commerce register indicate that the failure to file or timely file corporate returns has been a common practice for Defendants and their various related entities. For instance, Yoursafe Holding B.V. filed its FY2018 report on May 11, 2022 and apparently did not file reports for 2019-2021. Freenom filed its FY2017 report on December 15, 2020, its FY2018 report on May 11, 2022, its FY2019 report on October 18, 2022, and its FY2020 report on November 15, 2022. Dot TK filed its FY 2018 report on May 09, 2022 and its FY2019 report on October 18, 2022. These are just a few examples of Defendants failure to keep and file accurate and timely reports.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

74. As a result of these findings, the Amsterdam Court ordered an investigation into the conduct of Freedom Registry and its affairs from 2013 onward. The Amsterdam Court further stated that an assessment as to whether further intervention is required may be made based on the investigation.

75. The Amsterdam Court also ordered Freedom Registry to pay the costs of the investigation, and the Amsterdam Court also ordered Freedom Registry to pay the cost of proceedings as the predominantly unsuccessful party.

76. Contemporaneously with the decision, Joost Zuurbier incorporated a new company called Joost Zuurbier Management Services B.V. Joost Zuurbier is the sole shareholder and director of this new company, which in turn replaced Cervesia as the director of Fintag fka Bitsafe B.V. as of October 24, 2022, just seven days after the Amsterdam Court issued its decision.

77. On information and belief, Fintag remains the director of Freenom and also remains the majority shareholder and sole director for Freedom Registry, which in turn remains the sole shareholder of Freenom.

78. The Amsterdam Court's findings, combined with Defendants restructuring following those findings, highlight that several of Defendants act as a single enterprise and as alter egos of each other through an intricate web of offshore shell companies.

### 2. Freenom and the ccTLD Service Providers

79. Freenom has established relationships with the governments of Tokelau, the Central African Republic, Equatorial Guinea, Mali, and Gabon wherein Freenom provides technical and operational support services to the managers of those countries' ccTLDs.

80. For each of the five ccTLDs it services, Freenom has created a separate wholly-owned subsidiary to offer domain registry and registration services: Dot TK for .tk of Tokelau; Dot CF for .cf of the Central African Republic; Dominio GQ for .gq of Equatorial Guinea; Mali Dili for .ml of Mali; and My GA for .ga of Gabon. Freenom has referred to the ccTLD Service Providers as its "subsidiaries," "sister companies," and "daughter companies."

81. On information and belief, Freenom exercises control and/or directs the ccTLD Service Providers because the same individuals hold positions within each of these entities as directors, officers, and/or managers. For example, Joost Zuurbier, the CEO of Freenom, is also an officer of all five

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

ccTLD Service Providers. Fintag, which is indirectly controlled by Joost Zuurbier, is also a director of each of the ccTLD Service Providers. As stated above, Fintag is also a director of Freenom and is the majority shareholder and sole director of Freedom Registry, which in turn is the sole shareholder of Freenom.

82.     On information and belief, these directors, officers, and/or managers do not independently manage and direct the Freenom and the ccTLD Service Providers, but rather operate the ccTLD Service Providers as a single integrated company with a unified management system.

83.     Freenom and the ccTLD Service Providers all share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business.

84.     On information and belief, Freenom and the ccTLD Service Providers have held themselves out as integrated entities to the public. For example, the websites of the five ccTLD Service Providers all contain links to "Login to My Freenom" and/or redirect to freenom.com.

85.     Each time a customer enters into an agreement with any of the ccTLD Service Providers to register a domain name, that customer is entering into an agreement with Freenom. When a visitor attempts to register a domain name through Dot CF, Dominio GQ, Mali Dili, or My GA, that visitor is redirected to Freenom's website. For example, when registering a .ml domain name using Mali Dili's website available at point.ml, visitors are prompted to enter the domain name into a search field as shown in the screenshot below:

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis



However, when visitors click "GO" they are redirected to freenom.com where they may finalize the domain name registration, as shown screenshot below.

86.     Visitors who click on the "Policies" page on the website of Dot TK are redirected to a policy page located under the freenom.com domain name.

87.     On information and belief, Freenom does not engage in arm's length transactions with the

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

ccTLD Service Providers when Freenom registers or sells domain names through the ccTLD Service Providers.

88.     On information and belief, Freenom and the ccTLD Service Providers comingle assets and resources with each other. For example, payments for the purchase of ccTLD domain names owned by the ccTLD Service Providers were made to Freenom.

### 3.     Freenom and ID Shield

89.     ID Shield provides a proxy service whereby ID Shield registers domain names, as the registrant and in its own name, and then licenses these domain names to Defendants and Doe Defendants for their use.

90.     Freenom and the ID Shield share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business. For example, when a visitor attempts to navigate to ID Shield's website available at idshield.tk, the visitor is automatically redirected to freenom.com.

91.     On information and belief, ID Shield has no bank accounts or assets and is undercapitalized.

92.     On information and belief, ID Shield has no employees of its own and its operations are performed by Freenom's employees.

93.     Freenom is a director of ID Shield and, on information and belief, is the sole director of ID Shield. Accordingly, on information and belief, Freenom completely controls the operations of ID Shield.

94.     On information and belief, Freenom completely controls the policy decisions made by ID Shield.

95.     On information and belief, Freenom completely controls the agreements into which ID Shield enters.

96.     On information and belief, Freenom pays all of the expenses of ID Shield.

97.     On information and belief, Freenom collects all revenue from ID Shield's domain name registration proxy service. Freenom's customers purchase and pay for the ID Shield services directly from Freenom's website.

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

98.     On information and belief, Freenom and ID Shield do not engage in arm's length transactions when they conduct transactions with each other. For example, the "Freenom ID Shield WHOIS Privacy Service Agreement" outlines the terms and conditions for a customer's "use of the services offered by Stichting OpenTLD WHOIS Proxy [ID Shield]. . . ***and*** OpenTLD B.V. [Freenom]. . ." (emphasis added). The Freenom ID Shield WHOIS Privacy Service Agreement is attached to this Second Amended Complaint as Exhibit 5.

