TUCKER ELLIS LLP
David J. Steele SBN 209797
david.steele@tuckerellis.com
Howard A. Kroll SBN 100981
howard.kroll@tuckerellis.com
Steven E. Lauridsen SBN 246364
steven.lauridsen@tuckerellis.com
Dina Roumiantseva SBN 300576
dina.roumiantseva@tuckerellis.com
515 South Flower Street,
Forty-Second Floor
Los Angeles, CA 90071
Telephone:    213.430.3400
Facsimile:    213.430.3409

Attorneys for Plaintiffs,
META PLATFORMS, INC. (fka FACEBOOK, INC.),
INSTAGRAM, LLC, and WHATSAPP LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., INSTAGRAM, LLC, and WHATSAPP LLC, <br><br> Plaintiffs, <br><br> v. <br><br> OPENTLD B.V., FREEDOM REGISTRY B.V., FINTAG GROUP B.V., CERVESIA ACIDA BV, B.V. DOT TK, CENTRAFRIQUE TLD B.V., EQUATORIAL GUINEA DOMAINS B.V., MALI DILI B.V., GABON TLD B.V., STICHTING OPENTLD WHOIS PROXY, YOURSAFE B.V., JOOST ZUURBIER MANAGEMENT SERVICES B.V., VTL MERCHANT SUPPORT, INC., and JOHN DOES 1-20, INCLUSIVE, <br><br> Defendants. | Case No. 3:22-cv-07768-AMO <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P 12(b)(2)** <br><br> Hon. Araceli Martínez-Olguín <br><br> Hearing Date: February 1, 2024 <br> Time: 2:00 p.m. <br> Courtroom 10 – 19th Floor <br><br> Complaint Filed: December 8, 2022 <br> Trial Date: October 7, 2025 |

_TUCKER ELLIS LLP_
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

**TABLE OF CONTENTS**

I.      INTRODUCTION. ............................................................................................ 1

II.     STATEMENT OF ISSUES TO BE DECIDED. ........................................ 4

III.    STATEMENT OF FACTS. ........................................................................ 4

IV.     DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN
        CALIFORNIA. ............................................................................................ 6

        **A.**   Fed. R. Civ. P. 12(b)(2) motion to dismiss standard. ...................... 6

        **B.**   General personal jurisdiction exists over entities acting as a single
                 enterprise. ........................................................................................ 7

                 1.   Alter ego and single enterprise liability standard. .............. 8

                 2.   Unity of interest and ownership exist between Defendants. ........ 9

                      a)   Freenom and VTL (aka Freedom Registry, Inc.) are alter
                           egos. .............................................................................. 9

                      b)   Freenom and the ccTLD Service Providers are alter egos. ..... 11

                      c)   Freenom and ID Shield are alter egos. ................................. 12

                      d)   Freenom and Yoursafe aka Bitsafe aka Verotel are alter
                           egos. .............................................................................. 13

                      e)   Freenom, Freedom Registry, Fintag, Cervesia, and JZMS
                           are alter egos ................................................................. 14

                 3.   Maintaining Defendants' separate identities would result in fraud
                      or injustice. .................................................................... 15

        **C.**   Defendants are subject to specific jurisdiction in California. ........................ 17

                 1.   Defendants purposely directed activities towards the U.S. and
                      California. .......................................................................... 18

                      a)   Defendants' websites target the United States and
                           California. ....................................................................... 19

                      b)   Defendants purposefully availed themselves of the forum. .... 21

                 2.   Plaintiffs' claims arise from Defendants' forum-related activity. ..... 22

                 3.   Exercising personal jurisdiction over Defendants is reasonable. ...... 22

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

V.      IF THE COURT GRANTS DEFENDANTS' MOTION, PLAINTIFFS
        SHOULD BE PERMITTED JURISDICTIONAL DISCOVERY AND LEAVE
        TO AMEND. ..................................................................................................... 25

VI.     CONCLUSION........................................................................................................ 25

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION UNDER RULE 12(b)(2)
Case No. 3:22-cv-07768-AMO

1

2

**TABLE OF AUTHORITIES**

3   **Cases**

4

5   *Abbott Bldg. Corp. v. United States*, 951 F.2d 191 (9th Cir. 1991) .................................................. 2, 3, 12

6   *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763 (D. Ariz. 2017).................................................................. 8

7   *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020) ......................................................... 20

8   *Asahi Metal Indus. Co., Ltd. v. Sup. Ct.*, 480 U.S. 102 (1987)............................................................... 25

9   *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825 (Cal. Ct. App. 1962) ................. 10

10   *Autodesk, Inc. v. Kobayashi + Zedda Architects Ltd.*, 191 F. Supp. 3d 1007 (N.D. Cal. 2016) .............. 26

11   *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021) ............................................... 7, 19, 20, 21

12   *Ballard v. Savage*, 65 F.3d 1495 (9th Cir. 1995)............................................................... 19, 24, 25

13   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................. 9

14   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)............................................................ 19, 23, 24

15   *Cadence Design Sys., Inc. v. Syntronic AB*, No. 21-CV-03610-SI, 2021 WL 4222040 (N.D. Cal. Sept.

16         16, 2021) ....................................................................................................................................... 27

17   *Calder v. Jones*, 465 U.S. 783 (1984 ......................................................................................... 19, 20

18   *Campanelli v. Image First Unif. Rental Serv., Inc.*, No. 15-CV-04456-PJH, 2016 WL 4729173

19         (N.D. Cal. Sept. 12, 2016) .............................................................................................................. 9

20   *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610 (N.D. Cal. 2020) ............. 10

21   *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482 (9th Cir. 1993) ................................................ 26

22   *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280 (9th Cir. 1977).............................................. 7

23   *Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342 (S.D. Fla. Nov. 21, 2007)   18

24   *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co., Ltd*, No. 19-cv-01167-JST (AGT), 2021 WL

25         5707741 (N.D. Cal. Oct. 21, 2021), *R.&R. adopted*, 2021 WL 5707740 (N.D. Cal. Nov. 16, 2021 .. 21,

26         22

27   *Fed. Reserve Bank of San Francisco v. HK Sys.*, No. C-95-1190 MHP, 1997 WL 227955 (N.D. Cal.

28         Apr. 24, 1997)................................................................................................................................ 10

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

*Greenspan v. LADT, LLC*, 191 Cal.App.4th 486 (2010) ................................................................. 18

*Harris Rutsky & Co. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) ............................... passim

*Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085 (9th Cir. 2023) ............................... 20, 21

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450 (9th Cir. 2007 ......................... 19

*Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, No. 8:16-cv-01321-JLS-KES, 2017 WL 7240856 (C.D. Cal.

    Apr. 25, 2017) ............................................................................................................................... 9

*In re Packaged Seafood Prods. Antitrust Lit.*, 277 F. Supp. 3d 1167 (S.D. Cal. 2017) ........................ 17

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. 07-cv-43-MMM-SSx, 2007 WL 4976364

    (C.D. Cal. Oct. 29, 2007) ............................................................................................................. 17

*Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220 (1991) ............................... 8

*Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283 (Fed. Cir. 2012) ........................................................... 18

*Morrill v. Scott Fin. Corp.*, 873 F.3d 1136 (9th Cir. 2017) ......................................................... 20

*Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182 (9th Cir. 2002) ........................... 7, 15

*Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432 (S.D. Cal. Aug. 24,

    2010) ............................................................................................................................................. 17

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 1318–19, 1322 (9th Cir. 1998) ................... 23, 24

*Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ......................................................................... 9

*Pebble Beach Co. v. Caddy*, 453 F.3d 1151 (9th Cir. 2006) ..................................................... 23

*Ranza v. Nike*, 793 F.3d 1059 (9th Cir. 2015) ......................................................................... 7, 18

*S.E.C. v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) ......................................................................... 9

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ..................... 2, 7, 19, 20

*Sinatra v. Nat'l Enquirer*, 854 F.2d 1191 (9th Cir. 1988) ......................................................... 25

*Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938 (N.D. Cal. 2015) ....................... 8, 9

*U.S. v. Bestfoods*, 524 U.S. 51 (1998) ......................................................................................... 8

*Walden v. Fiore*, 571 U.S. 277 (2014) ......................................................................................... 20

*Yahoo! v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) ............. 19, 26

**Statutes**

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

15 U.S.C. § 1125(d) ................................................................................................ 1

Fed. R. Civ. P. 12(b)(2) .............................................................................. 1, 17, 25

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1

Fed. R. Civ. P. 4(k)(2) ............................................................................... 4, 17, 25

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

vi

Plaintiffs file this Opposition to the Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("MTD"; ECF No. 65) the Second Amended Complaint (ECF No. 34; "SAC") filed by all Defendants except VTL Merchant Support, Inc. ("VTL").[1]

## I.    INTRODUCTION.

Defendants are a complex web of shell companies that are alter egos of OpenTLD B.V. ("Freenom"), collectively acting as a single enterprise to register domain names used to host phishing[2] websites and engage in other online abuse.[3] Joost Zuurbier ("Zuurbier") ultimately owns all of the Defendants and controls them with his associate Marcel Trik ("Trik"). SAC ¶ 3.