### 4.     Freenom and Yoursafe aka Bitsafe aka Verotel

99.     Freenom and Yoursafe are controlled by the same persons: Joost Zuurbier and Marcel Trik. Joost Zuurbier is the CEO of Freenom and is a director of Yoursafe. Yoursafe's sole shareholder is a company called Yoursafe Holding B.V., whose director in turn is Fintag. Similarly, Marcel Trik is the CFO of Freenom and a director of Yoursafe.

100.     Yoursafe operates under a variety of trade names, including Bitsafe and Verotel/Verotel Merchant Services B.V. ("Verotel").

101.     According to its website available at verotel.com, "Verotel is a leading Internet Payment Service Provider (IPSP) that has been enabling more than 50,000 high-risk webmasters with building their online businesses since 1998."

102.     When a customer purchases and pays for domain name registration services or privacy services from Freenom, credit card processing is provided by Verotel.

103.     Verotel also offers domain name registration services. According to Verotel's website available at veroteldomains.com, "[t]hrough its affiliation with Freenom, an ICANN accredited registrar, Verotel Domains offers a dedicated registrar platform for adult webmasters who are privacy conscious and require extra protection and service for they [*sic*] high risk domain names."

104.     According to its website available at bitsafe.com, Bitsafe is "the new name for Freenom and Verotel, two disruptive brands in the transactional online business space. . . . Bitsafe brings these two brands together into a new service: a Bitsafe Basic Payment Account. Offering a 'discreet account', Bitsafe provides a Bitsafe IBAN, allowing account holders to take part of SEPA transactions and hold domain names and other digital assets. Purchases and ATM withdrawals can be made with the Bitsafe Debit Card."

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

105.    A June 6, 2018 press release by Verotel contained the following information: "Verotel and Bitsafe allow you to register or transfer your domains while protecting your identity online. Domain names can be registered with Bitsafe at cost price [sic], making this service the cheapest domain solution available. Bitsafe also offers additional privacy protection for a nominal fee that further safeguards your digital assets and ensures your continuity."

106.    Marcel Trik, the CFO of Freenom and a director of Yoursafe/Bitsafe/Verotel, is quoted in the same press release: "Combining the trust in payments and domains makes perfect sense. . . . With Bitsafe we are not only protecting your money but also your digital assets in one single discreet account."

107.    On information and belief, the directors, officers, and/or managers do not independently manage and direct Freenom and Yoursafe/Bitsafe/Verotel, but rather operate Freenom and Yoursafe/Bitsafe/Verotel as a single integrated company with a unified management system.

108.    Freenom and Yoursafe/Bitsafe/Verotel both share the same business address and, on information and belief, use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business.

109.    On information and belief, Freenom does not engage in arm's length transactions with Yoursafe/Bitsafe/Verotel, for example, when Freenom registers or sells domain names through Yoursafe/Bitsafe/Verotel. Each time a customer enters into an agreement with Yoursafe/Bitsafe/Verotel to register a domain name, that customer is entering into an agreement with Freenom.

110.    On information and belief, Freenom and Yoursafe/Bitsafe/Verotel comingle assets and resources with each other. For example, payments for the purchase of domain name registration services and proxy services offered by Yoursafe/Bitsafe/Verotel are made to Freenom.

    **5.    Freenom and VTL/Freedom Registry, Inc.**

111.    Freedom Registry, Inc. was incorporated in Delaware in 2012. In November 2017, Freedom Registry, Inc. formally changed its name to VTL Merchant Support Inc. (referred to in this Second Amended Complaint as "VTL").

112.    VTL was the sole shareholder of Freenom in 2012. Sometime between 2012 and the present, Freedom Registry became the sole shareholder of Freenom.

113.    VTL's filing with the California Secretary of State identifies its type of business as

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

"Payment Processing."

114.    In its filings with the California Secretary of State, VTL represents that its principal office in California is 2225 East Bayshore Road, Suite 290, Palo Alto, California 94303.

115.    VTL's filing with the California Secretary of State identifies "Johannes W.A. Zuurbier" (aka Joost Zuurbier) as VTL's CEO.

116.    Similarly, Marcel Trik, the CFO of Freenom and Freedom Registry and director of Yoursafe, serves as VTL's Secretary and CFO.

117.    In or around December 2022 or January 2023, VTL deactivated the name servers for its website accessible at vtl.support such that the website is no longer accessible.

118.    According to its former website, VTL is "a leading international Help Desk Outsourcing service for both Enterprise and medium sized businesses."

119.    VTL's former website was nearly identical to websites of other entities that, on information and belief, are connected to Defendants. For example, VTL's former website was nearly identical to that of yet another entity called VTL Support Services, Inc., a Nevada corporation for which Joost Zuurbier serves as the President, Secretary, Treasurer, and Director. These websites are compared below:

 

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

120.     Similarly, both of these websites are nearly identical to that of still another entity called Verotel Merchant Support, Inc., a Delaware corporation. On information and belief, Verotel Merchant Support, Inc. is another shell company or alter ego of Yoursafe/Bitsafe/Verotel. Apart from the fact that Verotel is a trade name of Yoursafe, the website for Verotel Merchant Support, Inc., shown in the screenshot below, shares key features with the two websites pictured above:



C.     **Defendants' Unlawful Conduct**

1.     **Defendants Registered the Infringing Domain Names**

121.     Freenom offers three types of domain name registration services, which it refers to as "Free Domains," "Paid Domains," and "Special Domains."

122.     According to Freenom's current website, domain names comprising one, two, or three characters, as well as "common dictionary keywords," are considered "special" and are only available for purchase.

123.     According to a prior version of Freenom's website,[19] Freenom also categorized domain

---

[19] Freenom submitted a screenshot of its website as a specimen to the United States Patent and Trademark Office on September 13, 2013 in connection with its trademark application for FREENOM (U.S. Serial No. 86/053,896).

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

names consisting of "Fortune 500 Trademarks" as "special domains" available for a "higher price per domain name per year." A screenshot of Freenom's website from 2013 appears below:



124.    Freenom specifically adopted a business model to target and profit in bad faith from the trademarks of Fortune 500 companies, and by charging a premium for those domain names, Freenom has acknowledged that Fortune 500 companies' trademarks have a greater value to bad actors on the Internet.

125.    Despite adopting a policy that Fortune 500 Brand domains would not be available for free, Freenom has allowed domain names that are identical or confusingly similar to those brands to be registered for free.