Plaintiffs filed this action because this single enterprise registered, trafficked in, and used over 5,000 domain names (the "Infringing Domain Names") that are identical or confusingly similar to Plaintiffs' trademarks in violation of the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). Many of Defendants' Infringing Domain Names—including, for example, faceb00k.ga, fb-lnstagram.cf, and chat-whatsaap-com.tk—have been used to launch phishing attacks, display pornography, or engage in other abusive conduct that harms Plaintiffs and their users. Indeed, Defendants (through Zuurbier and Trik) all directly participated in these unlawful acts, including cybersquatting, trademark infringement, trademark dilution, and violation of California's Anti-Phishing Act.

One of the Defendants entangled in this unlawful single enterprise is VTL, a Delaware corporation that was formerly known as Freedom Registry, Inc.[4] Indeed, VTL does not challenge personal jurisdiction because its principal place of business is in Palo Alto, California. The remaining Defendants are foreign entities and have moved to dismiss under Rule 12(b)(2), disputing (a) that they are alter egos of VTL and (b) that they have sufficient contacts with the United States. Defendants are mistaken, and their supporting

---

[1] Certain defendants also moved to dismiss pursuant to Rule 12(b)(6), as did VTL in a separate motion. For organizational simplicity, Plaintiffs respond to both Rule 12(b)(6) motions in a separate opposition.

[2] "Phishing" refers to the practice of deceiving Internet users into divulging personal information, such as login IDs and passwords, using fraudulent websites or emails that impersonate businesses.

[3] As shown in the chart on page 15 of the SAC, this single enterprise is so complex—and consists of so many similarly-named entities that also operate under overlapping aliases designed to confuse the public and mask illicit activity—that even Defendants' counsel could not keep track of Defendants' various relationships. *See* ECF Nos. 70, 71, 73, 76, 78, 83, 84 (Defendants' erroneous corporate disclosure statements filed with the Court and corrections thereto).

[4] Freedom Registry, Inc. should not be confused with Defendant Freedom Registry B.V.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

declarations[5] are replete with factual inaccuracies and false assertions concerning the SAC. Despite Defendants' best efforts to distract the Court from the fact that Plaintiffs amply plead that Defendants are not separate companies and thus are subject to the jurisdiction of this Court, their declarations do not and cannot contradict most of the allegations in the SAC; as such, these allegations must be accepted as true. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

For example, Defendants misleadingly assert that VTL "has never offered domain name services of any kind" (Fetter Decl. ¶ 11) and that "Plaintiffs allege no facts to support their claim that VTL is in the domain business" (ECF No. 65 at 24:13–14).[6] This is demonstrably false: VTL is the same company— and was formerly known—as Freedom Registry, Inc.,[7] which is connected to Freenom's domain name business, and Freenom continues to transfer domain names to VTL (using VTL's former name, "Freedom Registry, Inc."). Fetter Decl. ¶ 12 & Ex. A at 7; SAC ¶¶ 20 n.9, 132–33. Freedom Registry, Inc. and VTL are **the same company** despite the name change. Courts hold that changing the name of a corporation does not create a new, separate entity. *See Abbott Bldg. Corp., Inc. v. United States*, 951 F.2d 191, 196 (9th Cir. 1991) ("[T]here is no support for the proposition that a change of name results in a change of entity. Instead, the authority is quite to the contrary.").[8] And according to WHOIS[9] records on Freenom's website from September 2022, Freenom continues to register domain names for VTL in the name of "Freedom Registry, Inc.," listing VTL's Palo Alto address,[10] for Freenom's own benefit. SAC ¶ 133. Indeed, Plaintiffs have evidence of at least eight Infringing Domain Names *recently registered* to "Freedom Registry, Inc." SAC ¶ 133; Declaration of Helena Guye ("Guye Decl.") Exs. 2–8, 10.

---

[5] In support of the MTD, Defendants submit the Declarations of Mirella Fetter ("Fetter Decl.") (ECF No. 67) and Joost Zuurbier ("Zuurbier Decl.") (ECF No. 68).

[6] Page citations to documents filed with the Court correspond to the Clerk's blue ECF page header.

[7] In November 2017, Freedom Registry, Inc. formally changed its name to VTL. SAC ¶ 20 n.9. Freedom Registry, Inc. should not be confused with Defendant Freedom Registry B.V.

[8] VTL registered with the California Secretary of States that its business was "Payment Processing." SAC ¶ 113. Of course, although Defendants make much of this (ECF No. 65 at 24:13–18), this statement does not prevent VTL from continuing to provide domain services.

[9] The WHOIS directory contains important information about domain names, including the identity and contact information for the registrant or owner of the domain name.

[10] The address is 2225 East Bayshore Road #290, Palo Alto, CA (the "Palo Alto Address"). In March 2022, the building at the Palo Alto Address was abandoned and under construction. Declaration of Dina Roumiantseva ¶ 2.

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

Defendants' attempts to disassociate VTL from Freedom Registry, Inc. should be rejected by the Court.

Defendants' misstatements extend beyond VTL to Yoursafe, claiming that "Yoursafe[11] does not and has never offered domain name services." Fetter Decl. ¶ 7. Yet, Yoursafe's current website states: "other digital assets, such as domain names, can be stored with Yoursafe while protecting your identity online. *Yoursafe offers domains at cost price* . . . . With Yoursafe Domains you can be sure that your identity is protected." Guye Decl. Ex. 11 at 4 (emphasis added). Indeed, Yoursafe, which until recently did business under the name "Bitsafe" (Fetter Decl. ¶ 4), uses the same language used on Bitsafe's website as late as February 2023 to promote its domain name services. Guye Decl. Ex. 13. Defendants further dissemble by stating Yoursafe "never marketed or advertised specifically towards California." Fetter Decl. ¶ 6. Yet, a 2018 Bitsafe press release brags that "the new Bitsafe accounts were showcased during the Benzinga Fintech Summit event . . . in downtown San Francisco . . . ." Guye Decl. Ex. 14. Just because Yoursafe allegedly did not advertise in California following its name change from Bitsafe does not mean the company never offered those services at all. *See Abbott Bldg. Corp.,* 951 F.2d at 196.

Next, Yoursafe and Freenom dispute they have any offices in California. Fetter Decl. ¶ 6; Zuurbier Decl. ¶ 9. But "Bitsafe" represented on its website and currently represents on its LinkedIn page that it has offices in San Francisco. SAC ¶ 30; Guye Decl. Ex. 15. And B.V. Dot TK ("Dot TK") represents on its LinkedIn page that it "is a subsidiary of Freenom" and that "Freenom has offices in Amsterdam (Netherlands) and Palo Alto (USA)." SAC ¶ 24; Guye Decl. Ex. 12. And Freenom also represented that it had a satellite office in Palo Alto as late as November 2016. Guye Decl. Ex. 16.

Finally, Defendants attempt to draw a distinction between their two primary lines of business— domain name services offered by entities Defendants refer to as the "Freenom Entities" and online payment processing services offered by the "Payment Business Entities."[12] ECF No. 65 at 9:5–11:27. But a Dutch court found evidence that would support a finding that at least some of these shell companies comingle assets and use each other as conduits for each other's business, fail to keep appropriate corporate and financial records, are controlled by the same individuals, are inadequately capitalized, manipulate and

---

[11] Defendant Yoursafe B.V. ("Yoursafe") should not be confused with Yoursafe Holdings B.V. which owns Yoursafe and VTL. Fetter Decl. ¶¶ 5, 10.

[12] Defendants falsely claim VTL is "in the payment processing business" and has nothing to do with the domain business. ECF No. 69 at 15:8–18.

concentrate assets in certain entities and liabilities in other entities, use the same business locations, and share employees. SAC ¶¶ 63, 65–75 & Ex. 16. Thus, as detailed in the SAC and further supported by the evidentiary findings of the Dutch court, all of these companies are managed and operated as a single business enterprise to perpetuate Defendants' cybersquatting scheme.

The uncontested allegations in the SAC, together with the additional facts and documents refuting Defendants' declarations, readily make a prima facie showing that the Court has personal jurisdiction over all Defendants because they are part of a single enterprise with California-based VTL and directly participated in the unlawful activities pleaded in the SAC. In addition, Defendants are subject to specific personal jurisdiction because Defendants purposefully directed activities toward the United States and California (and purposefully availed themselves of the forum), Plaintiffs' claims arise out of Defendants' activity directed towards California, and exercising personal jurisdiction over Defendants is reasonable. The Court should therefore deny Defendants' MTD.

## II.   STATEMENT OF ISSUES TO BE DECIDED.

1.   Whether the Court has general jurisdiction over Defendants because they are alter egos of VTL, a California corporation, collectively acting as a single enterprise.

2.   Whether the Court has specific jurisdiction over Defendants based on either their California-directed activity or contacts or, alternatively, based on their United States-directed activity or contacts as a whole pursuant to Fed. R. Civ. P. 4(k)(2).