126.    In connection with the five ccTLDs (.tk, .cf, .gq, .ml, and .ga), Freenom offers free domain name registration services.

127.    Under Freenom's free domain name model, which is discussed in the screenshot above, when a customer seeks to register a free domain name in one of these ccTLDs, Freenom registers the domain name, as the registrant, and licenses it to the customer. Freenom's Terms and Conditions Agreement that applies to free domain names ("Free Domain Name Agreement") is attached to this

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Second Amended Complaint as Exhibit 6.

128.    According to the Free Domain Name Agreement, "[b]y accepting this agreement . . . you have authorized Freenom to register the domain name that you requested."

129.    Freenom's Free Domain Name Agreement also provides: "All domain names registered through FREE DOMAIN are registered in our name or in the name of one holding [sic] or sister companies."

130.    In one of Freenom's briefs filed in a 2015 arbitration proceeding between Freenom and ICANN stemming from ICANN's suspension of some of Freenom's registrar services, Freenom admitted that "when a third party registers a country code domain, **the domain is registered in OpenTLD's [*i.e. Freenom's*] name** on behalf of the actual registrant, who nonetheless remains the licensee and user of the domain." (emphasis in original.) A copy of the document containing this language is attached as Exhibit 17.

131.    For example, when a domain name is registered within the .tk ccTLD using Freenom's domain name registration services, the WHOIS[20] record for that domain name lists Freenom's alter ego Dot TK as the registrant, as shown in the screenshot below for the domain name faceb00k.tk:

FACEB00K.TK

 Your selected domain name is a FREE domain name. That means that, according to the Terms and Conditions of FREE domain names, the registrant is:

BV Dot TK
Dot TK administrator
P.O. Box 11774
1001 GT Amsterdam
Netherlands

Due to restrictions in Freenom's Privacy Statement personal information about the user of the domain name cannot be released.

132.    When a free ccTLD domain name expires or is "cancelled, suspended, refused, or reserved" Freenom revokes its licensees' license to use the domain name and transfers the domain name

---

[20] The WHOIS directory contains important information about domain names, including the identity and contact information for the registrant or owner of the domain name.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

to "Freedom Registry, Inc." In a declaration filed in the 2015 arbitration proceeding mentioned above, Joost Zuurbier submitted a declaration as the CEO of Freenom and stated, "Under this free domain structure, when third parties register these country-code domains, they are registered in the name of OpenTLD [*i.e.*, Freenom] while the actual registrant remains the licensee and user of the domain. Further, parked and expired domains are transferred to one of OpenTLD's [*i.e.*, Freenom's] affiliates: Freedom Registry, Inc. or Freenom SARL." A copy of this declaration is attached as Exhibit 18.

133.    On information and belief, this practice of transferring domain names to Freedom Registry, Inc. (now known as VTL) has continued. Once the license for the domain name concludes, Freedom Registry, Inc. is listed as the registrant of the domain name in the WHOIS directory.[21] One such example of a domain name that has been "taken back" by Freenom is shown in the screenshot below:

SECURITYFACEBOOK.TK

 Your selected domain name is a domain name that has been cancelled, suspended, refused or reserved at the Registry. It may be available for re-registration at http://www.freenom.com.

In the interim, the rights for this domain have been automatically transferred to:

Freedom Registry, Inc.
2225 East Bayshore Road #290
Palo Alto CA 94303
United States
Phone: +1 650-681-4172
Fax: +1 650-681-4173
E-mail: abuse: abuse@freenom.com, copyright infringement: copyright@freenom.com

134.    Freenom's alter ego, ID Shield, provides a proxy service that is used to hide Freenom's

---

[21] This is a legal distinction without a difference because Freedom Registry, Inc. is the former name of VTL and is thus merely another alter ego and/or alias for Freenom. Still, by continuing to list Freedom Registry, Inc. as the registrant instead of VTL, Defendants are providing inaccurate and misleading contact information. Under the RAA, Freenom is, as a gTLD registrar, required to take affirmative steps to ensure the accuracy of the contact information provided for the registration of gTLD domain names and to investigate allegations of inaccuracy. Upon a registrant's willful provision of inaccurate information, a registrar, such as Freenom, is required under the RAA to terminate or suspend the domain name registration if the false information is not corrected within fifteen days. Freenom's contractual obligations under the RAA thus render Freenom's own provision of false and misleading contact information blatant and willful. Further, that Freenom continues to use the name of an entity that it knows ceased existing under that name in November 2017 further highlights that this scheme to provide misleading contact information is intentional.

customer and/or the licensee of some of the Infringing Domain Names.

135.    Defendants registered at least 1,500 Infringing Domain Names that are identical or confusingly similar to the Facebook Trademarks. Several examples include: faceb00k.cf, facebo0k.cf, accounts-facebook.cf, facbook.ga, facebooklogiin.ga, facebooknet.gq, www-facebook.gq, fecebooksupport.ml, facebooksecurelogin.ml, facelboook.tk, and wwwv-facebook.tk. Freenom (as Freedom Registry, Inc., now known as VTL), or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, is or was the registrant for each of these Infringing Domain Names according to the WHOIS records for each of those domain names. A list of these Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 7.

136.    Defendants registered at least 3,000 Infringing Domain Names that are identical or confusingly similar to the Instagram Trademarks. Several examples include: instagramsecurity.cf, lnstaqram.cf, password-reset-instagram.ga, login-instagram.ga, www-instagram-com.gq, www-instagram.gq, www-instagramhelp-com.gq, instaqram.ml, lnsta-gram.ml, instagram-com.tk, and lnstaqram.tk. Freenom (as Freedom Registry, Inc./VTL), or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, is or was the registrant for each of these Infringing Domain Names. A list of these Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 8.

137.    Defendants registered at least 800 Infringing Domain Names that are identical or confusingly similar to the WhatsApp Trademarks. Several examples include: whatsapp-messenger.cf, whatsap-chat.cf, whatsaap.ga, whaatsapp.ga, chat-whatsap.gq, chats-whatsapp.gq, whatsapchat.ml, chatwhatsaap.ml, whatsaap.tk, and whetsapp.tk. Freenom (as Freedom Registry, Inc./VTL), or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, is or was the registrant for each of these Infringing Domain Names. A list of these Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 1. A copy of the WHOIS data for several representative Infringing Domain Names is attached to this Second Amended Complaint as Exhibit 9.