## III.   STATEMENT OF FACTS.

Defendants operate a single enterprise that registers, traffics in, and uses domain names, as well as provides associated services (including payment processing) to clients engaged in illicit activity such as phishing and pornography. SAC ¶¶ 2–3. Zuurbier is the founder and CEO of Freenom, which is an internet domain name service provider that offers domain name registrations and related services to the public. *Id.* ¶¶ 6–7, 60; Zuurbier Decl. ¶ 2. In a trademark application, Freenom filed a declaration that it began providing "[d]omain name registration services" in the United States since 2013. SAC ¶ 123 & n.19; Guye Decl. Ex. 18. Defendants disingenuously argue, "Plaintiffs neglect to inform the Court that Freenom *abandoned* that application in 2014" and that "[a] ten-year-old trademark application is not evidence that Freenom specifically targeted the California or U.S. market." ECF No. 65 at 18:6–9 (citation omitted).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

But Defendants neglect to inform the Court that abandoning a trademark application does not indicate that Freenom exited the U.S. market, and Zuurbier conveniently declared only that the application was abandoned, not that U.S. operations ceased. *See* Zuurbier Decl. ¶ 12.

Freenom controls five self-described "subsidiaries" that each manage a different country code top level domain ("ccTLD").[13] SAC ¶¶ 79–81; Zuurbier Decl. ¶ 4. Freenom and the ccTLD Service Providers share the same business address and employees, operate under a unified management system, and commingle assets. SAC ¶¶ 81–83. Freenom's "affiliate," Stichting OpenTLD WHOIS Proxy ("ID Shield") is a proxy service provider that registers domain names in the name of ID Shield and licenses use of those domain names to Freenom's customers. *Id.* ¶ 89; Zuurbier Decl. ¶ 8. ID Shield has no employees, bank accounts, or assets, and Freenom completely controls ID Shield's operations and policy decisions as its sole director. Freenom and ID Shield also share the same business address. SAC ¶¶ 89-95.

Freenom also has done and continues to do business as "Freedom Registry, Inc." SAC ¶ 20. Freedom Registry, Inc. was incorporated in the State of Delaware in 2012 by Zuurbier, who listed his address as the Palo Alto Address.[14] SAC ¶ 60; Fetter Decl. Ex. A at 3. Zuurbier testified during a 2015 arbitration proceeding Freenom brought in California against ICANN[15] ("the California Arbitration")[16] that, under Freenom's free domain model, Freenom registers domain names in Freenom's name, and that parked and expired domains are transferred to "Freedom Registry, Inc." SAC ¶ 132 & Ex. 18 ¶ 5. On November 1, 2017, Yoursafe Holding B.V. purchased Freedom Registry, Inc. Fetter Decl. ¶ 12. On November 9, 2017, Freedom Registry, Inc. changed its name to VTL. *Id.* As late as September 2022,

---

[13] These subsidiaries are Dot TK for .tk, Centrafrique TLD B.V for .cf, Equatorial Guinea Domains B.V. for .gq, Mali Dili B.V. for .ml, and Gabon TLD B.V. for .ga (collectively, the "ccTLD Service Providers"). SAC ¶¶ 79–80; Zuurbier Decl. ¶ 4.

[14] In 2012, Zuurbier also listed 584 Castro Street, San Francisco as his address in incorporation documents for both OpenTLD, Inc. and Freenom, Inc. Guye Decl. Exs. 24, 25.

[15] ICANN, which stands for the Internet Corporation for Assigned Names and Numbers, is a California non-profit corporation that operates as an American multi-stakeholder group responsible for coordinating the global policies applicable to the domain name system, including the maintenance and procedures of several databases related to the namespaces and numerical spaces of the internet.

[16] Freenom initiated the California Arbitration against ICANN, a California corporation, stemming from compliance issues emerging from Freenom's contract with ICANN that allows Freenom to engage in domain name services. SAC Exs. 17–18. Freenom was represented by Eugene Rome (the same counsel as in this case), who serves as Freenom's correspondent in ICANN compliance matters. *Id.*

5

Tucker Ellis LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

Freenom's domain names were still being transferred to "Freedom Registry, Inc.," listing the vacant Palo Alto Address. Guye Decl. Exs. 2–8, 10.

Freenom is wholly owned by Defendant Freedom Registry B.V. ("Freedom Registry"). SAC ¶¶ 21; Zuurbier Decl. ¶ 7. In turn, Defendant Fintag Group B.V. ("Fintag") owns a majority stake in Freedom Registry. SAC ¶¶ 22, 64; Fetter Decl. ¶ 5. Until October 24, 2022, Defendant Cervesia Acida B.V. ("Cervesia") was the majority shareholder, and sole director, of Fintag. SAC ¶¶ 23, 67 n.17, 76. Defendant Joost Zuurbier Management Services B.V. ("JZMS") replaced Cervesia and is now the director of Fintag. *Id.* Zuurbier is the sole owner of both Cervesia and JZMS, which he describes as his "personal companies." Zuurbier Decl. ¶ 13. Through this ownership structure, Zuurbier owns Cervesia, which owns Fintag, which owns Freedom Registry, which owns Freenom. SAC ¶¶ 21, 22, 67, 76.

Fintag is also the majority stakeholder of Yoursafe Holding B.V., which was founded by Zuurbier. SAC ¶ 62; Fetter Decl. ¶ 5. Yoursafe Holding B.V., in turn, owns Yoursafe and VTL. *Id.* ¶¶ 5, 10. Yoursafe was previously named "Verotel Merchant Services B.V." until a 2020 name change, and Yoursafe still offers services under the brand Verotel. *Id.* ¶ 9. "Verotel" offers a dedicated registrar platform for pornographic websites. SAC ¶ 103. Prior to March 1, 2023, Yoursafe did business under the name Bitsafe. Fetter Decl. ¶ 4. According to its website, Bitsafe is "the new name for Freenom and Verotel, two disruptive brands in the transactional online business space." SAC ¶ 104. Thus, Fintag, in addition to owning Freedom Registry, which owns Freenom, also owns Yoursafe Holding B.V., which owns Yoursafe (previously known as Bitsafe and Verotel Merchant Services B.V.) and VTL (previously known as Freedom Registry, Inc.). *Id.* ¶¶ 64, 100; ECF No. 65 at 24:26–27.

## IV.   DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION IN CALIFORNIA.

### A.   Fed. R. Civ. P. 12(b)(2) motion to dismiss standard.

"When a motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021) (internal quotation marks omitted). A district court may consider evidence contained in affidavits and discovery materials in addition to the allegations in the pleadings. *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). In determining whether Plaintiffs have made a prima facie showing of personal jurisdiction, the Court is bound by the following

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

principles: (1) uncontroverted allegations in Plaintiffs' SAC are taken as true; (2) conflicts between the facts contained in the parties' affidavits must be resolved in Plaintiffs' favor; and (3) all evidentiary materials are construed in the light most favorable to Plaintiffs. *Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1187 (9th Cir. 2002). "Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the district court sits applies." *Harris Rutsky & Co. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). Because California's long-arm statute, Cal. Civ. Proc. Code § 410.10, is coextensive with federal due process requirements, the jurisdictional analyses under state and federal law are the same. *Schwarzenegger*, 374 F.3d at 800–01.

**B.      General personal jurisdiction exists over entities acting as a single enterprise.**

General personal jurisdiction exists over VTL because its principal place of business is in California. *Ranza v. Nike*, 793 F.3d 1059, 1069 (9th Cir. 2015); SAC ¶¶ 31, 40, 114; Fetter Decl. ¶ 12. Personal jurisdiction thus exists over each Defendant in California because they are alter egos of VTL and operate as a single enterprise. *Ranza*, 793 F.3d at 1072–73 & n.6 (explaining "the alter ego test may be used to extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate" and stating same for single enterprise theory). Plaintiffs pleaded sufficient facts to allege all Defendants are alter egos acting together as a single enterprise, such that liability for one Defendant extends to the remaining Defendants. *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal.App.4th 1096, 1107–08 (2013); *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220, 1249 (1991).[17] Under this theory, "the corporate entity is disregarded . . . wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an *instrumentality,*

---

[17]   Each Defendant also is directly liable for the harm alleged in the SAC because they are direct participants in all of the unlawful activities alleged. SAC, ¶¶ 3, 33 and 62. The direct participation theory is distinct from Plaintiffs' alter ego theory. *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 806 (D. Ariz. 2017) ("A parent company can be liable for a subsidiary's acts where the parent directly participates [in] and directs the subsidiary's harmful activities."). Several courts find direct participant liability when there is no parent-subsidiary relationship because direct participant liability stems from an entity's own wrongful acts. *See U.S. v. Bestfoods*, 524 U.S. 51, 65 (1998) ("the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability"); *L.B. Industries, Inc. v. Smith*, 817 F.2d 69, 71 (9th Cir. 1987) (minority shareholder and corporate director could be directly liable). Here, the Defendants (through Zuurbier and Trik, which own or control the Defendants) directly participate in the cybersquatting and trademark infringement actions alleged in the SAC and, therefore, each of them should be held directly liable for the harm caused.