138.    Plaintiffs' Facebook Trademarks and Instagram Trademarks were distinctive and famous when Defendants registered, trafficked in, or used the Infringing Domain Names.

139.    Plaintiffs' WhatsApp Trademarks were distinctive when Defendants registered, trafficked in, or used the Infringing Domain Names.

**2.    Defendants and Doe Defendants Trafficked in the Infringing Domain Names**

140.    For free domain names registered in one of the ccTLDs serviced by Freenom, Freenom or one of the ccTLD Service Providers registers the domain name and licenses it to the customer to use. Freenom's Free Domain Name Agreement states, "we grant you a limited, non-exclusive, personal, non-transferable license to use FREE DOMAIN and the domain name provided to you in connection therewith."

141.    For domain names using ID Shield's proxy service, ID Shield registers the domain name and licenses it to Doe Defendants to use.

142.    Defendants trafficked in each of the Infringing Domain Names by licensing the Infringing Domain Names to Doe Defendants to use.

**3.    Defendants and Doe Defendants Used the Infringing Domain Names**

143.    Doe Defendants have used many of the Infringing Domain Names to host phishing websites (the "Phishing Websites").

144.    The Phishing Websites often display content bearing the Facebook, Instagram, and/or WhatsApp Trademarks and imitating the look and feel of Plaintiffs' websites. For example, one of the Doe Defendants used the domain name facebook-accounts.cf to operate a Phishing Website, as shown in the screenshot below:



SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

145.     Screenshots of additional Phishing Websites are attached to this Second Amended Complaint as Exhibit 10.

146.     The Phishing Websites are intended to mislead Internet users into providing their Facebook, Instagram, or WhatsApp login credentials, including account IDs and passwords, believing that they are visiting Plaintiffs' genuine websites.

147.     Defendants and Doe Defendants' use of Plaintiffs' Trademarks, including stylized versions of those marks, is without Plaintiffs' authorization or approval.

148.     Defendants and Doe Defendants' use of Plaintiffs' Trademarks, including stylized versions of those marks, on the Phishing Websites is intentional and designed to trade on the goodwill of Plaintiffs' Trademarks and deceive Plaintiffs' users and the public.

149.     Doe Defendants have also used many of the Infringing Domain Names to either host or redirect to websites that display adult content.

150.     Defendants generate revenue from domain names, including from the Infringing Domain Names, after the domain names have expired or been "cancelled, suspended, refused, or reserved." According to Freenom, "Domains that are no longer used by the registrant [Freenom's licensee] or are expired are taken back by Freenom and the residual traffic is sold to advertisement networks."

151.     Additionally, even when Freenom licenses free domain names to its customers, Freenom uses and profits from the traffic to the domain name. According to the Free Domain Name Agreement, "all visitors/visits to the domain name provided to [Freenom's licensee] in connection with FREE DOMAIN shall be counted solely as traffic to Freenom for all purposes relating to tracking and reporting audience measurement."

152.     Defendants used and continue to use many of the Infringing Domain Names to operate revenue-generating advertising "parking pages" that divert consumers away from Plaintiffs' legitimate websites. Additionally, Defendants have used some of the Infringing Domain Names even after Plaintiffs sent notice of the infringement.

153.     One example of Defendants' use of the Infringing Domain Names is instagramchat.gq.

When Internet users navigate to instagramchat.gq, they are redirected first to domain.dot.tk[22] and then directed to freenom.link, as shown in the screenshot below:

Date Traced: 2022-09-27 00:12:49 GMT

User Agent: Wheregoes.com Redirect Checker/1.0

| # | Code | Requested URL |
|---|---|---|
| ⌄ | 203 | http://instagramchat.gq |
|   |   | ▪ Redirects: 2 |

| 1 | 203 | ⊗ ⧉ http://instagramchat.gq |
|---|---|---|
|   |   | **Status Code: 203 - Meta-Refresh Redirect** |
| 2 | 301 | ⧉ http://domain.dot.tk/p/?d=INSTAGRAMCHAT.GQ&i=167.71.162. 214&c=1&ro=0&ref=unknown&_=1664237569628 |
|   |   | **301 Redirect** |
| 3 | 200 | ⊗ http://freenom.link/?k=80808080&_=1664237553 |
|   |   | **Trace Complete** |

154.    As a result, when Internet users attempt to visit instagramchat.gq, they ultimately land on freenom.link, which displays a revenue-generating parking page, as shown in the screenshot below:

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

---

[22] The domain name dot.tk (under which domain.dot.tk is hosted) is owned and operated by Defendants.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG



155. On information and belief, Defendants own freenom.link, which was registered using Porkbun, LLC, a registrar based in the United States.

156. Defendants host the freenom.link website on a server provided by Bodis, LLC. Bodis, LLC is a United States-based company that provides Defendants with the commercial links Defendants display on the freenom.link website. Bodis, LLC's General Terms of Service specify that those using the Bodis services irrevocably consent to the exclusive jurisdiction of, and venue in, the state and federal courts located in Tampa, FL as to any disputes arising out of or relating to Bodis' website or the use of Bodis' programs or services.

157. Defendants use freenom.link to display revenue-generating parking pages whenever Internet users are redirected from one or more of the Infringing Domain Names.

158. Other examples of Defendants' use of the Infringing Domain Names include: facebook-instagram-busines.ml, facebookhelpcustomer.cf, facebookloginup.cf, whatsap.cf, and whatsap-chat.gq. Screen captures showing Defendants' use of the Infringing Domain Names to host revenue-generating parking pages are attached to this Second Amended Complaint as Exhibit 11.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**D.     ID Shield's Failure to Disclose Contact Information**

159.     Freenom is an ICANN-accredited registrar subject to ICANN's RAA. A copy of the RAA is attached to this Second Amended Complaint as Exhibit 12.

160.     When a domain name is registered in a gTLD using Freenom's registrar services, the terms of the RAA apply. Specifically, the RAA requires that certain terms be incorporated into Freenom's registration agreement for these gTLD domain names. Freenom's Terms and Conditions Agreement that applies to paid domain names (including domain names in a gTLD) ("Paid Domain Name Agreement") is attached to this Second Amended Complaint as Exhibit 13.