7

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

*agency, conduit, or adjunct of another corporation*." *Las Palmas*, 235 Cal.App.3d at 1249. Courts in this Circuit recognize that "when one business entity is the alter ego or is part of a single enterprise with another entity, the entity's contacts in the forum should be imputed onto the affiliated entities." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 953–54 (N.D. Cal. 2015).[18]

### 1. Alter ego and single enterprise liability standard.

California law recognizes an alter ego relationship when (1) there is such a unity of interest and ownership that the individuality, or separateness, of the two entities has ceased; and (2) adherence to the fiction of the separate existence of the entities would sanction a fraud or promote injustice or an inequitable result if the acts of one entity are treated as those of that entity alone. *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). "The 'single-business-enterprise' theory is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose." *Toho-Towa*, 217 Cal.App.4th at 1108. Courts analyzing single enterprise theory treat it as a variation of alter ego theory. *Stewart*, 81 F. Supp. 3d at 961 (N.D. Cal. 2015) ("[T]he alter ego doctrine may apply between a parent and a subsidiary or, under the single enterprise rule, between sister or affiliated companies." (internal alteration marks and quotation marks omitted)). Information-and-belief allegations "are sufficient to state a plausible claim that" defendants are alter egos or a single enterprise. *Id.* at 962–63.

Defendants falsely assert that Plaintiffs have not "demonstrated" that Defendants are alter egos or a single enterprise. *See, e.g.*, MTD 21:8–10. But this is not the standard, which only requires that Plaintiffs allege facts that make alter ego plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). And courts recognize that alter ego facts are difficult to plead because they are in the control of defendants. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (*Twombly* "does not prevent a plaintiff from

---

[18] Defendants mistakenly argue the single enterprise theory can never be used to establish personal jurisdiction. MTD 20:27–21:7. The unpublished cases Defendants cite for this proposition do not analyze single enterprise theory in the alter ego context. *See Campanelli v. Image First Unif. Rental Serv., Inc.*, No. 15-CV-04456-PJH, 2016 WL 4729173, at *7 (N.D. Cal. Sept. 12, 2016) (holding the single enterprise theory could not establish personal jurisdiction in the joint employer context under the Fair Labor Standards Act ("FLSA") without any mention of "alter ego."); *Iconlab Inc. v. Valeant Pharms. Int'l, Inc.*, No. 8:16-cv-01321-JLS-KES, 2017 WL 7240856, at *6 (C.D. Cal. Apr. 25, 2017) (mistakenly referring to single enterprise theory as an "exotic theory of imputing contacts" and distinct from the "well-established alter ego and agency theories").

Tucker Ellis LLP
Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant"). Accordingly, when considering a motion to dismiss, courts have found that "[t]wo or three factors can be enough to plead a unity of interest." *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 639 (N.D. Cal. 2020).

### 2.    Unity of interest and ownership exist between Defendants.

Courts find that unity of interest and ownership exist when there is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal," and the affiliated corporations then may be deemed to be a single business enterprise, and the corporate veil pierced. *Toho-Towa Co.*, 217 Cal.App.4th at 1107. (internal citations omitted) "Under the 'single business enterprise' doctrine, separate corporations may operate with integrated resources in pursuit of a single business purpose." *Id*. at 1107–08. In analyzing the unity of interest prong, courts consider a variety of non-exclusive factors. *See Associated Vendors*. "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." *Toho-Towa*, 217 Cal.App.4th at 1109 (collecting cases); *see also Fed. Reserve Bank of San Francisco v. HK Sys.*, No. C-95-1190 MHP, 1997 WL 227955 at *6 n.7 (N.D. Cal. Apr. 24, 1997) ("[n]ot all of the enumerated factors must be found").

Here, unity of interest exists between Defendants because they: (a) have near-identical equitable ownership and are controlled by Zuurbier, (b) use the same offices and employees, (c) disregard legal formalities and fail to maintain arm's length relationships, (d) comingle funds and other assets, (e) fail to maintain minutes and adequate corporate records, (f) fail to adequately capitalize certain Defendants, (g) use certain companies as mere shells and instrumentalities for a single venture, and (h) use companies as a subterfuge for unlawful transactions, tax avoidance, and to transfer liability to other entities. SAC ¶¶ 3, 9, 61–78, 81–88, 90–99, 108–10 & Ex. 16; *Associated Vendors*, 210 Cal.App.2d at 838–40.

### a)    Freenom and VTL (aka Freedom Registry, Inc.) are alter egos.

Freenom and VTL (aka Freedom Registry, Inc.) are alter egos. First, they are both controlled by Zuurbier and Trik. Zuurbier is VTL's CEO and President, and Trik (the CFO of Freenom and Freedom Registry B.V. and the director of Yoursafe), is VTL's Secretary and CFO. SAC ¶¶ 115–16; Fetter Decl. Ex. A at 7. Freedom Registry, Inc. was incorporated in the State of Delaware in 2012 by Zuurbier, who

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

listed his address as the Palo Alto Address. SAC ¶ 111; Fetter Decl. Ex. A at 3. Defendants do not refute Plaintiffs' allegations that Freenom does business as "Freedom Registry, Inc." SAC ¶ 20 n.9.

Second, the unity of interest between Freenom and VTL is further evidenced by the transfer of expired domains by Freenom to "Freedom Registry, Inc." At the onset, when a customer seeks to register a free domain name with one of the ccTLD Service Providers, the customer enters into a contract with Freenom and not the ccTLD Service Provider. SAC ¶ 127 & Ex. 6. Per that agreement's terms, the customer "authorize[s] Freenom to register the domain name" and "all rights in and to the domain name . . . shall inure to the benefit of Freenom . . . ." *Id.* ¶¶ 127–29 & Ex. 6 § 6.3.[19] When a ccTLD domain name expires or is cancelled, suspended, refused, or reserved, Freenom transfers the domain name to VTL and lists VTL's former corporate name, "Freedom Registry, Inc.," as the registrant of that domain name. *Id.* ¶ 132 & Ex. 18 ¶ 5 ("parked and expired domain names are transferred to . . . Freedom Registry, Inc."). For instance, when the domain name securityfacebook.tk expired, Freenom listed the domain name registrant in 2022 as "Freedom Registry, Inc." (*i.e.*, VTL). Freenom, as VTL's alter ego, then advertised the domain name for registration at freenom.com. *Id.* ¶¶ 133; Guye Decl., Ex. 2.[20]

Accordingly, despite being the listed registrant and thus the ostensible "owner" of the domain names, "VTL" merely serves as a shell company and a conduit to channel funds collected from revenue-generating parking pages to Freenom.[21] SAC ¶¶ 150–58 & Ex. 11. Even though "VTL" is supposedly the registrant of these domain names, Freenom configures the domain names to redirect to freenom.link, which is owned by Freenom and displays a parking page from which Freenom—and not VTL—derives revenue. *Id.* ¶¶ 152–58 & Ex. 11; *see also* Guye Decl. Ex. 19. Thus, VTL serves as a U.S.-based shell company used to hold domain names from which Freenom generates revenue for itself. Accordingly, it is

---

[19] Freenom confirmed as much during the California Arbitration. *Id.* ¶ 130 & Ex. 17 at 4 ("when a third party registers a country code domain, **the domain is registered in OpenTLD's [Freenom's] name**").

[20] Defendants attempt to cast doubt on these practices by asserting that "it is unclear *when* the domain securityfacebook.tk expired, *i.e.*, whether it was before or after Freedom Registry, Inc. became dormant in 2015." MTD 25:6–11. Although the WHOIS data shown in the SAC does not depict a date, the full screenshot of that WHOIS data is clearly dated September 2022, just before the initial Complaint's filing, thus dispelling any doubt whether Freenom continued using VTL as a conduit to register infringing domain names after its 2017 "corporate revival." Guye Decl. ¶ 3 & Ex. 2.

[21] A "parking page" is a website used to display commercial advertisements, typically in the form of links to other commercial websites or commercial content. SAC ¶ 15 n.8.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

Freenom, and not VTL, who retains control over the domain name and determines what content to display and whether to sell, transfer, or license the domain name to a third party. Freenom's transfer of expired domain names shows that Freenom used VTL as a subterfuge to conceal self-dealing, and as a shell and instrumentality of Freenom. Further, the lack of control by VTL over the expired domain names shows that Freenom and VTL failed to maintain arm's length relationships and commingled assets.

Third, in March 2015, the State of Delaware voided Freedom Registry, Inc.'s charter for "non-payment of taxes and/or for failure to file a complete annual report," a fact that itself supports a finding of alter ego since it demonstrates the lack of observing corporate formalities. *See Toho-Towa*, 217 Cal.App.4th at 1108; Fetter Decl. Ex. A at 6.[22] Zuurbier testified in the California Arbitration that Freenom registers parked and expired domain names in Freedom Registry Inc.'s name. This statement was made in August 2015, *five months after* the State of Delaware revoked Freedom Registry, Inc.'s charter. SAC Ex. 18 ¶ 5; Fetter Decl. Ex. A at 6. This confirms that Freenom ignored the State of Delaware's revocation order and continued to operate Freedom Registry, Inc. and register domain names *after* its charter was revoked. VTL continues to disregard corporate formalities because it failed to file its 2023 Statement of Information with the State of California. Guye Decl. Ex. 20.