161.     One such ICANN requirement included in Freenom's registration agreement provides that ID Shield (as the registrant of the domain names) "shall accept liability for harm caused by wrongful use of the Registered Name, unless it discloses the current contact information provided by the licensee and the identity of the licensee within seven (7) days to a party providing [ID Shield] reasonable evidence of actionable harm." *See* Exhibits 12 & 13.

162.     Freenom and ID Shield's service agreements anticipate that they will be sued for misuse of domain names, including for trademark infringement and cybersquatting, and require parties to their respective agreements to indemnify against such claims. *See* Exhibits 13 & 6.

163.     ID Shield has registered one or more of the Infringing Domain Names, as the registrant and in its own name, and then licenses these domain names to Freenom and to Freenom's customers for their use. For example, the Infringing Domain Name fecebookiyat.info was registered by ID Shield, as the registrant and in its own name. A copy of the WHOIS record listing Stichting OpenTLD WHOIS Proxy (ID Shield) as the registrant is attached to this Second Amended Complaint as Exhibit 14.

164.     Plaintiffs' authorized representatives sent communications to Defendants with evidence the Infringing Domain Names, including fecebookiyat.info, caused actionable harm, including by infringing on the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks, and requesting that Defendants disclose the identities of the registrant(s).

165.     Defendants failed to timely disclose the identity or any contact information of the licensee when presented with reasonable evidence of actionable harm by Plaintiffs or their authorized representatives. In fact, ID Shield did not respond at all to one or more of the Plaintiffs' notices.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

### E.    Defendants' and Doe Defendants' Bad Faith Intent to Profit

166.    Neither Defendants nor Doe Defendants have any trademark or other intellectual property rights in the Infringing Domain Names.

167.    The Infringing Domain Names do not consist of the legal name of Defendants or Doe Defendants, nor do they consist of a name that is otherwise commonly used to identify Defendants or Doe Defendants.

168.    Neither Defendants nor Doe Defendants have made any prior use of the Infringing Domain Names in connection with a bona fide offering of any goods or services.

169.    Neither Defendants nor Doe Defendants have made any a bona fide noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

170.    Defendants intend to divert consumers by selecting and using domain names that are phonetically identical or confusingly similar to Plaintiffs' trademarks for Defendants' commercial gain.

171.    As demonstrated by numerous UDRP decisions, Defendants registered large numbers of domain names that are identical or confusingly similar to the trademarks of others, including those of Fortune 500 companies. In fact, as Freenom's 2013 website indicates, Defendants recognize that domain names that are identical or confusingly similar to the trademarks of Fortune 500 companies have a higher value than other domain names based on the fact that Freenom charges more for those types of domain names.

172.    On information and belief, as part of their unlawful scheme, Defendants specifically target Fortune 500 brands, such as those of Plaintiffs, as demonstrated by their registration of, use of, and trafficking in the Infringing Domain Names and domain names confusingly similar to the marks of other Fortune 500 companies.

173.    On information and belief, Defendants profit from their provision of domain names for free because the free registration services prompt customers to use Freenom's registrar services and other fee-based related services. Thus, even Defendants' free domain name registration services result in a profit to Defendants because, on information and belief, those free services draw in customers who ultimately also use other related fee-based services.

174.    Defendants also profit when free domain names are registered and subsequently expire,

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

or are cancelled, suspended, or refused, because Freenom revokes the license to the licensee and uses those domain names for its own benefit.

175.    Defendants and Doe Defendants monetize their domain names by operating revenue-generating parking pages and redirecting visitors to other commercial websites, websites with pornographic content, and websites used for malicious activity like phishing.

176.    The ID Shield proxy service is part of a deliberate scheme by Defendants to shield the identity of Defendants and Doe Defendants and thus aid in cybersquatting, including cybersquatting on Plaintiffs' Trademarks.

177.    Defendants also use false or misleading contact information because Defendants list Freedom Registry, Inc. as the registrant in multiple WHOIS records; however, Freedom Registry, Inc. ceased to exist as an entity operating under that name in November 2017 when it changed its name to VTL Merchant Support, Inc.

178.    For many Infringing Domain Names, Defendants intentionally omit any WHOIS record, falsely stating that a domain name has not been registered when in fact the domain name has been registered and is being used by Defendants or Doe Defendants. For example, as discussed above, instagramchat.gq is registered and is actively used by Defendants to operate a revenue-generating parking page. Despite this, when a visitor attempts to query Freenom's website for the WHOIS record of instagramchat.gq, the following webpage results:

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

179.    Defendants have an economic incentive to resist attempts to expose the identities of Doe Defendants using their proxy services even when presented with reasonable evidence of actionable harm by Plaintiffs and other trademark owners.

180.    Defendants knowingly and intentionally shield the identities of Doe Defendants, who are cybercriminals, including those who infringe and cybersquat on Plaintiffs' Trademarks.

181.    Freenom has a history of cybersquatting on famous and distinctive trademarks.

182.    Defendants have received multiple inquiries, non-compliance notices, and contractual breach letters from ICANN regarding their failure to provide registration data and failure to investigate and correct WHOIS inaccuracies, to validate and verify WHOIS data for their customers, and to publish required information about its ultimate parent entity.

183.    Freenom has also been named in numerous administrative complaints filed under the

Uniform Domain-Name Dispute-Resolution Policy ("UDRP"), resulting in the transfer of the domain name(s) to the trademark owners bringing the complaint.

184.    On or about June 23, 2015, ICANN suspended Freenom's ability to create new domain names or initiate inbound transfers of domain names for 90 days. The suspension was premised on ICANN's determination that, "[p]ursuant to Section 5.5.2.4 of the RAA, … [Freenom] has engaged in a pattern and practice of trafficking in or use of domain names identical or confusingly similar to a trademark or service mark of a third party in which the Registered Name Holder has no rights or legitimate interest."

185.    In the 2015 arbitration proceeding between ICANN and Freenom conducted in the Los Angeles, California resulting from Freenom's suspension, Freenom admitted that its free registration services "prove appealing to unscrupulous third parties engaged in abusive registration practices."