Finally, in an attempt to avoid the legal implications of the recent transfer of expired domain names by Freenom to "Freedom Registry, Inc.," Defendants mischaracterize "Freedom Registry, Inc." and VTL as different entities. However, the law is clear that when Freedom Registry, Inc. revived its voided charter and amended its Certificate of Incorporation to change its legal name to VTL in November 2017 (Fetter Decl. Ex. A at 6–7), that did not create a new entity. *See Abbott Bldg. Corp.*, 951 F.2d at 196. Yet, Defendants falsely claim that VTL's "business" was founded in November 2017 when Zuurbier "formed" VTL by "reviving and repurposing" Freenom Registry, Inc., which "***his*** domain business previously owned but was not using at the time." Fetter Decl. ¶ 12 (emphasis added). This phrasing attempts to suggest VTL's "business" and "formation" are somehow separate from its corporate existence, which is patently false.

**b)      Freenom and the ccTLD Service Providers are alter egos.**

---

[22] Similarly, VTL failed to file the required Statement of Info with the California Secretary of State that was due on January 31, 2023. Guye Decl. ¶ 20.

TUCKER ELLIS LLP

Chicago ◆ Cleveland ◆ Columbus ◆ Los Angeles ◆ San Francisco ◆ St. Louis

Freenom and the five ccTLD Service Providers are also alter egos of one another. The following uncontroverted allegations in the SAC showing this alter ego relationship must be accepted as true:

Freenom has referred to the ccTLD Service Providers as its "subsidiaries," "sister companies," and "daughter companies." SAC ¶ 80. These companies share the same common owners, directors, officers, and/or managers as Freenom—namely Zuurbier and Trik—either directly or indirectly through a series of shell companies. *Id.* ¶¶ 64, 81. These six companies all share the same address and use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business. *Id.* ¶ 83. These companies are held out to the public such that the ccTLD Service Providers' websites all either redirect to, or contain a link for logging into, Freenom's website. *Id.* ¶¶ 83–84. Freenom and the ccTLD Service Providers further commingle assets by directing payments made for the purchase of paid ccTLDs to Freenom instead of the ccTLD Service Providers. *Id.* ¶ 88. When a customer attempts to register a ccTLD with its service provider, the customer is redirected to Freenom's website, where the customer enters into a contract with Freenom and not the ccTLD Service Provider. *Id.* ¶ 85. Freenom often registers the domain name in its own name, rather than in the name of the ccTLD Service Provider, and licenses it back to the customer. *Id.* ¶¶ 126–30, Ex. 17 at 4. Other times, Freenom registers the domain name in the name of the ccTLD Service Provider, but when the domain name expires or is "cancelled, suspended, refused, or reserved," Freenom revokes the license Freenom provides its customer (or the ccTLD Service Provider's customer) and registers the domain name in Freenom's own name or in the name of "Freedom Registry, Inc." *Id.* ¶¶ 131–33. Freenom has admitted to these machinations in a declaration filed in the California Arbitration. *Id.* ¶¶ 130–32 & Ex. 17 at 4, Ex. 18 at ¶ 5.

Further, Freenom generates revenue from the Infringing Domain Names because, after the domain names expire or are cancelled, Freenom takes over use of the domain name and sells the traffic to advertising networks. SAC ¶ 150. Additionally, Freenom uses and profits from the traffic to the domain name because Freenom's Free Domain Name Agreement stipulates that "all visitors/visits to the domain name provided to [Freenom's licensee] in connection with FREE DOMAIN shall be counted solely as traffic to Freenom for all purposes relating to tracking and reporting audience measurement." *Id.* ¶ 151.

   c)  **Freenom and ID Shield are alter egos.**

Freenom and ID Shield are also alter egos based on the uncontroverted facts in the SAC. ID Shield

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

provides a proxy service whereby it registers domain names, as the registrant and in its own name, and then licenses use of these domain names to Defendants, Doe Defendants, and Freenom's customers. SAC ¶ 89. Freenom and ID Shield share the same business address and use the same offices, employees, computers, hosting services, and accounts to carry out their mutual online business. *Id.* ¶ 90. When a visitor navigates to ID Shield's domain name, idshield.tk, the visitor is automatically redirected to freenom.com. *Id.* ID Shield has no bank accounts or assets, is undercapitalized, and has no employees of its own, and its operations are performed by Freenom's employees. *Id.* ¶¶ 91–92. Freenom is the sole director of ID Shield. *Id.* ¶ 93. Therefore, Freenom completely controls the operations of ID Shield, including all policy and contracting decisions. *Id.* ¶¶ 93–95. Freenom pays all of ID Shield's expenses and collects all revenue from ID Shield's proxy service, as customers purchase and pay for the proxy service directly from Freenom's website. *Id.* ¶¶96–97. Freenom and ID Shield also do not engage in arms-length transactions between each other. *Id.* ¶ 98. For example, the "Freenom ID Shield WHOIS Privacy Service Agreement" specifies that ID Shield's services are offered by ID Shield and Freenom. *Id.* & Ex. 5.

### d) Freenom and Yoursafe aka Bitsafe aka Verotel are alter egos.

Freenom and Yoursafe are alter egos of one another. Again, Defendants have not submitted any competent declarations or evidence to refute the allegations in the SAC relating to Freenom and Yoursafe. Freenom and Yoursafe are both controlled by Zuurbier and Trik. Zuurbier is Freenom's CEO and a director of Yoursafe. SAC ¶ 99. Trik is Freenom's CFO and a director of Yoursafe. *Id.* Yoursafe operates under various trade names, including Bitsafe and Verotel/Verotel Merchant Services B.V. ("Verotel") *Id.* ¶ 100; Fetter Decl. ¶ 9. The directors, officers, and managers of these entities do not independently manage and direct Freenom and Yoursafe (and thus also Bitsafe and Verotel), but rather operate them as a single, integrated company with a unified management system. *Id.* ¶ 107. Freenom and Yoursafe share the same offices, employees, computers, hosting services, and accounts for their mutual online business. *Id.* ¶ 108. Freenom does not engage in arm-length transactions with Yoursafe, including when Freenom registers or sells domain names through Yoursafe. *Id.* ¶ 109. Each time a customer enters an agreement with Yoursafe to register a domain name, that customer enters an agreement with Freenom. *Id.* Freenom and Yoursafe also comingle assets because, when a customer pays for domain name registration and proxy services offered by Yoursafe, the payment is made to Freenom. *Id.* ¶ 110. Defendants merely offer a blanket,

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

conclusory denial of these allegations (Fetter Decl. ¶¶ 7, 8) that does not overcome Plaintiffs' specific factual allegations and evidence. To the extent Defendants challenge these allegations, such conflicts must be resolved in Plaintiffs' favor. *See Ochoa*, 287 F.3d at 1187.

Further, Defendants falsely claim that Yoursafe "has never offered domain name services" (Fetter Decl. ¶ 7), but the evidence, including Yoursafe's current website, shows otherwise. SAC ¶¶ 103–05; Guye Decl. Exs. 11–13, 21 (Verotel website stating: "The #1 Domain Registrar for Adult Entertainment Websites" and stating that Verotel has "tens of thousands of domains under management"). Yoursafe also falsely claims that it and Freenom are "separate and independent from one another" (Fetter Decl. ¶ 7), yet according to Verotel's website, "[t]hrough its affiliation with Freenom, . . . Verotel Domains offers a dedicated registrar platform for adult webmasters . . . for they [*sic*] high risk domain names." SAC ¶ 103. According to its website, Bitsafe is "the new name for Freenom and Verotel, two disruptive brands in the transactional online business space." *Id.* ¶ 104. Finally, Verotel offered ID Shield's services: "At Verotel Domains, all domains automatically come with ID Shield, our free-for-life WHOIS privacy service." *See* Guye Decl. Ex. 21. The facts and pleadings confirm the alter ego relationship of Freenom and Yoursafe.

**e)**    **Freenom, Freedom Registry, Fintag, Cervesia, and JZMS are alter egos**

Despite Defendants' assertions in their MTD, their "payment business" and their "domain name business" are not separate and distinct, as shown by an October 2022 decision issued by the Netherlands Commercial Court in Amsterdam (the "Amsterdam Court"). SAC ¶¶ 65–66 & Ex. 16. These purportedly separate businesses, which include Freenom, Freedom Registry[23], Fintag, Cervesia, and JZMS,[24] comingle assets; fail to keep appropriate corporate records, document financial transactions, timely file financial statements, and maintain arms-length relationships; are controlled by the same individuals; use the same offices; treat the stock of certain companies as interchangeable; share employees (without allocating costs); conceal their ownership through a series of shell companies; use various entities as conduits for each other's business; and manipulate and concentrate assets in certain entities and liabilities in other

---

[23] For the sake of clarity, Freedom Registry here refers to Defendant Freedom Registry B.V.