186.    The arbitrator agreed with ICANN's suspension, noting that Freenom had engaged in a pattern of abusive registration conduct, specifically targeting trademarks of competing registrars, calculated to deliberately divert name registration business from other registrars to Freenom by inducing consumer confusion.[23] In particular, the arbitrator referenced a finding that Freenom intentionally deleted the disputed domain name registrations, where it was both the registrar and the registrant, during the pendency of the UDRP proceedings instead of placing the names on registrar lock, in direct contravention to Paragraph 8 of the Uniform Domain Name Dispute Resolution Policy. The arbitrator concluded that if this pattern were allowed to continue, it would inflict increasing harm through the illicit exploitation of third-party trademark rights by escalating consumer confusion in the marketplace to the detriment of not only the rights holders but also consumers and the public in general.

187.    Defendants are aware that the domain names they register and traffic in are used to infringe the trademark rights of trademark owners because Freenom and/or the ccTLD Service Providers, as the registrant and/or registrar, receive notices of infringement by trademark owners (including Plaintiffs) and their agents, and receive notices of every UDRP complaint and decision against a domain name registered using Defendants' services.

---

[23] The arbitrator's opinion is available at https://www.icann.org/en/system/files/files/emergency-award-24aug15-en.pdf.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

188.   Despite Defendants' awareness of the infringement, they continue to refuse to disclose identifying information for licensees when presented with evidence of actionable harm caused by domain names.

189.   By refusing to identify the licensees when presented with evidence of actionable harm, even after being subject to numerous UDRP complaints and having received multiple Notice of Breach letters from ICANN, Defendants have demonstrated that they are knowingly disregarding their legal and contractual obligations, the rights of those being harmed by cybercriminals who use their services to register domain names to infringe the marks of others, and the harm caused to third parties who fall victim to cybercrime such as phishing attacks that are facilitated through domain names registered with Defendants on behalf of their cybercriminal customers. These cybercrimes rely on deceptive domain names, like the Infringing Domain names, registered with Defendants to harvest users' personal and financial information.

190.   Defendants and Doe Defendants intended to divert consumers to websites using domain names that were confusingly similar to the Facebook Trademarks, Instagram Trademarks and WhatsApp Trademarks. In some instances, the Infringing Domain Names have been used in connection with phishing attacks, pornographic content, and to operate revenue-generating parking pages and to redirect visitors to other commercial websites.

191.   This history of conduct also demonstrates Defendants' and Doe Defendants' bad faith intent to profit from Plaintiffs' Trademarks, as well as the marks of others, by earning revenue from cybercriminals who exploit those marks for unlawful purposes.

## FIRST CAUSE OF ACTION

### [Cybersquatting on Plaintiffs' Trademarks Under 15 U.S.C. § 1125(d)]

192.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

193.   Plaintiffs' Trademarks were distinctive or famous and federally registered at the United States Patent and Trademark Office at the time Defendants registered, used, and trafficked in the Infringing Domain Names.

194.   Each of the Infringing Domain Names is confusingly similar to Plaintiffs' Trademarks.

195.   Each of the Infringing Domain Names is dilutive of the Facebook Trademarks or

Instagram Trademarks.

196.    Defendants registered (as the registrant[24]), used, or trafficked in, each of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

197.    Doe Defendants used, or trafficked in, each of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks.

198.    Neither Defendants nor Doe Defendants have any trademark or other intellectual property rights in the Infringing Domain Names.

199.    The Infringing Domain Names do not consist of the legal name of any of Defendants or Doe Defendants, nor do they consist of a name that is otherwise commonly used to identify them.

200.    Neither Defendants nor Doe Defendants have any prior use of any of the Infringing Domain Names in connection with the bona fide offering of any goods or services.

201.    Neither Defendants nor Doe Defendants have made any bona fide noncommercial or fair use of Plaintiffs' Trademarks on a website accessible at any of the Infringing Domain Names.

202.    Defendants and Doe Defendants intended to divert consumers from Plaintiffs' legitimate websites to a website accessible under the Infringing Domain Names for their commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of their websites.

203.    Defendants and Doe Defendants provided material and misleading false contact information when applying for the registration of the Infringing Domain Names and/or intentionally failed to maintain accurate contact information. Defendants and Doe Defendants have demonstrated a pattern of such conduct. For instance, Defendants list Freedom Registry, Inc. as the registrant for many of the Infringing Domain Names; however, Freedom Registry, Inc. underwent a name change and became VTL Merchant Support, Inc. in November 2017. Defendants, however, have continued to falsely list Freedom Registry, Inc.—an entity that no longer exists under that name—as the registrant for these Infringing Domain Names. Freenom does so despite its ICANN-imposed obligations to ensure the

---

[24] The WHOIS record for each of the Infringing Domain Names lists or has listed at least one of Freenom (as Freedom Registry, Inc./VTL), or one of its alter ego ccTLD Service Providers, and/or Freenom's alter ego proxy company, ID Shield, as the registrant.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

accuracy of registrant data.

204.    Defendants' registration, use, and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

205.    Doe Defendants' registration, use and/or trafficking in the Infringing Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiffs to relief.

206.    Defendants and Doe Defendants have registered multiple domain names which they knew were identical or confusingly similar to marks of others that were distinctive at the time of registration of such domain names.

207.    Defendants and Doe Defendants have provided material and misleading false contact information for the Infringing Domain Names.

208.    Plaintiffs' remedy at law is not adequate to compensate it for the injuries Defendants and Doe Defendants inflicted on Plaintiffs. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

209.    Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

210.    Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

211.    Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs' actual damages, and the costs of this action. Instead of actual damages and profits, Plaintiffs may alternatively elect to an award of statutory damages under 15 U.S.C. § 1117(d) in an amount of $100,000 per Infringing Domain Name. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

212.    This is an exceptional case, entitling Plaintiffs to an award of reasonable attorneys' fees under 15 U.S.C. § 1117.

**SECOND CAUSE OF ACTION**

**[Trademark and Service Mark Infringement of Plaintiffs' Trademarks Under 15 U.S.C. § 1114]**

213.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

214.   Defendants and Doe Defendants have used Plaintiffs' Trademarks in interstate commerce. Defendants' and Doe Defendants' use of Plaintiffs' Trademarks is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval by Plaintiffs of Defendants' and Doe Defendants' websites.