[24] Freenom and Freedom Registry share a common director, Fintag, which is the majority shareholder of Freedom Registry. *Id.* ¶¶ 22, 64, 77. Zuurbier indirectly owns and controls Fintag because he is the sole owner of both Cervesia and JZMS. Cervesia holds 87.5% of Fintag's shares and was its sole director until October 2022 when JZMS became Fintag's director. *Id.* ¶¶ 23, 32, 64–67, 76 & n.17; Zuurbier Decl. ¶ 13.

Tucker Ellis LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

entities. *Id.* ¶ 63. Defendants have not submitted any competent evidence to refute these allegations.

Fintag, Freedom Registry, Cervesia, and other related companies were found to have a corporate structure that resulted in Zuurbier's control of Fintag. *Id.* ¶ 67. Exemplifying that Freedom Registry and Fintag are one and the same, Zuurbier twice offered for the investor in Freedom Registry to exchange its shares in Freedom Registry for shares in Fintag. *Id.* ¶ 68 & Ex 16 ¶¶ 2.14, 2.21. Defendants also comingled assets and disregarded corporate formalities when Fintag hired Freenom's employees (who had been and continued performing work for Freedom Registry) without passing on these personnel costs. *Id.* Between 2017–2021, Fintag paid $3,125,489 in personnel, travel, and office expenses for Freedom Registry without reimbursement because Freedom Registry could not afford to pay these costs. SAC ¶ 68 & Ex. 16 at ¶¶ 2.18, 3.11–12. Zuurbier explained that he decided to keep personnel costs outside of Freedom Registry as of January 1, 2017, and to have those costs instead paid by Fintag. *Id.* This allowed Freedom Registry to operate at "*break even*," demonstrating that Zuurbier intentionally kept Freedom Registry undercapitalized. *Id.* Indeed, according to Zuurbier, Fintag had to keep funding Freedom Registry's losses and consider whether Fintag would need to buy out the investor's interests in Freedom Registry due to its finances. SAC Ex. 16 at ¶ 2.23. Fintag and Freedom Registry also failed to keep records of all transactions between them. *Id.* at ¶ 69.[25]

The Netherlands Chamber of Commerce records further demonstrate Defendants routinely failed to file corporate returns. *Id.* ¶ 71 n.18. Indeed, Fintag acknowledged that Freedom Registry conducted its affairs improperly by failing to hold shareholder meetings and adopt and file financial statements. *Id.* ¶ 72 & Ex. 18 ¶ 3.2. Further, Fintag had to continue funding Freedom Registry to ensure it could meet payment obligations. *Id.* Seven days after the Amsterdam Court's decision, Zuurbier incorporated JZMS (with Zuurbier as sole shareholder and director), which replaced Cervesia as Fintag's director. SAC ¶ 76. Fintag remains Freenom's director and the majority shareholder and sole director of Freedom Registry, which in turn remains the sole shareholder of Freenom. *Id.* at ¶ 77.

**3.    Maintaining Defendants' separate identities would result in fraud or injustice.**

---

[25] The Amsterdam Court found that the soundness of Freedom Registry's administration was questionable, that valid reasons existed to doubt Freedom Registry's policies and conduct, and that "Freedom Registry's historical and current financial and operational state of affairs . . . cannot be understood at all," causing the court to order an investigation into the company's affairs from 2013 onward. *Id.* ¶¶ 73–74.

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

At the pleading stage, a plaintiff need only "plausibly allege" an inequitable result. *See In re Packaged Seafood Prods. Antitrust Lit.*, 277 F. Supp. 3d 1167, 1188 (S.D. Cal. 2017). "As with all pleadings subject to Rule 8, plaintiffs . . . do not have to plead any magic words." *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. 07-cv-43-MMM-SSx, 2007 WL 4976364, at *8 n.60 (C.D. Cal. Oct. 29, 2007), *aff'd*, 323 Fed. Appx. 571 (9th Cir. 2009) (collecting cases) (internal quotation marks omitted). Thus, Plaintiffs need not specifically plead the words "fraud," "injustice," or "inequitable result," in their complaint to plead facts demonstrating an inequitable result. *See id.* "Inequitable results flowing from the recognition of the corporate form include the frustration of a meritorious claim, perpetuation of a fraud, and the fraudulent avoidance of personal liability." *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *7 (S.D. Cal. Aug. 24, 2010).

Here, observing Defendants' separate "corporate forms" would yield an inequitable result and should be avoided. Defendants are constructed as a complex web of companies, orchestrated by Zuurbier, and designed to conceal which actor is engaging in harmful conduct through Defendants' (1) practice of transferring expired domain names to "Freedom Registry, Inc." and continuing to do so after its corporate charter was revoked and its name was changed (SAC ¶¶ 111, 132–33 & Ex. 18 ¶ 5; Fetter Decl. Ex. A at 6); (2) practice of targeting Fortune 500 Trademarks (SAC ¶¶ 123–125); (3) trafficking in or using domain names identical or confusingly similar to trademarks of third parties (*id.* ¶ 184); (4) offering free registration services that "prove appealing to unscrupulous third parties engaged in abusive registration practices" (*id.* ¶ 185); and (5) continuing to register and traffic in infringing domain names after notice and being named in UDRP complaints[26] (*id.* ¶¶ 187–191), supporting Defendants' scheme to attract cybersquatters and other bad actors to their services. *See Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV, 2007 WL 6862342, at *10 (S.D. Fla. Nov. 21, 2007) (finding registrars "grossly abused their position of trust to the detriment of Plaintiffs' customers and the general public, as well as Plaintiffs and countless other trademark owners"). Moreover, Defendants have been found to operate in a non-transparent manner, comingle assets, and intentionally undercapitalize entities. SAC ¶¶ 65–75. These are the exact circumstances under which the alter ego doctrine should be applied to prevent a culpable

TUCKER ELLIS LLP

Chicago ● Cleveland ● Columbus ● Los Angeles ● San Francisco ● St. Louis

---

[26] UDRP stands for Uniform Domain Name Dispute Resolution Policy. UDRP complaints initiate administrative proceedings brought for resolution of disputes regarding registration of domain names.

defendant from escaping liability for which they are equitably responsible. *See Greenspan v. LADT, LLC*, 191 Cal.App.4th 486, 507 (2010).

### C.   Defendants are subject to specific jurisdiction in California.

As discussed above, if the Court finds it has personal jurisdiction over one Defendant, it has personal jurisdiction over its alter egos, direct participants, and fellow members of the single enterprise. *Ranza*, 793 F.3d at 1072–73 & n.6. Defendants Freenom, ID Shield, and the five ccTLD Service Providers (and thus their alter egos) are subject to specific personal jurisdiction in California based on either their California contacts or, alternatively, their United States contacts as a whole per Rule 4(k)(2).[27] Exercise of specific personal jurisdiction is appropriate when: (1) a defendant purposefully directed its activities or consummated some transaction with the forum or a resident thereof; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. *Harris*, 328 F.3d at 1129. Further, for claims that "arise[] under federal law," serving a summons establishes personal jurisdiction if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2). Absent Defendants stating they are subject to the courts of general jurisdiction in another state, a court can employ Rule 4(k)(2). *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461–62 (9th Cir. 2007). The due process analysis under Rule 4(k)(2) is "nearly identical to traditional personal jurisdiction analysis . . . [but] rather than considering contacts between [the defendant] and the forum state, we consider contacts with the nation as a whole." *Ayla*, 11 F.4th at 979.

When a Rule 12(b)(2) motion is decided without an evidentiary hearing, "the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). If a plaintiff satisfies the first two prongs of this test, the court presumes the exercise of personal jurisdiction is reasonable, and the burden shifts to the defendant to "present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 1500 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (emphasis in original)). In intentional tort cases, the Supreme Court looks specifically to where the defendant directed

---

[27] "Rule 4(k)(2) can be considered even when the plaintiff has affirmatively pled a different basis for personal jurisdiction." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1296 (Fed. Cir. 2012).

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

1   its tortious conduct. *See Calder v. Jones*, 465 U.S. 783 (1984).

2              **1.**      **Defendants purposely directed activities towards the U.S. and California.**

3           Defendants subjected themselves to specific personal jurisdiction in California, or the United

4   States, by registering, using, and trafficking in the Infringing Domain Names. *See* SAC ¶¶ 121–58. The

5   purposeful availment prong[28] of the minimum contacts test requires a "qualitative evaluation of the

6   defendant's contact with the forum state," to determine whether the defendant should reasonably

7   anticipate being haled into court there. *Harris*, 328 F.3d at 1130. Physical contact with the forum is not

8   required. *Id.* The Court's analysis under the "purposeful availment or direction" prong of the specific

9   jurisdiction test depends on the nature of the underlying claims. *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136,

10   1142 (9th Cir. 2017). Courts focus on purposeful direction when claims arise from tortious conduct

11   committed outside the forum. *Id.*; *see also Schwarzenegger*, 374 F.3d at 802–03. Because trademark

12   infringement is treated as a tort for personal jurisdiction purposes, the focus here is on purposeful direction.

13   *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020). Under the *Calder* effects test, "a

14   defendant purposefully directs its activities toward the forum[, or toward the United States for Rule 4(k)(2)

15   purposes,] when the defendant has (1) committed an intentional act, (2) expressly aimed at the forum state,

16   (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Ayla*, 11 F.4th at

17   980. However, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v.*

18   *Fiore*, 571 U.S. 277, 285 (2014).