215.   The above-described acts of Defendants and Doe Defendants constitute trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and entitle Plaintiffs to relief.

216.   Defendants and Doe Defendants have unfairly profited from the alleged trademark and service mark infringement.

217.   By reason of Defendants' and Doe Defendants' acts of trademark and service mark infringement, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

218.   Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiffs and their federally registered trademarks and service marks.

219.   Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

220.   Plaintiffs' remedy at law is not adequate to compensate them for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

221.   Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs', actual damages, and the costs of this action. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

222.   This is an exceptional case, making Plaintiffs eligible for an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

### THIRD CAUSE OF ACTION

### [Trademark and Service Mark Infringement of Plaintiffs' Trademarks

### and False Designation of Origin Under 15 U.S.C. § 1125(a)]

223.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

224.   Plaintiffs' Trademarks are distinctive marks that are associated with Plaintiffs and

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

exclusively identify their respective businesses, products, and services.

225.    Defendants' and Doe Defendants' use in commerce of Plaintiffs' Trademarks, and variations thereof, is likely to cause confusion, or to cause mistake, or to deceive the relevant public that Defendants' and Doe Defendants' goods and services are authorized, sponsored, or approved by, or are affiliated with, Plaintiffs.

226.    Defendants' and Doe Defendants' acts constitute trademark and service mark infringement of Plaintiffs' Trademarks, as well as false designation of origin, in violation of 15 U.S.C. § 1125(a), entitling Plaintiffs to relief.

227.    Defendants and Doe Defendants have unfairly profited from their conduct.

228.    By reason of the above-described acts of Defendants and Doe Defendants, Plaintiffs have suffered damage to the goodwill associated with Plaintiffs' Trademarks.

229.    Defendants and Doe Defendants have irreparably harmed Plaintiffs and, if not enjoined, will continue to irreparably harm Plaintiff and Plaintiffs' Trademarks.

230.    Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

231.    Plaintiffs' remedy at law is not adequate to compensate it for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

232.    Plaintiffs are entitled to recover Defendants' and Doe Defendants' profits, Plaintiffs' actual damages, and the costs of this action. Plaintiffs are also entitled to have their damages trebled under 15 U.S.C. § 1117.

233.    This is an exceptional case, making Plaintiffs eligible for an award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

## FOURTH CAUSE OF ACTION

**[Dilution of the Facebook Trademarks and Instagram Trademarks Under 15 U.S.C. § 1125(c)]**

234.    Meta and Instagram reallege and incorporate by reference all of the preceding paragraphs.

235.    The Facebook Trademarks and Instagram Trademarks are famous, as that term is used in

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

15 U.S.C. § 1125(c), and they were famous before Defendants' and Doe Defendants' use of them and variations of the trademarks in commerce. This fame is based on, among other things, the inherent distinctiveness and federal registration of each of the Facebook Trademarks and Instagram Trademarks as well as the extensive and exclusive worldwide use, advertising, promotion, and recognition of them.

236.   Defendants' and Doe Defendants' use of the Facebook Trademarks and Instagram Trademarks, and variations thereof, in commerce is likely to cause dilution by blurring or dilution by tarnishment of these trademarks.

237.   Defendants' and Doe Defendants' acts constitute willful dilution by blurring and dilution by tarnishment in violation of 15 U.S.C. § 1125(c), entitling Meta and Instagram to relief.

238.   Defendants and Doe Defendants have unfairly profited from their conduct.

239.   Defendants and Doe Defendants damaged the goodwill associated with the Facebook Trademarks and the Instagram Trademarks and they will continue to cause irreparable harm.

240.   Meta's and Instagram's remedy at law is not adequate to compensate them for the injuries inflicted by Defendants and Doe Defendants. Accordingly, Meta and Instagram are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

241.   Defendants and Doe Defendants have irreparably harmed Meta and Instagram and, if not enjoined, will continue to irreparably harm them and their federally registered trademarks and service marks.

242.   Defendants and Doe Defendants have irreparably harmed the general public and, if not enjoined, will continue to irreparably harm the general public, which has an interest in being free from confusion, mistake, and deception.

243.   Because Defendants and Doe Defendants acted willfully, Meta and Instagram are entitled to damages, and those damages should be trebled pursuant to 15 U.S.C. § 1117.

244.   This is an exceptional case, making Meta and Instagram eligible for an award of attorneys' fees pursuant to 15 U.S.C. § 1117.

### FIFTH CAUSE OF ACTION

### [Violation of the Anti-Phishing Act Under Cal. Bus. & Prof. Code § 22948]

245.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs.

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

246.     By using some of the Infringing Domain Names to operate Phishing Websites, Doe Defendants falsely represented themselves to be Facebook, Instagram, or WhatsApp, without Plaintiffs' authorization

247.     Doe Defendants' Phishing Websites were intended to, and on information and belief did in fact, solicit, request, and induce users of Facebook, Instagram, and WhatsApp to provide identifying information, including account credentials.

248.     Plaintiffs were adversely affected by Doe Defendants' phishing scheme and suffered, without limitation, damage to the goodwill associated with Plaintiffs' Trademarks, harm to their users, and monetary losses in an amount to be determined.

249.     Doe Defendants' conduct constitutes a violation of Cal. Bus. & Prof. Code § 22948.3(a)(1).

250.     As a result, Plaintiffs are entitled to recover the greater of their actual damages or five hundred thousand dollars ($500,000) per each phishing website pursuant to Cal. Bus. & Prof. Code § 22948.3(a)(1).

251.     Further, because Doe Defendants engaged in a pattern and practice of violating the Anti-Phishing Act, Plaintiffs request the trebling of their actual damages pursuant to Cal. Bus. & Prof. Code § 22948.3(c)(1).

252.     Plaintiffs further seek an award of their attorneys' fees and costs of suit pursuant to Cal. Bus. & Prof. Code § 22948.3(c)(2).