19           In their MTD, Defendants rely heavily on *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085

20   (9th Cir. 2023) to argue that, "when a defendant's website is the only jurisdictional contact, the court's

21   analysis turns on whether the site had a forum-specific focus or the defendant exhibited an intent to

22   cultivate an audience in the forum." MTD 17:17–20. Defendants' argument misses the mark:

23   (a) Defendants' websites ***do*** have a California and United States focus; and (b) Defendants purposefully

---

25   [28] A plaintiff may establish that an out-of-state defendant "***either*** purposefully availed itself of the

26   privilege of conducting activities in [the forum state], ***or*** purposefully directed its activities toward" the

27   forum. *Schwarzenegger*, 374 F.3d at 802 (emphasis added). The Ninth Circuit further clarified in *Yahoo!*
    *v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006), that the first
    prong "includes ***both*** purposeful availment and purposeful direction" and may be satisfied by either or a

28   combination of the two. While courts "typically" inquire into one set of factors or the other based on the
    type of claims presented, both sets of factors may be used to establish jurisdiction. *Id.*

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

availed themselves through substantial conduct and business dealings in addition to offering a website.

a)    **Defendants' websites target the United States and California.**

Defendants argue that the market for the Freenom entities is global, declaring that California users make up less than 0.4% of Freenom's total user base and that U.S. users represent less than 3.6%. MTD 17:24–27; Zuurbier Decl. ¶ 10. Defendants assert Freenom has registered 50 million domain names over the last 20 years. MTD 9:8–10; Zuurbier Decl. ¶ 3. Simple extrapolation indicates that Freenom has over the last 20 years registered over 200,000 domain names to California users and over 1.8 million domain names for U.S. users, figures sufficient to support express aiming at the forum because "[t]he outcome of the express-aiming inquiry does not depend on the number of sales made to customers in the forum." *See Herbal Brands*, 72 F.4th at 1095 (discussing sales of physical products over the internet). The Ninth Circuit explained, "[i]f one sale were not enough to establish that a defendant expressly aimed its conduct at a forum, we would face the difficult question of how many sales would suffice." *Id.* "The same challenges would exist if we were to attempt to craft a rule based on sales to the forum as a percentage of a defendant's total sales." *Id.* Thus, Defendants' purportedly small California and U.S. user base does not cut against personal jurisdiction. To the contrary, almost two million domain name registrations show that Defendants have successfully cultivated U.S. and California customers.[29]

Further, even absent evidence indicating that a defendant sold its service to Americans, other conduct involving a website can show that Defendants did aim their conduct at the United States and California. *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co., Ltd*, No. 19-cv-01167-JST (AGT), 2021 WL 5707741, at *4 (N.D. Cal. Oct. 21, 2021), *R.&R. adopted*, 2021 WL 5707740 (N.D. Cal. Nov. 16, 2021). In *9 Xiu*, the defendant sold inauthentic social media accounts that—much like the domain names here—were used for scams, spam, phishing, and misinformation campaigns. *Id.* at *1, 4. Even though defendants' websites were in Chinese and there was no evidence of U.S.-based sales, website traffic, or targeted advertising, the court found the defendants targeted the United States because defendants' websites promoted the sale of a high concentrations of accounts tied to the United States and offered English-only ghostwriting services for those accounts. *Id.* The court found these services could

---

[29] Defendants' LinkedIn pages state they have offices in California (and thus target such consumers). Guye Decl. Exs. 15–16.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

appeal to those who wanted to direct scams toward United States internet users and, when taken in the light most favorable to the plaintiffs, *see Ayla*, 11 F.4th at 983, constituted evidence suggesting defendants sought to capitalize on an interest in targeting scams and misinformation campaigns directed at the United States, thus constituting express aiming. *9 Xiu*, 2021 WL 5707741, at *4.

Here, Freenom's revenue-generating parking pages are in English. SAC ¶¶ 152–58 & Ex. 11. Freenom's, ID Shield's, and the ccTLD Service Providers' respective websites are also in English, as is each of the contracts into which these Defendants enter with their customers. *Id.* ¶¶ 85–86 & Exs. 6, 13. They also sell services through these websites in U.S. dollars. *Id.* They have sold, at a premium price, infringing domain names containing famous U.S. brands, *i.e.*, Fortune 500 trademarks, which indicates an intent to target their scheme at the United States, or at least to facilitate the Doe Defendants in targeting their phishing scams at the U.S. *Id.* ¶¶ 121–25. Moreover, the websites used for phishing scams mimicking legitimate Facebook, Instagram, and WhatsApp pages often are in English. *Id.* ¶¶ 144–49 & Ex. 10.

Further, in June 2015, ICANN suspended Freenom's ability to create new domain names for ninety days because Freenom "engaged in a pattern and practice of trafficking in or use of domain names identical or confusingly similar to a trademark or service mark of a third party in which the Registered Name Holder has no rights or legitimate interest." SAC ¶ 184. In a 2015 arbitration proceeding between ICANN and Freenom conducted in California regarding this suspension, Freenom admitted that its free registration services "prove appealing to unscrupulous third parties engaged in abusive registration practices." *Id.* ¶ 185. In September 2023, ICANN issued another breach notice to Freenom, noting that Freenom "continues to exhibit the same pattern of conduct that led to the Notices of Breach issued against it by ICANN" in November 2017 and February 2020. Guye Decl. Ex. 22. All these facts show that the services offered via these websites, like those in *9 Xiu*, appeal to those who wish to target scams, including phishing scams, at the United States, which "constitue[s] evidence suggesting the defendants sought to capitalize on an interest in targeting scams . . . to the United States, thus constituting express aiming." *9 Xiu*, 2021 WL 5707741, at *4. As for the last "purposeful direction" element, "not only did the defendants aim their conduct at the United States, but they also caused harm that they knew was likely to be suffered in the United States. Scams and misinformation campaigns are detrimental to social intercourse, and defendants knowingly assisted in directing such schemes at the United States" and at California. *Id.* Thus, Defendants

purposefully directed their conduct at the United States, thus giving rise to personal jurisdiction over them.

b)     **Defendants purposefully availed themselves of the forum.**

Here, in addition to having purposefully directed their unlawful conduct at California and at the United States, Defendants purposely availed themselves of California as a forum and the U.S. in general by utilizing California- and U.S.-based instrumentalities to further their cybersquatting scheme. First, Defendants Yoursafe and Freenom purport to offer their respective services through their offices in California and have thus purposefully availed themselves of the forum. Guye Decl. Exs. 15–16.

Second, a significant part of Defendants' scheme involves monetizing (*i.e.*, using) domain names, including the Infringing Domain Names, by redirecting traffic of expired, cancelled, or inactive "parked" domain names, after Defendants take control of these domain names for their own use, often transferring them to California-based "Freedom Registry, Inc." (*i.e.*, VTL), before using them to generate advertising revenue. SAC ¶¶ 150–52. This scheme includes redirecting internet users from the Infringing Domain Names to a revenue-generating parking page hosted at freenom.link, which Defendants registered through Porkbun, LLC, a U.S.-based registrar. *Id.* ¶¶ 153–55. Defendants host freenom.link on a server provided by U.S.-based Bodis, LLC, whose terms of service are governed by Florida law. *Id.* ¶¶ 156–158 & Ex. 11.

Third, Defendants avail themselves of California and the U.S. by utilizing "Freedom Registry, Inc." as an instrumentality to transfer registration of expired or cancelled domain names that are then used by Defendants to cybersquat on Plaintiffs' trademarks and profit in bad faith by diverting internet traffic to revenue generating parking pages. *See Burger King*, 471 U.S. at 479 (noting "franchise dispute grew directly out of 'a contract which had a *substantial* connection with'" the forum state). This was a knowing and intentional act directed at the forum by Defendants. Defendants and the Doe Defendants also purposefully directed their tortious conduct towards California by registering, trafficking in, and using the Infringing Domain Names as part of an intentional cybersquatting scheme aimed at Plaintiffs that caused foreseeable injury in California. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156–57 (explaining that while merely registering a domain name that contains a trademark does not create personal jurisdiction, doing so as part of a cybersquatting scheme that harms a plaintiff does) (citing *Panavision Int'l, L.P. v.*

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

*Toeppen*, 141 F.3d 1316 1318–19, 1322 (9th Cir. 1998)[30] (holding cybersquatting scheme constituted aiming acts at plaintiff in California, causing injury there because the defendant registered domain names *for the purpose of* extorting money from plaintiff); *see also Burger King*, 471 U.S. at 480 (continued use of trademarks after termination of franchise agreement "caused foreseeable injuries to the corporation in Florida"). Here, Defendants expressly registered, trafficked in, and used the Infringing Domain Names to profit from Plaintiffs' trademarks, and in many instances, they either registered those domain names to VTL, a California entity, or they redirected the domain names to parking pages provided by a U.S. service provider. As alter egos, Defendants are each liable for the tortious conduct of the other Defendants, and this conduct should also be attributed to all for personal jurisdiction purposes.

### 2.   Plaintiffs' claims arise from Defendants' forum-related activity.

The Ninth Circuit uses a "but for" test to determine whether claims arise from the out-of-state defendant's forum contacts. *Harris*, 328 F.3d at 1131–32. This test asks: "but for" the defendant's contacts with the forum, would the plaintiff's claims against the defendant have arisen? *See Ballard*, 65 F.3d at 1500. In other words, is the lawsuit asking the defendant to account for actions it directed towards the forum? *See Burger King*, 471 U.S. at 473–74. Here, VTL is based in California, became the registrant of Infringing Domain Names, and used those domain names to host or direct the public to revenue-generating parking pages, which form part of the basis of Plaintiffs' action. Further, the scams Defendants facilitate and profit from, including the Doe Defendants' phishing scams, could not target California or the United States but for the Defendants' actions in registering and trafficking in the Infringing Domain Names, thus satisfying this requirement. *See 9 Xiu*, 2021 WL 57807741, at *4.

### 3.   Exercising personal jurisdiction over Defendants is reasonable.

Because Defendants directed tortious conduct towards California and Plaintiffs' lawsuit arises out of that tortious conduct, Defendants may only avoid specific personal jurisdiction if they can demonstrate a *compelling case* that some other considerations would render jurisdiction unreasonable. *Ballard*, 65 F.3d at 1500. Courts analyzing this prong look to seven factors in weighing reasonableness: "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of

---

[30] Significantly, *Panavision* was decided in 1998, the year before the ACPA was enacted, but still held personal jurisdiction existed over the defendant for acts of trademark dilution. *Id.* at 1327.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

TUCKER ELLIS LLP
Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum." *Harris*, 328 F.3d at 1132. Defendants have failed to carry their burden to show this is an extraordinary case where personal jurisdiction would be unreasonable.

*First*, Defendants have intentionally interjected themselves into California's affairs by utilizing their California-based alter ego, VTL, to act as the registrant for domain names in connection with monetizing their domain name business. And Defendants admit VTL exists to provide "financial support services to Yoursafe merchants (customer support services) and cardholders (end-user support services) in the United States." MTD 11:12–14. Thus, VTL exists to provide U.S.-based services, and Defendants operate VTL in California. Further, Defendants have expressly targeted their cybersquatting scheme at the United States while facilitating the Does Defendants' targeting phishing scams at the United States.

*Second*, Defendants do not face any "unique burdens" litigating this case in California. MTD 19:11–14 (quoting *Asahi Metal Indus. Co., Ltd. v. Sup. Ct.*, 480 U.S. 102 (1987)). Despite most of the Defendants being based in the Netherlands, their business and conduct at issue involve providing internet-based services to five foreign countries located in Africa and the South Pacific. Defendants cite cases from 1945, 1987, and 1993, addressing the burden of litigating in a "faraway and inconvenient forum" (MTD 19:11–18), but the Ninth Circuit recognized thirty-five years ago that "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Sinatra v. Nat'l Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988). Given Defendants' international internet business, which includes operating Freenom, VTL, Yoursafe, and other companies located in or with offices in the United States from the Netherlands, Defendants cannot credibly contend that litigating in California is unduly burdensome. Guye Decl. Exs. 15, 20. Indeed, in 2015, Freenom *initiated* arbitration proceedings against ICANN in California using its same counsel as in this case. SAC ¶¶ 36 & n.11, 130, 132, 184–85 & Exs. 17 & 18. Similarly, in 2014, Yoursafe/Verotel used the same counsel when it filed a lawsuit in Los Angeles Superior Court because it allegedly has "a large customer footprint in that area." Guye Decl. ¶ 24 & Ex. 23. *See Autodesk, Inc. v. Kobayashi + Zedda Architects Ltd.*, 191 F. Supp. 3d 1007, 1019 (N.D. Cal. 2016) (rejecting claim of burden where defendant had secured California counsel).

*Third*, Defendants do not argue that litigating this dispute in California would conflict with the sovereignty of the Netherlands; rather, they merely assert the case concerns Defendants' "conduct in the Netherlands" and that Freenom's contracts with its users contain Dutch forum selection clauses. MTD 20:3–8. Defendants, however, directed conduct towards California, causing harm to California residents in California. Moreover, Freenom also has contracted with ICANN and others to litigate disputes in California under California law in certain circumstances. SAC ¶ 36. Freenom's consent to a California forum and California law negates any argument regarding a conflict or strain of diplomatic relations.

*Fourth*, and contrary to Defendants' assertions (MTD 20:7–8), California has a strong interest in litigating this dispute, which involves tortious conduct by foreign Defendants directed at companies and consumers based in California and application of its unique Anti-Phishing Statute. "California maintains a strong interest in providing an effective means of redress for its residents who are tortiously injured." *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1489 (9th Cir. 1993), *holding modified by Yahoo! Inc.*, 433 F.3d 1199.

*Fifth*, Defendants do not establish the Netherlands would be a more efficient forum than California. Plaintiffs are all based in California, as is Defendant VTL. Further, the individual who controls all Defendants, Zuurbier, has represented to the State of Delaware in connection with the incorporation of Freedom Registry, Inc. that he maintains an office in Palo Alto, California. Fetter Decl. Ex. A at 3–6. According to Defendants' LinkedIn pages, Yoursafe and Freenom also have offices in California, and a press release states that Freenom has an office in Palo Alto—all despite Defendants' allegations to the contrary. Guye Decl. ¶¶ 16–17 & Exs. 15–16.[31]

*Sixth*, litigating a dispute involving four California companies (Meta, Instagram, WhatsApp, and VTL) in California serves Plaintiffs' interests in convenient, effective relief.

*Seventh*, while Defendants identify the Netherlands as an alternative forum, there is no certainty that a Dutch Court would adequately interpret and apply U.S. laws like the ACPA, the Lanham Act, or

---

[31] In addition, Defendants' counsel falsely assert in their MTD that Plaintiffs would seek to compel Netherlands-based witnesses to travel to the United States for deposition. MTD 19:25–20:2 & Dahlberg Decl. ¶ 2. To the contrary, Plaintiffs' counsel stated that they did not want to take depositions by video conference and that they would let the Court decide whether counsel should travel to Europe or witnesses should travel to the United States for deposition. Declaration of Howard A. Kroll ¶ 2.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Los Angeles ♦ San Francisco ♦ St. Louis

California's Anti-Phishing Statute. Defendants do not show that a Dutch Court would apply U.S. law at all since they did not put forth any evidence that the Netherlands has equivalent anti-cybersquatting laws. While the Netherlands may be an alternative forum, Defendants do not explain why it is more appropriate.

On the whole, this is not an exceptional case where exercising specific personal jurisdiction over Defendants based on their purposeful direction of activity towards the forum would be unreasonable. Accordingly, Defendants are subject to specific personal jurisdiction in this case based on their conduct that gave rise to Plaintiffs' claims.

## V. IF THE COURT GRANTS DEFENDANTS' MOTION, PLAINTIFFS SHOULD BE PERMITTED JURISDICTIONAL DISCOVERY AND LEAVE TO AMEND.

If this Court is not satisfied personal jurisdiction exists over Defendants, it should permit Plaintiffs to conduct limited jurisdictional discovery. *See Cadence Design Sys., Inc. v. Syntronic AB*, No. 21-CV-03610-SI, 2021 WL 4222040, at *7 (N.D. Cal. Sept. 16, 2021) (permitting jurisdictional discovery on alter ego and general personal jurisdiction). Specifically, Plaintiffs would seek discovery regarding Defendants' corporate structure, recordkeeping, formalities, and finances, as well as domain name registration records to show either that Defendants are alter egos of California-based VTL or have expressly aimed their tortious conduct at the forum, or both.

## VI. CONCLUSION.

Between the uncontroverted allegations in the SAC and the evidence submitted, Plaintiffs have more than carried their burden to make a prima facie showing of persona jurisdiction, and this Court should therefore deny Defendants' Rule 12(b)(2) Motion to Dismiss. As alter egos of California-based VTL under a single enterprise theory, all Defendants are subject to general personal jurisdiction in California. Defendants are also subject to specific personal jurisdiction in California because they purposefully directed harmful conduct towards California, causing foreseeable harm to California-based companies and consumers in California. Alternatively, Defendants are subject to this Court's jurisdiction under Fed. R. Civ. P. 4(k)(2). If the Court is not satisfied Plaintiffs have stated a prima facie case for personal jurisdiction, Plaintiffs should be permitted limited jurisdictional discovery and granted leave to amend to add additional allegations as bases for exercising personal jurisdiction over Defendants.

DATED: October 23, 2023                    Tucker Ellis LLP

By:  /s/ David J. Steele
David J. Steele
Howard A. Kroll
Steven E. Lauridsen
Dina Roumiantseva

Attorneys for Plaintiffs,
META PLATFORMS, INC.,
INSTAGRAM, LLC, and WHATSAPP LLC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION UNDER RULE 12(b)(2)
Case No. 3:22-cv-07768-AMO