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request:

253.     That the Court find that:

a.     Defendants registered, trafficked in, or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d);

b.     Doe Defendants registered, trafficked in or used one or more of the Infringing Domain Names with a bad faith intent to profit from Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d);

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

c. Defendants infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1);

d. Doe Defendants infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1);

e. Defendants infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a);

f. Doe Defendants infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a);

g. Defendants have willfully diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c);

h. Doe Defendants have willfully diluted the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c);

i. Doe Defendants have solicited, requested, or taken action to induce another person to provide identifying information by representing themselves as Plaintiffs without the authority or approval of Plaintiffs in violation of Cal. Bus. & Prof. Code § 22948.2;

j. Defendants did not timely and accurately disclose the current contact information provided by Doe Defendants and the identity of Doe Defendants in response to one or more of Plaintiffs' notices;

k. Defendants are liable for the harm to Plaintiffs caused by those Doe Defendants' wrongful use of the Infringing Domain Names.

l. Defendants are alter egos each individually and collectively liable for others' unlawful acts;

m. Freenom is the direct participant in the unlawful acts of Freedom Registry, Fintag, Cervesia, the ccTLD Service Providers, ID Shield, Yoursafe, VTL, and Joost Zuurbier Management Services B.V. and thus is liable for the harm caused; and

n. each of the above acts was willful.

254. That the Court enter a judgment against Defendants that Defendants have infringed the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(d).

255.   That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1125(d).

256.   That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in the federally registered Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks in violation of 15 U.S.C. § 1114(1).

257.   That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1114(1).

258.   That the Court enter a judgment against Defendants that Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a).

259.   That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Plaintiffs in Plaintiffs' Trademarks in violation of 15 U.S.C. § 1125(a).

260.   That the Court enter a judgment against Defendants that Defendants have infringed the rights of Meta and Instagram in the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

261.   That the Court enter a judgment against Doe Defendants that Doe Defendants have infringed the rights of Meta and Instagram in the federally registered Facebook Trademarks and Instagram Trademarks in violation of 15 U.S.C. § 1125(c).

262.   That the Court enter a judgment against Doe Defendants that Doe Defendants have solicited, requested, or taken any action to induce another person to provide identifying information in violation of Cal. Bus. & Prof. Code § 22948.2.

263.   That the Court enter a judgment against Defendants that Defendants are liable for the harm caused to Plaintiffs by Doe Defendants cybersquatting, trademark infringement and dilution of Plaintiffs' Trademarks for each instance in which Defendants did not timely and accurately disclose the current contact information provided by Doe Defendants and the identity of Doe Defendants in response to one or more of Plaintiffs' notices regarding an Infringing Domain Name.

264.   That Plaintiffs be awarded Defendants' profits and Plaintiffs' actual damages, or, in the

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

alternative, $100,000 in statutory damages per infringing domain name by reason of Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117(d).

265. That Plaintiffs be awarded Doe Defendants' profits and Plaintiffs' actual damages, or, in the alternative, $100,000 in statutory damages per infringing domain name by reason of Doe Defendants' cybersquatting, in accordance with the provisions of 15 U.S.C. § 1117(d).

266. That Plaintiffs be awarded Defendants' profits and Plaintiffs' actual damages, and costs of the action, by reason of Defendants' trademark infringement, false designation of origin and willful dilution, and that these damages be trebled in accordance with the provisions of 15 U.S.C. § 1117.

267. That Plaintiffs be awarded Doe Defendants' profits and Plaintiffs' actual damages, and costs of the action, by reason of Doe Defendants' trademark infringement, false designation of origin and willful dilution, and that these damages be trebled in accordance with the provisions of 15 U.S.C. § 1117.

268. That Defendants and Doe Defendants be ordered to account for and disgorge to Plaintiffs all amounts by which Defendants and Doe Defendant have been unjustly enriched by reason of the unlawful acts complained of.

269. That Plaintiffs be awarded an amount sufficient to reimburse Plaintiffs for the costs of corrective advertising.

270. That Plaintiffs be awarded prejudgment interest on all infringement damages.

271. That Plaintiffs be awarded Plaintiffs' actual damages, or, in the alternative, $500,000 in statutory damages per violation of California's Anti-Phishing Act of 2005 by Doe Defendants and that these damages be trebled in accordance with the provisions of Cal. Bus. & Prof. Code § 22948.3.

272. That Plaintiffs be awarded their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, Cal. Bus. & Prof. Code § 22948.3(c)(2), and any other applicable provision of law.

273. That the Court award Plaintiffs their costs of suit incurred herein.

274. That the Court order each of the Infringing Domain Names be transferred to Plaintiffs.

275. That Defendants, Doe Defendants, and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants or Doe Defendants, be permanently enjoined and restrained from:

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

a. Registering, using, or trafficking in any domain name that is identical or confusingly similar to the Facebook Trademarks, Instagram Trademarks, and WhatsApp Trademarks;

b. Engaging in any use, including advertising, promoting, marketing, franchising, selling, and offering for sale any goods or services, on or in connection with Plaintiffs' Trademarks, or any similar mark or designation, that is likely to cause confusion, or to cause mistake as to the affiliation of that use with Plaintiffs; and

c. Engaging in any activity which lessens the distinctiveness or tarnishes the Facebook Trademarks and Instagram Trademarks.

276. That Doe Defendants and their agents, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, be permanently enjoined and restrained from:

a. Soliciting, requesting, or taking action to induce another person to provide identifying information by representing themselves as Plaintiffs without the authority or approval of Plaintiffs.

277. That the Court award such other or further relief as the Court may deem just and proper.

DATED: April 28, 2023                    Tucker Ellis LLP


By:   /s/David J. Steele
      David J. Steele
      Howard A. Kroll
      Steven E. Lauridsen
      Dina Roumiantseva

      Attorneys for Plaintiffs,
      META PLATFORMS, INC.,
      INSTAGRAM, LLC, AND
      WHATSAPP LLC

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

## DEMAND FOR TRIAL BY JURY

Plaintiffs Meta Platforms, Inc., Instagram, LLC, and WhatsApp LLC hereby demand a trial by jury to decide all issues so triable in this case.

DATED: April 28, 2023                                Tucker Ellis LLP


By:   /s/David J. Steele
      David J. Steele
      Howard A. Kroll
      Steven E. Lauridsen
      Dina Roumiantseva

      Attorneys for Plaintiffs,
      META PLATFORMS, INC.,
      INSTAGRAM, LLC, AND
      WHATSAPP LLC

SECOND AMENDED COMPLAINT
CASE NO. 4:22-cv-07768-HSG

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis